1    Craig K. Perry
     Nevada Bar # 003786
2    CRAIG K. PERRY & ASSOCIATES
     8010 W. Sahara Avenue, Suite 260
3    Las Vegas, Nevada 89117
     (702) 228-4777
4    (702) 943-7520 Fax
     cperry@craigperry.com

5    *Attorney for Plaintiff*

6            IN THE UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA
7

8    KIRBY SPENCER,                          Case No. 2:14-CV-01136-RFB-PAL

9                      Plaintiff,

10   v.                                      **PLAINTIFF'S RESPONSE IN
                                             OPPOSITION TO DEFENDANT'S
11                                           MOTION FOR SUMMARY
                                             JUDGMENT**
12   AT&T DIGITAL LIFE, INC.,

13                    Defendant.             Hon. Richard F. Boulware, II

14                                           Magistrate Judge Peggy A. Leen

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.      **INTRODUCTION**................................................................................................1

II.    **FACTUAL BACKGROUND** .............................................................................4

      **A.**    Plaintiff received more than 2,000 unsolicited text messages from Defendant in just two months despite repeated cease and desist requests ............................4

      **B.**    Plaintiff only filed this lawsuit after demanding on four separate occasions that Defendant cease sending him the unauthorized text messages........................6

      **C.**    The text messages received by Plaintiff were purely informational notification text messages sent by Defendant's AT&T Digital Life home monitoring system .......................................................................................................6

      **D.**    Once a customer consents to receive text message notifications from Defendant's home monitoring system, every text message sent by Defendant is automatically generated and sent without human intervention .........7

III.   **LEGAL STANDARD**.........................................................................................9

IV.   **ARGUMENT** .....................................................................................................10

      **A.**    The text messages Defendant sent to Plaintiff's cell phone do not fall within the TCPA's "emergency" exception .......................................................10

          1.   *The text messages received by Plaintiff were not necessary or related to any emergency situation involving health and safety* .....................................10

          2.   *The TCPA's emergency exception was not meant to apply to purely informational notifications such as the ones received by Plaintiff* .................13

          3.   *The TCPA was not created solely to prevent automated telemarketing messages* ..........................................................................................14

      **B.**    Defendant sent the text messages to Plaintiff using an Automatic Telephone Dialing System...............................................................................17

          1.   *An ATDS is defined by its ability to dial numbers without human intervention* ........................................................................................17

          2.   *The FCC's definition of an ATDS as equipment that dials without human intervention has been applied in a number of recent TCPA rulings involving unauthorized text messages*..............................................................20

3. *Defendant's Digital Life home monitoring system dialed Plaintiff's cellular telephone number without any human intervention when it sent him the text message notifications at issue* ......................................................21

    i.    The fact that one of Defendant's customers had to program the system to send the text messages at issue does not constitute "human intervention" ...............................................................................23

    ii.    The text message notifications received by Plaintiff were sent as a result of an electronic sensor sending a signal to Defendant's home monitoring system....................................................................................26

**V.**    **CONCLUSION** ..............................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**United States Supreme Court Cases:**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................................9, 10

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)........................................................................................9

*Chevron v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984)......................................................................................20

*City of Arlington v. F.C.C.,*
    133 S. Ct. 1863 (2013)..................................................................................20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)........................................................................................9

**United States Circuit Court of Appeals Cases:**

*Apple Valley Bldg. & Development Co. v. Bonanza Air Lines, Inc.,*
    423 F.2d 661 (9th Cir. 1970) ..........................................................................9

*Meyer v. Portfolio Recovery Assocs., LLC,*
    707 F.3d 1036 (9th Cir. 2012) ........................................................................1

*Satterfield v. Simon & Schuster, Inc.,*
    569 F.3d 946 (9th Cir. 2009) ..............................................................1, 9, 20

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors As'n,*
    809 F.2d 626 (9th Cir.1987) ...........................................................................9

*US West Commc'ns, Inc. v. Jennings,*
    304 F.3d 950 (9th Cir. 2002) ........................................................................20

**United States District Court Cases:**

*Agne v. Papa John's Int'l, Inc.,*
    286 F.R.D. 559 (W.D. Wash. 2012) ..............................................................26

*Bates v. Dollar Loan Center, LLC,*
    No. 13-cv-1731, 2014 WL 60472 (D. Nev. Jan. 7, 2014) ..............................9

*Carlson v. Nevada Eye Care Professionals,*
    No. 13-cv-00364, 2013 WL 2319143 (D. Nev. May 28, 2013) ....................9

*Charkchyan v. EZ Capital, Inc.*,
No. 14-cv-03564, 2015 WL 3660315 (C.D. Cal. June 11, 2015)...........................................26

*Fields v. Mobile Messengers Am., Inc.*,
No. 12-cv-05160, 2013 WL 6774076 (N.D. Cal. Dec. 23, 2013)..........................................20

*Glauser v. GroupMe, Inc.*,
No. 11-cv-2584, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015).......................................21, 25, 28

*Gragg v. Orange Cab Co.*,
995 F.Supp.2d 1189 (W.D. Wash. 2014)...........................................................24, 28

*Harnish v. Frankly Co.*,
No. 14-cv-02321, 2015 WL 1064442 (N.D. Cal. Mar. 11, 2015) .....................................20–21

*Heinrichs v. Wells Fargo Bank, N.A.*,
No. 13-cv-05434, 2014 WL 985558 (N.D. Cal. Mar. 7, 2014) ...........................................1

*Hernandez v. Collection Bureau of Am., Ltd.*,
No. 13-cv-01626, 2014 WL 4922379 (C.D. Cal. Apr. 16, 2014) .........................................20

*Johnson v. Yahoo!, Inc.*,
No. 14-cv-2028, 2014 WL 7005102 (N.D. Ill. Dec. 11, 2014)...........................................23

*Kazemi v. Payless Shoesource Inc.*,
No. 09-cv-5142, 2010 WL 963225 (N.D. Cal. Mar. 16, 2010) ..........................................26

*Kramer v. Autobytel*,
759 F.Supp.2d 1165 (N.D. Cal. 2010) ...............................................................26

*Lamont v. Furniture N., LLC*,
No. 14-cv-036, 2014 WL 1453750 (D.N.H. Apr. 15, 2014) ............................................16

*McKenna v. WhisperText*,
No. 14-cv-00424, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015)........................................24, 25

*Nunes v. Twitter, Inc.*,
No. 14-cv-02843, 2014 WL 6708465 (N.D. Cal. Nov. 26, 2014) .......................................20

*Pimental v. Google Inc.*,
No. 11-cv-02585, 2012 WL 691784 (N.D. Cal. Mar. 2, 2012) .........................................26

*Robbins v. Coca-Cola-Co.*,
No. 13-cv-132, 2013 WL 2252646 (S.D. Cal. May 22, 2013) .........................................26

*Sherman v. Yahoo! Inc.*,
997 F. Supp. 2d 1129 (S.D. Cal. 2014)...............................................................16

*Sterk v. Path, Inc.*,
No. 13-cv-2330, 2014 WL 2443785 (N.D. Ill. May 30, 2014)...........................................20

Vote v. U.S.,
753 F. Supp. 866 (D. Nev. 1990) ...................................................................... 10

*Webb v. Healthcare Revenue Recovery Grp. LLC*,
No. 13-cv-00737, 2014 WL 325132 (N.D. Cal. Jan. 29, 2014) ................................. 1

## Statutes and Court Rules:

Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ................................. *passim*

47 C.F.R. § 64.1200, *et seq.* ......................................................................... 10

28 U.S.C. § 2341 ......................................................................................... 20

47 U.S.C. § 402 .......................................................................................... 20

## Miscellaneous:

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, FCC Report and Order, CC Dkt. No. 92-90* (Oct. 16, 1992) ...................................... 13

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, FCC Report and Order, CG Docket No. 02-278* (July 3, 2003) ................ 3, 17–18, 21

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, FCC Declaratory Ruling, CG Dkt. No. 02-278* (Jan. 4, 2008) .................................... 18

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order, CG Dkt. No. 02-278* (Feb. 15, 2012) ........................ 13, 14, 15–16

*In the Matter of Implementation of the Middle Class Tax Relief and Job Creation Act of 2012, Report and Order, CG Dkt. No. 12-129* (Oct. 17, 2012) ................................................. 18–19

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, FCC Declaratory Ruling, CG Dkt. No. 02-278* (Nov. 29, 2012) ................................. 19

1

## I.   INTRODUCTION

2          In a desperate attempt to distract the Court from the undisputed facts of this case,

3   Defendant AT&T Digital Life, Inc. ("AT&T" or "Defendant") raises a plethora of different

4   arguments in its Motion for Summary Judgment (Dkt. 35) in the hope that one of them will

5   stick.  However, more important than the meritless legal arguments Defendant tries to make

6   are the undisputed facts in this case that Defendant either attempts to gloss over or else

7   conveniently ignores altogether.   It is undisputed that Defendant sent over 2,000 text

8   messages to Plaintiff's cellular telephone.  It is also undisputed that Plaintiff was never one

9   of Defendant's customers and never authorized Defendant to send such text messages to his

10  cell phone.  Further, it is undisputed that Plaintiff reached out to Defendant on four separate

11  occasions – both by phone and in writing – in an attempt to stop Defendant from sending any

12  more messages before filing this suit.  Nor is it disputed that, despite the repeated cease and

13  desist requests, Defendant kept sending Plaintiff text messages for over two months,

14  sometimes sending more than *forty* text messages in a single day.   While Defendant does its

15  best to muddy the waters and smear Plaintiff's character, the factual basis for Plaintiff's

16  claim is irrefutable.

17          Plaintiff brought this suit against Defendant for violating 47 U.S.C. §

18  227(b)(1)(A)(iii) of the Telephone Consumer Protection Act ("TCPA").    Under Section

19  227(b)(1)(A)(iii), an entity violates the TCPA when it: (1) calls a cellular telephone number;

20  (2) using an automatic telephone dialing system ("ATDS"); (3) without the recipient's prior

21  express consent.  *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir.

22  2012) (citing 47 U.S.C. § 227 (b)(1)).[1]  There is no argument here that elements (1) and (3)

23  are satisfied: Defendant called Plaintiff's cellular telephone number when it sent the text

24  messages at issue[2] and Plaintiff never provided prior express consent to receive the text

25  ---

[1] Although lack of consent is not in dispute in this case, the existence of consent is actually
26  an affirmative defense under the TCPA.  *Heinrichs v. Wells Fargo Bank, N.A.*, No. 13-cv-
05434, 2014 WL 985558, at *3 (N.D. Cal. Mar. 7, 2014); *Webb v. Healthcare Revenue
27  Recovery Grp. LLC*, No. 13-cv-00737, 2014 WL 325132, at *4 (N.D. Cal. Jan. 29, 2014).
[2] The Ninth Circuit has ruled that text messages constitute calls under the TCPA.  *Satterfield*
28  *v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009).

1  messages.  The only questions left to resolve are whether Defendant can extend the TCPA's

2  exception for calls made for "emergency purposes" to the text message notifications that

3  Plaintiff received and whether the text messages were made using an ATDS

4         Defendant's first argument is that the TCPA does not even apply to the over 2,000

5  messages it sent Plaintiff because the messages were necessary to inform the intended

6  recipient of true "emergencies" and, as such, are exempt under the TCPA.  But despite

7  Defendant's efforts to label the text messages at issue as "alerts," "warnings," and "Life

8  Safety Services" (Def. Mot. at 12), the fact of the matter is that the text messages that

9  Defendant sent Plaintiff were simply notifications of such information as "front door opened"

10  and "kitchen door opened"—all without any actual triggering of the customer's home alarm.

11  As further explained below, when these text messages were automatically sent by

12  Defendant's Digital Life home monitoring system, the system did not call the police, did not

13  trigger an alarm to sound, nor do anything else that would indicate that the notifications were

14  actually related to some kind of emergency situation.   These text messages were sent

15  regardless of whether the alarm system was "armed" or "un-armed," and regardless of *why* a

16  particular sensor was activated.   Particularly fatal to Defendant's claim that these were

17  "emergency" messages is the fact that Defendant's security system had an entirely *separate*

18  process in place for contacting the local police department and notifying Defendant's

19  monitoring service in case of an *actual* emergency situation.   The TCPA's emergency

20  exception was only meant to apply to automated calls that were "necessary" in a situation

21  affecting an individual's health or safety, such as emergency alerts about severe weather or

22  power outages.  Sending more than forty informational text messages a day that a kitchen

23  door was opened is far beyond the scope of emergency calls related to actual life threatening

24  situations to which the exception was meant to apply.

25         Defendant's argument that it did not utilize an ATDS to send the messages to Plaintiff

26  is also without any merit, as it requires the Court to flatly reject the FCC's interpretation of

27  an ATDS.  While Defendant argues that an ATDS is strictly limited to "equipment which has

28  the capacity (A) to store or produce telephone numbers to be called, using a random or

sequential number generator; and (B) to dial such numbers" (Def. Mot. at 15), in its 2003 Report and Order the FCC specifically stated that an ATDS is defined by its "*capacity* to dial numbers without human intervention."[3]  Furthermore, a number of district courts within the Ninth Circuit have explicitly rejected Defendant's argument and found that the definition of an ATDS as stated in the FCC 2003 Order – and reiterated by the FCC in a number of subsequent decisions – applies in situations involving unauthorized text messages sent to cellular telephones.

Acknowledging that a number of courts have accepted the "without human intervention" definition of an ATDS set forth by the FCC, Defendant next argues that its system was not an ATDS because the text messages it sent to Plaintiff were sent *with* human intervention.  Defendant's first argument on this point – that there was human intervention because an individual has to provide the system with his cell phone number and choose which automated notifications he receives – confuses the issue of human intervention with that of <u>consent</u>.  Because <u>every</u> phone call made through an ATDS necessarily requires at least some human intervention – at some point, a person must have inputted the phone numbers to be dialed and/or programmed the system to place certain calls – Defendant's interpretation of "human intervention" would effectively eliminate the TCPA.  Furthermore, Defendant's argument is unsupported by the existing case law on the issue which establishes that a defendant can avoid liability only if there was human intervention in the process of sending *each* particular message.  As discussed below, and in direct contrast to the cases cited to for support by Defendant, Defendant's own expert witness testified that once a customer initially opts in to receive text message notifications, the system will automatically generate and send an infinite number of text messages without any human involvement in the process of creating, directing, and sending any of them.

---

[3] *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, FCC Report and Order, CG Docket No. 02-278*, at ¶ 132 (July 3, 2003) (hereinafter "FCC 2003 Order," relevant excerpts of which are attached hereto as <u>Exhibit A</u>") (emphasis in original).  All exhibits referenced herein are attached as exhibits to the Declaration of Evan M. Meyers, filed contemporaneously herewith.

Defendant's second argument on the human intervention point – that there was human intervention because the sensors that trigger the text message are activated due to human activity – is an even more desperate attempt to confuse the issue.  Unlike the cases cited to by Defendant, the event that caused the text message notifications to be sent was a sensor detecting what it was programmed to recognize as a door opening.  An individual pushing a door open, which results in a sensor detecting the event and notifying Defendant's system to send a notification, is in no way comparable to an individual typing up a text message and directly ordering the text message system to send it.

Desperate legal arguments aside, Defendant ultimately cannot change the facts of this case and the testimony of its own expert witness which establish that the system at issue here was an ATDS that sent thousands of unauthorized automated text messages to Plaintiff's cellular telephone without human intervention.   Accordingly, Defendant's Motion for Summary Judgment should be denied.

## II.    FACTUAL BACKGROUND

A.    Plaintiff received more than 2,000 unsolicited text messages from Defendant in just two months despite repeated cease and desist requests.

On May 31, 2014, Plaintiff activated a new phone that he had recently purchased. (Deposition of Kirby Spencer, relevant excerpts of which are attached as Exhibit B, at 82:18–20.)  Almost immediately after activating the phone Plaintiff began to receive a constant stream of text messages from a single specific phone number known as a "short code" registered to Defendant.  (Tracfone Log at 42.)[4]  One of the first text messages Plaintiff received was the following:

AT&T Digital Life
Front door opened on 5/31/14 at 2:26 PM.
Go to https://my-digitallife.att.com for more info.[5]

Plaintiff received eight more text messages from Defendant on that first day alone.  (Ex. C at 42.)

----

[4] The TracFone log showing all cellular phone activity for Plaintiff's phone during the relevant time period is attached hereto as Exhibit C.

[5] A screenshot of the May 31, 2014 message is attached here to as Exhibit D.

Plaintiff was never a customer of Defendant and never gave permission for Defendant to send any text messages to his cellular telephone. (Ex. B at 89:4–7, 99:2–14; Pl's June 27, 2014 letter to Defendant at 1.[6]) Given the annoyance of receiving countless unwanted text messages that he had never authorized or signed up for, on June 2, 2015, just two days after receiving the first round of text messages, Plaintiff called Defendant's customer service department in an attempt to get the messages to stop. (Ex. B at 85:6–23.) Plaintiff talked to one of Defendant's customer service representatives and requested that Defendant stop sending text messages to his cellular telephone. (*Id.* at 89:4–7.) Despite the reassurances of the representative that the text messages would be stopped (*Id.* at 89:10–15), Plaintiff received over two hundred additional text messages just by the end of that week alone. (Ex. C at 39–42.) On June 10, 2014, Plaintiff sent a letter to AT&T's corporate headquarters in Dallas asking for Defendant to "cease and desist sending text messages."[7] Despite providing his cellular telephone number and his email address, Plaintiff never received a response to his letter.

Frustrated with receiving countless text messages from Defendant every time a door was opened somewhere, and having received no response to his phone call or letter, about one week after sending the letter Plaintiff placed another phone call to Defendant's customer service center. (Ex. B at 92:14–19.) Plaintiff informed Defendant's representative that he had previously called about receiving the unauthorized text messages and that he was still receiving them. (*Id.* at 93:17–25.) Despite his third attempt to stop the text messages, Plaintiff continued to receive hundreds of text messages a week. (*See, e.g.*, Ex. C at 16–23.) In early July 2015, Plaintiff attempted for a fourth time to stop Defendant from sending text messages to his cell phone by yet again calling Defendant's customer service center. (Ex. B at 97:24–98:6.) While Plaintiff expressed his frustration with Defendant's inability to stop the text messages, the representative informed Plaintiff that there was nothing she could do to stop them. (*Id.* at 99:2–14, 99:22–24.)

[6] Plaintiff's June 27, 2014 letter to Defendant is attached hereto as Exhibit E.
[7] Plaintiff's June 10, 2014 cease and desist letter to Defendant is attached hereto as Exhibit F.

On July 10, 2014, after receiving well over 1,450 text messages from Defendant, Plaintiff filed this suit for violations of the TCPA. (Ex. C at 12–42; Dkt. 1.) Even though Defendant was served with the Complaint on July 18, 2014, Defendant continued to send text messages to Plaintiff until July 30, 2014. (Ex. C at 1.) By July 30, 2014 – over two months after Plaintiff first requested for Defendant to stop sending the messages – Defendant received a total of over 2,000 text messages before Defendant finally stopped sending messages to Plaintiff. (Ex. C at 1–42; Def. Opp. to Pl's. Mot. for Leave to Amend, Dkt. 27, at 5.)

B.   <u>Plaintiff only filed this lawsuit after demanding on four separate occasions that Defendant cease sending him the unauthorized text messages.</u>

While Defendant seems to suggest that Plaintiff's lawsuit is manufactured and resorts to attacking Plaintiff's character, Plaintiff operated a real estate investing business in which he earned a sizeable income in 2014, and he testified that he purchased the phone for use in his business of buying, renovating, and marketing real-estate properties. (Ex. B at 65:12–66:25, 154:5–9, 154:25–155:22.) In addition, Plaintiff actually had to pay out-of-pocket expenses as a result of the unauthorized text messages received from Defendant. (*Id.* at 117:12–16.) Finally, and flying in the face of Defendant's argument that Plaintiff somehow "manufactured" this lawsuit, Plaintiff reached out to Defendant to request that the messages stop on four separate occasions *before* he asked for any monetary compensation—including placing a phone call just two days after receiving the first text message notification. (Ex. B at 85:6–23, 92:14–19, 97:24–98:6; Ex. F.)

C.   <u>The text messages received by Plaintiff were purely informational notification text messages sent by Defendant's AT&T Digital Life home monitoring system.</u>

All of the unauthorized text messages received by Plaintiff were sent by an AT&T Digital Life home monitoring system installed and operated by Defendant in one of its customer's homes. (Deposition of Homi Torab, Defendant's designated rebuttal expert,

1   relevant excerpts of which are attached hereto as <u>Exhibit G</u>, at 24:7–19, 51:13–17, 69:2–14.)

2   The text messages that Defendant sent to Plaintiff stated simply that either a "front door

3   opened" or that a "kitchen door opened." (Def. Ex. 5, Dkt. 35-3, at 7–12; Ex. B at 133:22–

4   134:7.) The text message notifications sent by Defendant's home monitoring system are sent

5   regardless of whether the home monitoring system was "armed" or "unarmed" and regardless

6   of whether the homeowner is inside the house at the time the sensor is triggered. (Ex. G at

7   67:6–19.) In fact, the Digital Life home monitoring system can send notifications upon any

8   number of events occurring even if they don't even potentially relate to safety—*e.g.* if the

9   temperature in the house changes or the lights are turned on. (*Id.* at 65:3–13; 66:7–22,

10  67:20–25.)

11      Most importantly, the text message notifications at issue here were sent by a system

12  *separate* from the system that handles alarm monitoring and notifying the police or other

13  emergency services. (*Id.* at 94:19–95:21.) Thus, "emergencies" and "alarm monitoring

14  emergencies" are handled separately from any of the text message notifications received by

15  Plaintiff. (*Id.* at 95:17–21.) When there is a "life emergency-type" situation such as a "fire"

16  or "robbery," Defendant's home monitoring service will reach out to the police or other

17  emergency services and will also attempt to call or reach the homeowner independently of

18  any text message notifications the customer had signed up to receive. (*Id.* at 94:22–95:4;

19  95:15–21.) In fact, an actual emergency situation will not necessarily trigger a text message

20  notification that a customer has consented to receive. (*Id.* at 94:8–18.)

21          D.    <u>Once a customer consents to receive text message notifications from</u>
            <u>Defendant's home monitoring system, every text message sent by Defendant</u>
22          <u>is automatically generated and sent without human intervention.</u>

23      Defendant's customers who have a Digital Life home monitoring system installed can

24  "opt in" to receive certain text message notifications from the monitoring system. (Ex. G at

25  62:15–21.) A customer opts in to receive certain text messages by (1) logging into his/her

26  Digital Life account through an internet website, (2) selecting a specific "triggering" event

27  that will determine when a text message notification will be sent, and (3) choosing the cell

28

---

1   phone number to which the text messages will be sent.  (Def. Exs. 7, 8, 9, Dkt. 35-4, at 1–10;

2   Ex. G at 83:11–84:2.)    Once a customer opts in to receive a certain message, every

3   successive message is automatically sent every time a sensor installed as part of the home

4   monitoring system reports that the triggering event occurred.  (Ex. G at 63:6–10, 65:3–7,

5   73:19–23; *see* Deposition of Plaintiff' expert witness, Randall Snyder, relevant excerpts of

6   which are attached hereto as Exhibit H, at 93:7–94:3.)   The text messages are generated

7   solely as a result of the sensor itself being triggered regardless of how or why the sensor was

8   triggered—that is, regardless of what causes the sensor to register the triggering event,

9   including the homeowner himself coming back inside, a cat leaving the room, the weather,

10  etc.  (Ex. G at 64:22–65:7, 66:7–22.)  Once a sensor is triggered, the text message itself is

11  automatically sent by Defendant's system, which dials without any human involvement of

12  any kind the cell phone number already stored on a list in Defendant's database.  (Ex. G at

13  69:2–14; 69:22–70:1; Ex. H at 93:14–94:3.)   No human person analyzes the sensor being

14  triggered to decide what to do, whether to send a text message, or what the text message

15  should say; no person drafts a message; and no person actually sends a message to the

16  number already on file.  (Ex. G at 64:22–65:7, 69:2–70:1, 72:2–73:4.)  The content of the

17  text message itself is not created by a human, and is based on a template that is automatically

18  populated with information from the system.  (*Id.* at 69:15–70:1.)

19      According to the testimony of Plaintiff's expert, Mr. Snyder, the process of a

20  customer opting in to receive certain text message notifications from Defendant is identical

21  to the process of an individual opting in to receive other automated text messages, such as

22  coupons from a retailer.  (Ex. H at 21:15–24, 94:25–95:7.)  Text message applications that

23  require human intervention can only send a text message if an individual launches the

24  application, actually creates the message to be sent, and directs the application to send that

25  particular message.  (*Id.* at 100:19–101:10.)   Similarly, call centers that do not utilize

26  automatic telephone dialer systems have live human agents that have to manually initiate

27  each individual phone call made.  (*Id.* at 71:24–73:12.)  Unlike such systems that require

28  human intervention before a phone call is made, once a customer consents to receive

notifications, Defendant's system automatically determines when to send the text message notification, what the content of the text message will be, which phone numbers to send the text message to, and actually sends each text message without any human intervention.  (Ex. H at 93:7–94:3, 98:23–99:4.)  Because an automatic telephone dialing system is defined by its ability to create and send messages without human intervention (*id.* at 104:15–20), the fact that a text message was automatically sent as a result of an independent event that may have had a human as a "but for" cause is completely irrelevant.  (*Id.* at 87:16–88:1.)  Indeed, a human is a "but for" cause of nearly every call and every text message regardless of the circumstance, and Defendant's theory in this case seeks to no less than nullify the TCPA. Such a theory is untenable and should be rejected.

## III.   LEGAL STANDARD

"Summary judgment is an extraordinary remedy" that should only be granted when "no genuine and disputed issues of material fact remain, and . . . the movant is clearly entitled to prevail as a matter of law." *Apple Valley Bldg. & Development Co. v. Bonanza Air Lines, Inc.*, 423 F.2d 661, 662 (9th Cir. 1970); *Satterfield*, 569 F.3d at 950.  At the summary judgment stage the "evidence of the nonmovant is 'to be believed, and all justifiable inferences are to be drawn in his favor.'"  *Carlson v. Nevada Eye Care Professionals*, No. 13-cv-00364, 2013 WL 2319143, at *3 (D. Nev. May 28, 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

The movant initially bears the heavy burden of establishing the "absence of a genuine issue of material fact."  *Bates v. Dollar Loan Center, LLC*, No. 13-cv-1731, 2014 WL 60472, at *1 (D. Nev. Jan. 7, 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The nonmoving party then has to set forth facts demonstrating that there is a genuine issue of fact for trial.  *Id.* (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  It is sufficient for the nonmoving party to simply show that "the claimed factual dispute requires a jury or judge to resolve the parties' differing versions of the truth at trial." *Carlson*, 2013 WL 2319143, at *3 (citing *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors As'n*, 809 F.2d 626, 631 (9th Cir.1987)).

1  In general, "[t]rial courts should act with caution in granting summary judgment and

2  may deny summary judgment where there is reason to believe that the better course would be

3  to proceed to trial."  Vote v. U.S., 753 F. Supp. 866, 870 (D. Nev. 1990)

4  (citing *Anderson*, 477 U.S. at 255).

## IV.   ARGUMENT

6  Defendant seeks to escape liability for sending over 2,000 unsolicited text messages

7  by claiming that they were (1) "emergency" messages related to their customer's "health or

8  safety," and (2) were not automatically sent by an ATDS without human intervention.  The

9  facts adduced in this case, however, fail to support either of Defendant's positions.  The text

10  messages at issue were nothing more than notifications that a door was opened.  Furthermore,

11  Defendant's own expert witness testified that these notifications were completely unrelated

12  to whether there was an actual emergency situation or even to whether the customer's alarm

13  system itself was activated.  Nor was there any human involvement in creating the text

14  messages or actually sending them to Plaintiff's cellular telephone.

A.   <u>The text messages Defendant sent to Plaintiff's cell phone do not fall within the TCPA's "emergency" exception.</u>

The TCPA exempts from its regulations calls "made for emergency purposes."  47

U.S.C. § 227 (b)(1)(A).  The FCC has defined the term "emergency purposes" to mean "calls

made necessary in any situation affecting the health and safety of consumers."  47 C.F.R. §

64.1200(f)(4).  However, the text messages Defendant sent to Plaintiff's cell phone were

nothing more than informational notification messages that a door was opened.  In addition,

the FCC's rulings have clearly established that the emergency purposes exception was not

meant to apply to such purely informational text messages.

1.   *The text messages received by Plaintiff were not necessary or related to any emergency situation involving health and safety.*

Despite Defendant's efforts to label the text messages received by Plaintiff as

"alerts," "warnings," and "home-security system alert[s]," (Def. Mot. at 11, 12), the fact of

the matter is that the messages at issue did nothing more than notify Defendant's customer

that a kitchen door was opened or that the front door was opened.  (Def. Ex. 5, Dkt. 35-3, at 7–12; Ex. B at 133:22–134:7.)  The content of the message itself certainly did not indicate that the message was sent as a result of an emergency situation relating to the "health" or "safety" of the recipient, as a door being opened means nothing more than that.  Nor were the messages in any way linked to an emergency situation such as an alarm being triggered because someone had broken into the house.  (Ex. G at 94:13–95:21.)  In fact, the text message notifications at issue would have been sent regardless of whether the system was armed or unarmed, and regardless of even whether the homeowner himself was still inside the house—thus making these notifications far from <u>necessary</u> for the recipient's health or safety, as required by the specific wording of the statute in order for these messages to be exempt.  (*Id.* at 67:6–19.)

Moreover, Defendant's home monitoring system allowed its customers to set up automatic text message notifications whenever any number of events were recorded by the sensors installed in the house.  (Def. Ex. 7, 8, 9, Dkt. 35-4, at 1–10.)  The type of event that would result in a sensor triggering a text message notification was determined solely by the customer and did not have to have any relationship whatsoever with their "health" or "safety" being threatened—including setting up notifications related to simply a change in temperature inside the house or someone turning on the lights.  (Ex. G at 65:3–13; 66:7–22, 67:20–25.)  The fact that it was entirely discretionary whether a customer would receive these notifications, and that a customer could choose to receive notifications about completely harmless events, means that the text message notifications sent by Defendant's system were solely a convenience feature rather than part of the emergency monitoring service that Defendant also provided.

Particularly fatal to Defendant's argument that these text messages were "necessary" in a situation involving the "health" or "safety" of its customer is the fact that Defendant's home monitoring system had a completely *separate* system in place for contacting the police or fire department, as well as the homeowner themselves, in the event that it detected an *actual* emergency.  (*Id.* at 95:7–21.)  Thus when the system detects an emergency situation

and contacts the proper authorities it will not necessarily send out a notification text message such as the ones received by Plaintiff.  (Ex. G at 94:8–18, 94:22–95:4.)  Defendant's system was created in such a way that any emergency alerts actually relating to the health and safety of the customer were routed to the proper authorities, while customers could *choose* to utilize the same sensors to receive automated notifications *independent* of an emergency event occurring.  There is a fundamental difference between an emergency alert feature that utilizes sensors to monitor for emergency situations and to call the proper authorities when such emergencies arise, and a convenience feature provided by Defendant's home monitoring service that allows a customer to utilize the same sensors to keep informed about what is happening in their house.  While the former may be an "emergency"; the latter most surely is not.

Defendant claims that it is "undisputed that the only purpose of the Digital Life text alerts was to provide home security alerts" (Def. Mot. at 13, n. 7), and that Plaintiff alleged in his Complaint that he received "text alerts that warned either 'Front Door Opened' or 'Kitchen Door Opened.'"  (*Id.* at 13.)  Defendant, however, is misrepresenting the actual allegations and claims made in Plaintiff's Complaint.  To the extent that Defendant argues that the text notifications were somehow necessary warnings or alerts, Plaintiff very much does dispute this issue.  Plaintiff's Complaint in fact explicitly alleges that "AT&T repeatedly placed these *non-emergency* calls in the form of SMS messages to Plaintiff's cellular telephone without Plaintiff's consent."  (Compl. at ¶ 30) (emphasis added).   In addition, Plaintiff's Complaint never characterized the messages received as "text alerts" and alleged only that the Defendant repeatedly sent Plaintiff "*messages*" relating to a front door or kitchen door being open.  (*Id.* at ¶ 15) (emphasis added).  Finally, given the fact that Defendant's own expert witness testified that the text message notifications were sent independently of any emergency alert being triggered, regardless of whether the alarm system was armed or disarmed, and even if there was no emergency situation, the purpose of these text message notifications is far from undisputed.

2.   *The TCPA's emergency exception was not meant to apply to purely informational notifications such as the ones received by Plaintiff.*

Applying the FCC's rulings and determinations regarding the sort of automated calls that qualify for the emergency exception, the text message notifications at issue here involve situations far from those that the FCC has found could "pose significant risks to public health and safety."[8]  Unlike notifications involving "service outages" and "interruptions in the supply of water, gas or electricity" that could lead to individuals being unable to heat their homes in the winter, disruption of critical life-sustaining apparatuses that rely on electricity, and other emergency situations, a "front door" or "kitchen door" being opened can hardly be considered a situation that poses the same type of "risk to public health and safety," and notification of such an event is certainly not "necessary."  (Ex. I at ¶ 51.)  This is especially the case here because the door being opened is not in any way related to whether there is an actual emergency situation that results in Defendant's system contacting emergency services or whether is any possible risk of harm to the occupants.

In addition, in its more recent February 15, 2012 Report and Order, the FCC gave an example of "calls initiated for emergency purposes" and pointed to "emergency messages permitted by the WARN Act and/or the Commercial Mobile Alert System (CMAS)."[9]  The types of messages sent by the CMAS pursuant to the WARN Act "cover only critical emergency situations" involving "three types of alerts: 1. Alerts issued by the President[,] 2. Alerts involving imminent threats to safety or life[, and] 3. Amber Alerts."  *See* https://www.fcc.gov/guides/wireless-emergency-alerts-wea.   Furthermore,   all   of   the messages sent through the CMAS pursuant to the WARN Act are free of charge to the recipients.  (*Id.*)  Unlike the messages sent by the CMAS pursuant to the WARN Act that the FCC has specifically found to be exempted from TCPA regulation under the emergency

---

[8] *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, *FCC Report and Order*, CC Dkt. No. 92-90, at ¶ 51 (Oct. 16, 1992) (hereinafter "FCC 1992 Order" and attached hereto as <u>Exhibit I</u>.)

[9] *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, *FCC Report and Order*, CG Dkt. No. 02-278, at ¶ 17 (Feb. 15, 2012) (hereinafter "FCC 2012 Order" and attached hereto as <u>Exhibit J</u>).

exception, the text messages sent by Defendant were (1) not free of charge to Plaintiff (Ex. B at 117:12–16), and (2) did not involve imminent threats to safety or life, or anything resembling an Amber Alert or an alert issued by the President.

Finally, in the same FCC 2012 Order, the FCC also determined that automated calls involving notifications about school closings were not "calls initiated for emergency purposes." (Ex. J at ¶ 3.)  In the FCC 2012 Order the FCC stated that "purely informational messages," even ones as important as "school closings," were still subject to TCPA regulation and did not exempt such calls from regulation under the emergency purposes exception.  (*Id.*)  Given that a school closing can directly affect the health and safety of children, the FCC's refusal to exempt such calls from TCPA regulation is a clear sign that informational text messages involving a kitchen door being opened fail to meet the emergency exception requirements.[10]

> ### 3. *The TCPA was not created solely to prevent automated telemarketing messages.*

Defendant argues that because the "TCPA was enacted to prevent abusive telemarketing practices," and because "the text alerts that Mr. Spencer received were not the result of a mass telemarketing campaign," the text messages at issue here "were not intended to be regulated by the TCPA[.]"  (Def. Mot. at 13–14.)  However, contrary to Defendant's characterization of the TCPA as strictly a "telemarketing" statute, the language of the TCPA, as well as the FCC's rulings, make clear that even "valu[able]" and "popular[]" automated messages that are purely informational are <u>not</u> exempt from regulation under the TCPA.

The TCPA prohibits certain automated phone calls placed to residential phone lines and another, broader set of automated calls placed to cellular telephone lines.  *See* 47 U.S.C. § 227(b)(1)(A)(iii) and 47 U.S.C. § 227(b)(1)(B).  Under the regulations against automated

---

[10] On June 18, 2015, the FCC voted on numerous petitions that sought clarification on a variety of issues related to the TCPA.  One issue discussed and voted on was the issue of limited, specific exceptions for "urgent circumstances."  The FCC has not yet released its final written Order on these issues, but it is highly likely based on an analysis of the actual meeting that the final written Order will further clarify the narrowness of the TCPA's emergency exception and will more fully demonstrate the lack of merit to Defendant's arguments here.

telephone calls to residential lines the TCPA prohibits calls "using an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(B). The TCPA exempts such calls to residential numbers from regulation if they are made for emergency purposes *or* are otherwise exempt by the FCC under Section 227(b)(2)(B). *Id.* Section 227(b)(2)(B)(i) allows the FCC to exempt calls "not made for a commercial purpose"—*i.e.* informational phone calls. By contrast, Section 227(b)(1)(A)(iii), under which Plaintiff brought suit, prohibits *any* telephone call made using an ATDS. Unlike the TCPA prohibition on calls to residential lines, Section 227(b)(1)(A)(iii) does not have a clause allowing the FCC to create any exemption from regulation. All phone calls, regardless of whether they are for commercial or informational purposes, are prohibited under 227(b)(1)(A)(iii), as long as they are made without proper consent and using an ATDS.

By granting the FCC the ability to exempt informational calls made to residential lines, and not inserting a similar clause within the prohibition on phone calls made to cellular telephones, Congress implicitly made informational calls placed to cellular telephones subject to TCPA regulation. If Congress had intended – as Defendant seems to suggest – to limit liability for automated calls placed to cell phones solely to telemarketing calls, then it would have inserted a similar exemption for calls not made for commercial purposes. However, given the fact that cellular telephone calls can result in the recipient incurring a charge per call, Congress chose to prohibit *all* automated telephone calls – whether informational or commercial – from being sent to cellular telephones. *See* 47 U.S.C. § 227 (b)(1)(A)(iii) (prohibiting phone calls made "to any number assigned to . . . any service for which the called party is charged for the call.")

Congress's intent to prohibit both commercial and purely informational calls to cellular telephones has recently been reaffirmed by the FCC, which has stated that even informational calls that provide, "valuable" and "popular" information, such as school closures, are still subject to TCPA regulations and can only be placed if the school has obtained prior express consent:

None of our actions change requirements for prerecorded messages that are non-

---

telemarketing, informational calls, such as calls by or on behalf of tax-exempt non-profit organizations . . . and calls for other *noncommercial* purposes, including those that deliver purely informational messages such as school closing.  Such calls continue to require some form of prior express consent under the TCPA and the Commission's rules, if placed to wireless numbers[.]

(Ex. J at ¶ 3 (emphasis added); *see also* Ex. J at ¶ 28.)  If Congress and the FCC had only intended for the TCPA prohibition on automated cell phone calls to apply strictly to telemarketing messages, then surely automated informational messages placed by schools would be exempt from TCPA regulation.   On the contrary, the TCPA regulates both telemarketing and purely informational calls to cellular telephones, regardless of the purpose of such calls, including the ones placed by Defendant here.  *See Sherman v. Yahoo! Inc.*, 997 F. Supp. 2d 1129, 1134–35 (S.D. Cal. 2014) (holding that a single text message informing the recipient that a "friend" had sent them a message was actionable under the TCPA and rejecting the defendant's argument that a "notification message is not the type of invasion of privacy Congress intended to prevent in passing the TCPA"); *Lamont v. Furniture N., LLC*, No. 14-cv-036, 2014 WL 1453750, at *2, *3 (D.N.H. Apr. 15, 2014) (finding that purely informational automated calls to a cell phone regarding when a piece of furniture would be delivered were actionable under the TCPA and required "prior express consent").

Defendant can hardly claim that the text messages that Plaintiff received here were "necessary" in a situation involving the "health" or "safety" of its customer when it sent over 2,000 messages over the course of just two months, sometimes sending as many as 44 text messages in a single day.  (Ex. C at 1–2.)  Nor can Defendant lean on the supposed "broadness" of the emergency purposes exception given the fact that the FCC has refused to even exempt school closing notifications from TCPA regulation and has acknowledged that emergency notifications include free automated alerts from the President or free alerts involving *imminent* threats to life or safety.  Because the text message notifications at issue here related solely to whether a kitchen or front door was opened – nothing more, and nothing less – they are subject to regulation under the TCPA and are not exempt under the emergency purposes exception.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      B.    <u>Defendant sent the text messages to Plaintiff using an Automatic Telephone Dialing System</u>.

Defendant argues that the text messages at issue were not sent by an ATDS as required under the TCPA because Defendant's system did not have the "capacity to generate random or sequential numbers to be called."  (Def. Mot. at 15.)  Defendant's argument, however, ignores the FCC 2003 Order that defined "the basic function" of an ATDS as "the *capacity* to dial numbers without human intervention."  (Ex. A at ¶ 132) (emphasis in original).   Subsequent FCC rulings have reiterated the "without human intervention" standard, and a large number of district court opinions within the Ninth Circuit have applied that definition in TCPA cases alleging receipt of unauthorized text messages.  Nor is there any solid factual or legal basis for Defendant's argument that the text messages received by Plaintiff did in fact require human intervention.  Defendant's interpretation of "human intervention" is not only directly contrary to the caselaw it cites, but would also effectively nullify the TCPA.

      1.    *An ATDS is defined by its ability to dial numbers without human intervention.*

According to Defendant, a complaint alleging a violation of the TCPA must establish that the calls at issue were placed by a system that meets the "statutory definition" of equipment that has the "capacity to generate random or sequential numbers to be called." (Def. Mot. at 15) (citing 47 U.S.C. § 227(a)(1)).   However, as Defendant itself later concedes, the FCC 2003 Order clarified that the "basic function" of an ATDS is "the *capacity* to dial numbers without human intervention."  (Ex. A at ¶ 132) (emphasis in original).  While the FCC 2003 Order acknowledged that the TCPA defines an ATDS as equipment that meets the statutory definition of "using a random or sequential number generator," it also noted that "[i]t is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies."  (*Id.*)  The FCC stated that while telemarketers in the *past* used "dialing equipment to create and dial 10-digit telephone numbers arbitrarily,"

Pl's Response in Opposition to
Def's Mot. for Summary Judgment
17
Case No. 14-CV-01136-RFB-PAL

1   "the evolution of the teleservices industry has progressed to the point where using lists of

2   numbers is far more cost effective."  (Ex. A at ¶ 132)

3          In its 2003 Order, the FCC used its TCPA rulemaking authority to address the change

4   in technology from the sort of random and sequential dialing that Defendant alludes to (Def.

5   Mot at 16), to modern telemarketing technologies that use "lists of numbers."  By specifically

6   noting that "the basic function of such equipment has not changed," the FCC clarified that

7   the common factor that makes *both* traditional random/sequential dialers, and modern list

8   dialers ATDSs, is their "*capacity* to dial numbers without human intervention."  (Ex. A at ¶

9   132) (emphasis in original).

10         More importantly, the FCC reiterated this definition again and again over the

11  following years.  In a 2008 Declaratory Ruling the FCC cited to its 2003 Order and stated

12  that, "[t]he Commission noted that the evolution of the teleservices industry had progressed

13  to the point where dialing lists of numbers was far more cost effective, but that the basic

14  function of such dialing equipment, had not changed—the capacity to dial numbers without

15  human intervention."[11]  Further, in a 2012 Report and Order implementing the do-not-call

16  provisions of the 2012 Tax Relief and Job Creation Act, the FCC analyzed the proper

17  definition of "automatic dialing equipment" and concluded as follows:

18         [T]he Tax Relief Act does not define "automatic dialing" or "robocall" equipment.
           We believe, however, that these terms are equivalent to "automatic telephone dialing
19         system" as defined in the TCPA and commonly referred to as "robocalling"
           equipment.  Specifically, the TCPA defines "automatic telephone dialing system" as
20         equipment "which has the capacity to store or produce telephone numbers to be
           called, using a random or sequential number generator; and to dial such numbers."
21         *The Commission has emphasized that this definition covers any equipment that has*
           *the specified capacity to generate numbers and dial them without human intervention*
22         *whether or not the numbers called actually are randomly or sequentially generated or*
           *come from a calling list*. . . . Therefore, we adopt the TCPA's definition of automatic
23         telephone dialing system and the Commission's relevant interpretations of that term,
           for purposes of defining "automatic dialing" and "robocall" equipment as used in the
24         Tax Relief Act.[12]

25

26  ───────────────
    [11] *See In the Matter of Rules and Regulations Implementing the Telephone Consumer*
27  *Protection Act of 1991*, *FCC Declaratory Ruling*, *CG Dkt. No. 02-278*, at ¶ 13 (Jan. 4, 2008)
    (hereinafter "FCC 2008 Ruling" and attached hereto as <u>Exhibit K</u>).
28  [12] *See In the Matter of Implementation of the Middle Class Tax Relief and Job Creation Act*

───────────────

Moreover, the November 29, 2012 FCC Declaratory Ruling that Defendant cites to for support on page 21 of its brief also actually supports the above definition of ATDS.[13]  Not only was the November 29, 2012 FCC ruling a declaratory ruling – and not an "Order," as Defendant labeled it – but Defendant also improperly and very "creatively" cited to it in an effort to supports its position.  Defendant stated that the FCC "emphasized that the definition focuses on the equipment's ability 'to generate numbers and dial them without human intervention.'"  (Def. Mot. at 21) (citing Ex. M, at ¶ 2 n.5).  However, the actual language of the declaratory ruling in footnote five reads as follows:

> The Commission has emphasized that this definition covers any equipment that has the specified *capacity* to generate numbers and dial them without human intervention *regardless of whether the numbers called are randomly or sequentially generated or come from calling lists*.

(Ex. M, at ¶ 2 n.5) (emphasis added).  Defendant somehow manages to leave off the critical portion of the Declaratory Ruling that directly undercuts its argument that an ATDS has to dial "sequentially" or "randomly" generated numbers.   According to the above ruling, equipment that dials telephone numbers "from calling lists" "without human intervention" meets the statutory definition of an ATDS.   Defendant's misleading citations notwithstanding, it is clear that the FCC intended to interpret ATDS as any equipment that has the capacity to dial numbers without human intervention—regardless of whether the numbers are generated randomly, sequentially, or, as in the instant case, *come from a calling list*.[14]

---

*of 2012*, *Report and Order*, CG Dkt. No. 12-129, at ¶ 29 (Oct. 17, 2012) (attached hereto as Exhibit L) (emphasis added).
[13] *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, *FCC Declaratory Ruling*, *CG Dkt. No. 02-278* (Nov. 29, 2012) (hereinafter "FCC SoundBite Ruling" and attached hereto as Exhibit M).
[14] To the extent Defendant may argue in its reply brief that Defendant's system does not dial numbers that *come from a calling list*, Defendant's expert witness testified that its system allows multiple phone numbers to be entered which will result in all numbers on the list receiving a text message notification.  (Ex. G at 41:16–22.)  Furthermore, the text messages at issue here were not only sent to Plaintiff's phone number, but were also sent to three other phone numbers—clearly indicating that the system utilized a calling list.  (Ex. G at 40:8–42:4; A log of communications relating to the text messages sent is attached hereto as Exhibit

1       While Defendant argues that the "FCC 2003 Order [and by implication the FCC's

2  2008 and 2012 rulings] impermissibly defied the plain language of the statutory text" (Def.

3  Mot. at 19), the FCC's interpretations are binding on this Court under the Hobbs Act.  *See* 28

4  U.S.C. § 2341(1); 47 U.S.C. § 402(a); *US West Commc'ns, Inc. v. Jennings*, 304 F.3d 950,

5  958 n.2 (9th Cir. 2002); *Hernandez v. Collection Bureau of Am., Ltd.*, No. 13-cv-01626, 2014

6  WL 4922379, at *3 (C.D. Cal. Apr. 16, 2014) (holding that under the Hobbs Act the court

7  was "simply bound to apply the FCC's [2003 Order]" and finding that a dialing system that

8  "can operate without human intervention" was an "[ATDS] for purposes of the TCPA");

9  *Sterk v. Path, Inc.*, No. 13-cv-2330, 2014 WL 2443785, *4 (N.D. Ill. May 30, 2014) ("In

10 general, a district court gives great weight, if not controlling weight, to final decisions of the

11 FCC implementing and interpreting the TCPA.")  Broad deference should be given to an

12 agency's interpretation under *Chevron v. Natural Res. Def. Council, Inc.*, 467 U.S. 837

13 (1984).  *See City of Arlington v. F.C.C.*, 133 S. Ct. 1863, 1870–72 (2013); *Satterfield*, 569

14 F.3d at 952.  In fact, it is because of the broad deference given to the FCC that, as explained

15 below, a number of district courts have applied the definition of ATDS used in the FCC 2003

16 Order in TCPA cases alleging receipt of unauthorized text messages.

17              2.      *The FCC's definition of an ATDS as equipment that dials without
18                      human intervention has been applied in a number of recent TCPA
                        rulings involving unauthorized text messages.*

19       Numerous rulings from various district courts within the Ninth Circuit have applied

20 the FCC's 2003 Order to determine whether an ATDS was used to send unauthorized text

21 messages in violation of the TCPA.  *See, e.g., Harnish v. Frankly Co.*, No. 14-cv-02321,

22 2015 WL 1064442, at *2 (N.D. Cal. Mar. 11, 2015); *Glauser v. GroupMe, Inc.*, No. 11-cv-

23 2584, 2015 WL 475111, at *6 (N.D. Cal. Feb. 4, 2015); *Nunes v. Twitter, Inc.*, No. 14-cv-

24 02843, 2014 WL 6708465, at *2 (N.D. Cal. Nov. 26, 2014); *Fields v. Mobile Messengers

25 Am., Inc.*, No. 12-cv-05160, 2013 WL 6774076, at *3 (N.D. Cal. Dec. 23, 2013).

26       Recently, in *Harnish v. Frankly Co.*, the court held that "[t]he FCC has found that

27 ─────────────────────────────────────────────────────────

28 O.)  Plaintiff's expert witness similarly testified that Defendant's system stores numbers
   which it then dials.  (Ex. H at 93:14–94:3; 100:5–7.)

equipment having 'the capacity to dial numbers without human intervention,' including predictive dialers, falls under the definition of an ATDS." *Harnish*, 2015 WL 1064442, at *3 (citing Ex. A at ¶ 132).  The court in *Harnish* found this definition applicable given a similar set of facts as presented to the Court here involving an unauthorized generic text message sent to the plaintiff's cellular telephone.  *Id.* at *1.

Similarly, in *Glauser*, a case relied on by Defendant, the court rejected the same argument being made by Defendant here and acknowledged that the FCC 2003 Order extends to dialing equipment used to send multiple text messages even if it does not dial numbers randomly or sequentially.  2015 WL 475111, at *5–*6.  Citing to the FCC's 2008 Declaratory Ruling, as well as the FCC's 2012 SoundBite Ruling, the court rejected the defendant's argument and determined that "the FCC's implementing regulations have expanded" the definition of an ATDS beyond random/sequential dialing.  *Id.* at *5.  The court ruled that "while the capacity for random/sequential dialing is not required for TCPA liability, the capacity to dial numbers without human intervention is required."  *Id.* at *6.

In short, Defendant's argument that this Court should strictly apply the statutory definition of an ATDS as equipment that randomly or sequentially dials telephone numbers goes against the overwhelming majority of legal opinions on the matter, numerous FCC rulings, and the FCC's statutory authority to create regulations implementing the TCPA.

3. *Defendant's Digital Life home monitoring system dialed Plaintiff's cellular telephone number without any human intervention when it sent him the text message notifications at issue.*

Defendant's Digital Life home monitoring system is a textbook example of an ATDS that dials telephone numbers without human intervention.  As Defendant's own expert witness admitted, once a customer consents to receive certain text message notifications when a chosen event occurs, the customer will automatically receive a text message notification every time that event occurs.  (Ex. G at 63:6–10, 65:3–7, 73:19–23.)  Every single text message notification sent by Defendant's system is automatically created using a pre-configured message template that does not involve any human individual actually reviewing or drafting the message.  (*Id.* at 69:15–70:1.)  Once the message is automatically

created, Defendant's system automatically dials the telephone number from the list of numbers stored in the database and sends the text message—all without human intervention. (Ex. G at 69:2–14; 69:22–70:1.)  Even Defendant's opening brief acknowledges that once a customer opts-in to receive certain text message notifications, "[i]f an event occurs in the home that matches the customer's criteria for sending a text [message], the controller device in the home transmits information to the server in AT&T's Data Center . . . along with a command to generate and send a text [message]" and software called "the 'Digital Life Core Platform,' *instantly* generates the text [message]."  (Def. Mot. at 7) (emphasis added).  Thus, as made clear by Defendant's own admissions, the Digital Life home monitoring system that is responsible for sending the text messages received by Plaintiff automatically generates and dials telephone numbers without human intervention.

Based on the above facts, as well as other evidence produced by Defendant detailing how its Digital Life system functions, Plaintiff's expert witness, Randall Snyder, who has over 30 years of experience working in the telecommunications industry and has been retained as an expert in over 90 cases involving cellular telephone communications technology, also opined that Defendant's system was an ATDS that sent text message notifications without human intervention.  (*See* Declaration of Randall Snyder, attached hereto as Exhibit N, at 3–4; Ex. H at 98:23–99:4.)  According to Mr. Snyder:

> [W]hen a certain event occurs the system detects that event . . . then decides what the event is, based on the sensor, chooses automatically . . . which messaging event to send . . . door open, window open, etc., automatically takes from within the system the current date and time, pulls . . . the cellular telephone number . . . creates the text message . . . automatically puts those fields together programmatically, and then automatically sends that message out[.]

(Ex. H at 93:7–94:3.)  Thus, when Defendant's system sends a text message notification, "a human did not create the message, draft it, type it, send it, or in any way be involved with the creation, generation, or sending of the text message[.]"  (*Id.* at 98:23–99:4.)  A system that operates in such a manner is precisely what the FCC had in mind when it defined an ATDS as having the "capacity to dial numbers without human intervention."

i.   The fact that one of Defendant's customers had to program the system to send the text messages at issue does not constitute "human intervention."

Defendant's next argument that the text messages were sent with human intervention because a user has to initially sign up to receive them conflates the issue of consent with that of human intervention in actually dialing the number, effectively nullifies the TCPA, and is contrary to each case cited for support by Defendant.

As Plaintiff's expert witness testified, the process of Defendant's customers signing up to receive the text message notifications is equivalent to that of an individual consenting to receive automatically generated advertisements.  (Ex. H at 21:15–24, 94:25–95:7.)  The initial step of *signing up* to receive a certain type of automated message, a particular advertisement, or telemarketing calls, is fundamentally distinct and separate from the subsequent calls that are *automatically dialed* without human intervention.  (*Id.* at 98:23–99:13.)  As Defendant's expert witness confirmed, when a customer of Defendant signs up to receive the automated notifications that in and of itself does not generate a text message notification.  (Ex. G at 65:22–66:6.)  Rather, a text message notification is automatically generated, and the customer's cell phone is dialed without any human intervention, when an event entirely independent of the actual signing up for the text message occurs and triggers the text message to be sent.  (*Id.* at 66:7–12.)

Furthermore, *every* ATDS that dials numbers without human intervention requires the same kind of initial setup as Defendant's system here.  *See, e.g., Johnson v. Yahoo!, Inc.*, No. 14-cv-2028, 2014 WL 7005102, at *5 (N.D. Ill. Dec. 11, 2014) ("[e]very ATDS requires some initial act of human agency – be it turning on the machine or pressing 'Go.'  It does not follow that every subsequent call the machine dials – or message it sends – is a product of that human intervention.)  In fact, even ATDSs that meet Defendant's standard for dialing randomly or sequentially generated numbers require a human to program the system and set certain preferences for how many phone calls to make, at what interval to dial numbers, and when to connect or disconnect a call.  (*See* Def. Mot. at 16) (describing how random number

generators are programmed to create "random sequences of 10 digits" or sequential 10 digit telephone numbers).  If the act of programming an ATDS to automatically place certain calls upon a certain event occurring is considered "human intervention," then the TCPA would effectively be rendered meaningless because *every* ATDS requires a similar act of initially programming the system as Defendant's system here.  Similarly, if the act of an individual signing up, or consenting, to receive subsequent text messages was itself sufficient "human intervention" to avoid an ATDS finding, then the issue of "consent" and the issue of whether an ATDS was used would cease to be separate elements under the TCPA—a result that would run afoul of the statute, the FCC's interpretations thereof, and court rulings regarding the TCPA.

Ultimately, the fatal defect in Defendant's argument is that it fails to draw the distinction between human intervention in sending each text message received, and the setting up of a system that automatically sends an infinite number of subsequent text messages without any human involvement.  (Ex. G at 64:22–65:7, 73:19–23.)  As Plaintiff's expert testified, "human intervention" is "essentially having a human involved in the actual direct sending . . . creation and sending of the message to a specific recipient."  (Ex. H at 101:2–10.)  The failure to draw this distinction becomes particularly clear when reviewing the three cases cited to in support by Defendant; *Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189 (W.D. Wash. 2014), *McKenna v. WhisperText*, No. 14-cv-00424, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015), and *Glauser*.  In all three cases the court found that there was no ATDS used because each *individual* text message sent required human intervention.

For example, in *Gragg*, the court focused on the fact that *each* message sent out to the defendant's customers required (1) a customer providing information to a dispatcher, (2) the dispatcher pressing "enter" in order to transmit the information to a TaxiMagic program, and (3) a driver pressing "accept" on his or her data terminal.  995 F. Supp. 2d at 1193.  By contrast, Defendant's system *automatically* created the text messages sent to Plaintiff's cellular telephone, and sent those messages, without requiring any individual to press "enter" or "accept" in order for *each* transmission to occur.  Defendant's customer did nothing more

than initially consent to receive such future, automated messages.

In *McKenna*, a mobile messaging application automatically invited its users to send a text message invitation to all of their phone contacts.  2015 WL 428728, at *2.  The court in *McKenna*, however, found that the *single* text message would be sent "only at the user's affirmative direction to recipients selected by the user."  *Id.* at *3.  In this case, Defendant's system does not instantly send a single text message notification as a result of the actual act of signing up and programming the notifications.  Rather, Defendant's system automatically sends multiple text messages in the future independently of the initial act of programming.  (Ex. G at 66:7–12.)  In short, there is no direct correlation between the supposed "human intervention" of one of Defendant's customers setting up the system, and the resulting text messages that are subsequently sent.

Finally, *Glauser*, like *McKenna*, involved automated "welcome" text messages sent by a group messaging application.  2015 WL 475111, at *1.  For the exact same reason that *McKenna* is wholly inapposite to the situation here, so too is *Glauser*.  The text messages at issue in *Glauser* were sent to the plaintiff when a human user created a "group" and as a direct result the messaging application sent text messages to the plaintiff and other "group" members informing them that they were added to the group and advertising the application.  *Id.*  In finding that the messages were sent with human intervention, the court focused on the fact that "the Welcome Texts were triggered when 'GroupMe obtained the telephone numbers of the newly added group members'" and thus "the Welcome Texts were sent to plaintiff as a direct response to the intervention of Mike L., the 'Poker' group creator."  *Id.* at *6.  As stated above, here, the act of Defendant's customer setting up the text message notifications at issue did not, and could not, directly "trigger" the text message notifications that Plaintiff received.  Rather than the notifications being sent as a "direct response" to the *human* intervention of Defendant's customer opting in to receive the message, the pre-programmed notifications were sent as a "direct response" to the *non*-human intervention of an electrical sensor being triggered.  (Ex. G at 66:7–12.)

In contrast to the three cases cited to by Defendant are a long line of TCPA cases

involving multiple automated text messages sent to an individual's cell phone where courts

not only denied motions to dismiss, but even certified classes and approved class settlements.

*See, e.g.*, *Charkchyan v. EZ Capital, Inc.*, No. 14-cv-03564, 2015 WL 3660315, at *1 (C.D.

Cal. June 11, 2015); *Robbins v. Coca-Cola-Co.*, No. 13-cv-132, 2013 WL 2252646, at *1

(S.D. Cal. May 22, 2013); *Pimental v. Google Inc.*, No. 11-cv-02585, 2012 WL 691784, at

*1 (N.D. Cal. Mar. 2, 2012); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 562 (W.D.

Wash. 2012); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1167 (N.D. Cal. 2010);

*Kazemi v. Payless Shoesource Inc.*, No. 09-cv-5142, 2010 WL 963225, at *1 (N.D. Cal. Mar.

16, 2010). If, as Defendant argues, the act of programming a system to send out certain text

messages multiple times to the same cell phone number is considered "human intervention,"

then the types of spam text messaging campaigns that were at issue in the above cases would

not be subject to TCPA liability and companies would be free to send out as many text

message advertisements as they wished, so long as they made sure to have a human simply

set up the campaign and transfer the phone numbers into the system. No court has ever

reached such a conclusion with facts even remotely similar to those in the instant case.

> ii.    The text message notifications received by Plaintiff were sent
>         as a result of an electronic sensor sending a signal to
>         Defendant's home monitoring system.

In a final attempt to escape liability, Defendant claims that there was human

intervention because "somebody in the Digital Life-equipped home must do something to

trigger a text[.]" (Def. Mot. at 23.) Defendant, however, is mischaracterizing the process by

which its own system operates. As Defendant's expert witness affirmed, "what actually

results in the notification is when a sensor senses the event happening, a garage door

opening, window breaking, or the temperature over a certain amount[.]" (Ex. G at 66:7–12.)

Further evidencing the fact that it is ultimately the *sensor*, and not a human action, that

causes the text messages to be sent out, is the fact that Defendant's system will send

notifications regardless of what caused the sensor to trigger. (*Id.* at 64:5–8, 66:13–22.) As

long as a certain "threshold" is passed, the sensor will trigger and cause a text message

1   notification to be sent out.  (Ex. G at 64:14–65:5.)  Thus, the fact that a sensor will cause a

2   text message notification to be sent regardless of whether it was triggered by an "intentional

3   breakage," a "tornado," or an "accident[]," means that it is ultimately the sensor sensing the

4   event that determines whether a text message is sent out, rather than the event itself

5   occurring.  (*Id.* at 64:5–65:5, 66:13–22.)

6        A person opening the door – and as a result (i) triggering a sensor, (ii) which in turn

7   sends a signal to the Digital Life home monitoring system, (iii) that then communicates with

8   a "Back-End Application," (iv) which automatically creates the text message using a pre-

9   determined template, (iv) then sends it to Defendant's messaging system, (v) which then

10  *actually* dials the telephone number and sends the text message (*Id.* at 69:2–14) – is many

11  times removed from having any human involvement in the actual sending of the text

12  message.  Carrying out Defendant's reasoning to its logical but absurd conclusion, there is

13  nothing in the causal chain of human involvement in a text message being sent that would

14  ultimately not be considered "human intervention."  By way of example, sports-related text

15  message notifications are increasingly popular.  A person can sign up for automatic text

16  notifications with the updated score for his/her favorite baseball or football team and/or when

17  the team is about to score.  If an individual signed up to receive a text message every time

18  his/her team scored a run or scored a touchdown, it would be incredulous to argue that such

19  messages were somehow not automated and were instead sent with "human intervention"

20  even though, as in the instant case, the individual had to sign up for the messages and a

21  player had to hit a homerun or catch a pass for a touchdown.  The TCPA, if it is to have any

22  application at all, should not, and cannot, be interpreted in the manner advocated by

23  Defendant.

24       Ultimately, it is the event itself, and the sensor's recording of the event, that causes

25  the text message to be sent out.  What led to the event occurring, or the sensor recording the

26  event (considering the fact that a sensor may malfunction), is by itself incapable of triggering

27  a text message notification.  As Plaintiff's expert, Mr. Snyder testified:

28       [T]he event is the door opening.  The event is not what a human does.  So the opening

of the door is where the sensor is, and the sensor at the opening of the door sends an automated electrical signal that then causes the automatic text messaging system to send a text message with the right content based on what that sensor detected.

(Ex. H at 87:20–88:1.)  This is why this case is fundamentally distinct from the cases relied on by Defendant, where human intervention was *directly* responsible for the text message being sent.  *See, e.g., Gragg*, 995 F. Supp. 2d at 1193; *Glauser*, 2015 WL 475111, at *6. Here, any human intervention was at most only responsible for the event itself occurring, and certainly not directly responsible for the sensor detecting that a triggering event had occurred or the sensor directing Defendant's system to create a text message and automatically send it to a cellular telephone.

There is no dispute that Defendant's Digital Life home monitoring system sent thousands of unauthorized text messages to Plaintiff's cellular telephone.  Nor is there any dispute that neither Plaintiff nor Defendant's customer was in any way involved with the creation, generation, drafting, or actual sending of any, much less each, such text message sent to Plaintiff.  As much as Defendant reiterates how someone had to program the system and opt-in to receive these messages, none of that changes the fact that every ATDS requires someone to initially program it, and that the actual act of initially "opting in" to receive these messages does not by itself create a text message notification.  To rule otherwise would effectively abolish the TCPA.  Because each text message notification received by Plaintiff was dialed without human intervention, Defendant's system is an ATDS as required to support a claim under the TCPA.

## V.    CONCLUSION

In a desperate bid to draw this court's attention away from the undisputed facts in this case, Defendant's Motion for Summary Judgment raises multiple, creative TCPA defenses, and even goes so far as to call into question Plaintiff's character.  While claiming that a door being opened is an "emergency" situation requires, at best, a stretch of the imagination, accusing Plaintiff of impropriety while ignoring his immediate efforts to stop the unwanted messages is simply disingenuous.  Nonetheless, regardless of any of the legal arguments raised by Defendant, the undisputed facts are that Plaintiff received over 2,000 unauthorized

1  text message notifications from Defendant and that no human ever actually drafted, directed,

2  or sent any of those messages.  Because the FCC has repeatedly interpreted – as accepted by

3  numerous courts – an ATDS as equipment that has the capacity to dial telephone numbers

4  without human intervention, and because the text message notifications at issue were sent

5  without Plaintiff's authorization and were unrelated to any emergency situation necessitating

6  text messages relating to "health" or "safety," Plaintiff respectfully requests that this Court

7  deny Defendant's Motion for Summary Judgment.

8

9  Dated: June 29, 2015                          Respectfully submitted,

10                                                       CRAIG K. PERRY & ASSOCIATES

11                                                       By: /s/ Craig K. Perry
                                                              One of Plaintiff's Attorneys
12

13
   Craig K. Perry, Esq.
14 Nevada Bar # 003786
   8010 W. Sahara Avenue, Suite 260
15 Las Vegas, Nevada 89117
   Tel:  (702) 228-4777
16 Fax: (702) 943-7520
   cperry@craigperry.com
17
   Evan M. Meyers (*pro hac vice*)
18 McGUIRE LAW, P.C.
   55 W. Wacker Drive, 9th Fl.
19 Chicago, IL 60601
   Tel:  (312) 893-7002
20 emeyers@mcgpc.com

21 *Attorneys for Plaintiff Kirby Spencer*

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

        I hereby certify that on June 29, 2015, I electronically filed the forgoing *Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment* with the Clerk of the Court using the CM/ECF system.  Notice of this filing is sent to all counsel of record by operation of the Court' electronic filing system.  Parties may access this filing through the Court's system.


Dated:  June 29, 2015                    By: /s/ Evan M. Meyers_____
                                                          Evan M. Meyers