Ryan Lower (SBN 9108)
rml@morrislawgroup.com
MORRIS LAW GROUP
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, NV 89101
Telephone: (702) 474-9400
Facsimile: (702) 474-9422

Douglas W. Sullivan (pro hac vice)
dsullivan@crowell.com
Joel D. Smith (pro hac vice)
jsmith@crowell.com
CROWELL & MORING LLP
275 Battery Street, 23rd Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827

Attorneys for Defendant AT&T Digital Life, Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KIRBY SPENCER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AT&T DIGITAL LIFE, INC., a foreign corporation doing business in Nevada,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE No. 2:14-cv-01136-RFB-(PAL)<br><br>**DEFENDANT AT&T DIGITAL LIFE, INC.'S SECOND MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

1

**TABLE OF CONTENTS**

2

**Page**

3    MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

    I.    INTRODUCTION ........................................................................ 1
4

    II.   FACTUAL BACKGROUND .................................................... 3
5

        A.   AT&T Digital Life Provides Home Security And Monitoring
6                Services, Including Individualized, Real-Time Text Alerts That
            Warn Customers When Home Security Sensors Are Activated ................ 3
7

        B.   AT&T's System Does Not Have The Capacity To Generate
8                Random Or Sequential Numbers To Be Called ................................ 5

9            C.   AT&T Digital Life's System Can Generate And Send Text Alerts
            Only Through Human Intervention—The System Cannot Send Text
10               Alerts Any Other Way ................................................................ 5

11           D.   In March 2014, An AT&T Digital Life Customer Activated The
            Text Alert Feature And Set Up The System To Send Text Alerts To
12               702-496-3387 ........................................................................ 7

13           E.   Mr. Spencer Inadvertently Received Digital Life Text Alerts After
            The Phone Number Was Reassigned To Him................................. 8
14
        F.   This Lawsuit Is One Of Nearly A Dozen TCPA Lawsuits Filed By
15               Mr. Spencer To Recover Substantial Penalties Unrelated To Any
            Alleged Harm ........................................................................ 8
16
    III.  LEGAL STANDARD ............................................................. 9
17
    IV.  ARGUMENT ........................................................................ 10
18
        A.   Mr. Spencer's Claim Fails As A Matter Of Law Because The Text
19               Alerts Were Not Sent Using An Automatic Telephone Dialing
            System ................................................................................ 10
20
            1.   AT&T's System Does Not Meet The Statutory Definition
21                   Of An ATDS Because It Cannot Generate Random Or
                Sequential Telephone Numbers To Be Called ............................. 11
22
            2.   Mr. Spencer Cannot Evade Summary Judgment By Arguing
                That AT&T's System Dials Numbers Without Human
23                   Intervention .......................................................................... 14

24                   a.   The FCC Never Eliminated The Statutory Number
                    Generation Capacity Requirement ......................... 15
25
                b.   Even If The Term "ATDS" Could Be Construed To
26                       Apply To Any Equipment That Dials Numbers
                   Without Human Intervention, AT&T's System Does
27                      Not Meet That Definition ................................... 18

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-i-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

**TABLE OF CONTENTS**
(continued)

Page

        c.    The Opinions Of Randall A. Snyder Do Not Create A Factual Dispute Concerning The Use Of An ATDS ............................................................................ 20

    B.    Mr. Spencer's Claim Fails As A Matter Of Law Because AT&T Did Not Make The Calls At Issue ........................................... 21

    C.    Mr. Spencer's Claim Fails As A Matter Of Law Because The Text Alerts He Received Fall Within The TCPA's Broad "Emergency Purposes" Exception ..................................................... 22

V.    CONCLUSION .................................................................................. 25

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-ii-

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...................................................................................................10

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*,
    69 F.3d 337 (9th Cir. 1995)......................................................................................10

*Ashland Hosp. Corp. v. Serv. Employees Int'l Union, Dist. 1199 WV/KY/OH*,
    708 F.3d 737 (6th Cir. 2013).....................................................................................24

*In re Barboza*,
    545 F.3d 702 (9th Cir. 2008).....................................................................................10

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)...................................................................................................21

*Burslepp v. Improv Miami, Inc.*,
    2012 WL 4932692 (S.D. Fla. Oct. 16, 2012)...........................................................10

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).....................................................................................................9

*Chesbro v. Best Buy Stores*,
    705 F.3d 913 (9th Cir. 2012).....................................................................................24

*Derby v. AOL, Inc.*,
    2015 WL 3477658 (N.D. Cal. June 1, 2015) ...........................................................19

*Dominguez v. Yahoo, Inc.*
    2015 WL 6405811 – Fed. Appx. – (3d Cir. Oct. 23, 2015) ....................................17

*Fed. Express Corp. v. Holowecki*,
    552 U.S. 389 (2008)...................................................................................................17

*Glauser v. GroupMe, Inc.*,
    2015 WL 475111 (N.D. Cal. Feb. 4, 2015)..............................................................18

*Gottlieb v. Carnival Corp.*,
    436 F.3d 335 (2d Cir. 2006)......................................................................................16

*Gragg v. Orange Cab Co.*,
    995 F. Supp. 2d 1189 (W.D. Wash. 2014)...........................................................11, 13, 14, 19

*Grant v. Capital Mgmt. Servs., L.P.*,
    449 Fed. Appx. 598 (9th Cir 2011)...........................................................................22

CROWELL
& MORING LLP
ATTORNEYS AT LAW

*Hooper v. Lockheed Martin Corp.*,
    688 F.3d 1037 (9th Cir. 2012).................................................................................20

*Ibey v. Taco Bell*,
    2012 WL 2401972 (S.D. Cal. June 18, 2012)..........................................................14

*Icicle Seafoods, Inc. v. Khalif*,
    2006 WL 5159255 (W.D. Wash. 2006) .....................................................................20

*Marks v. Crunch San Diego*,
    2014 WL 5422976 (S.D. Cal. Oct. 23, 2014) .....................................................14, 16

*McKenna v. WhisperText*,
    2015 WL 5264750 (N.D. Cal. Sept. 9, 2015) ................................................18, 21, 22

*Ryabyshchuck v. Citibank (S. Dakota) N.A.*,
    2012 WL 5379143 (S.D. Cal. Oct. 30, 2012) ...........................................................24

*Satterfield v. Simon & Schuster, Inc.*,
    569 F.3d 946 (9th Cir. 2009)............................................................................ *passim*

*In re Stratosphere Corp. Secs. Litig.*,
    66 F. Supp. 2d 1182 (D. Nev. 1999) .........................................................................20

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001).....................................................................................................17

*U.S. v. Caceres-Olla*,
    738 F.3d 1051 (9th Cir. 2013)...................................................................................11

**Federal Statutes**

47 U.S.C. § 227(a) .......................................................................................... *passim*

47 U.S.C. § 227(b) .......................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 56(a).............................................................................................9

Fed. R. Evid. 702(a) ............................................................................................20

**Regulations**

47 C.F.R. § 64.1200(f)(2)...............................................................................12, 16

47 C.F.R. § 64.1200(f)(4)...........................................................................3, 22, 23

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-iv-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

1

**Other Authorities**

*In the Matter of the Telephone Consumer Protection Act of 1991*,
　　7 F.C.C. Rcd. 2736 (April 17, 1992)................................................................22, 23, 24

*In the Matter of Rules & Regs. Implementing the TCPA*,
　　7 F.C.C. Rcd. 8752 (Oct. 16, 1992) ...........................................................................23

*In the Matter of Rules & Regs. Implementing the TCPA*,
　　18 F.C.C. Rcd. 14014 (July 3, 2003) ....................................................................15, 16

*In re Rules & Regs. Implementing the TCPA*,
　　23 F.C.C. Rcd. 559 (Jan. 4, 2008)........................................................................15, 16

*In the Matter of Rules & Regs. Implementing the TCPA*,
　　27 F.C.C. Rcd. 1830 (Feb. 15, 2012) .........................................................................17

*In the Matter of Rules & Regs. Implementing the TCPA*,
　　27 F.C.C. Rcd. 15391 (Nov. 29, 2012) .......................................................................12

*In the Matter of Rules & Regs. Implementing the TCPA*,
　　30 F.C.C. Rcd. 7961 (July 10, 2015) .............................................................3, 12, 13

FCC, *Consumer Guide: Unwanted Telephone Calls* (Oct. 8, 2014)................................12

FCC, Press Release (June 18, 2015) ..............................................................................12

137 Cong. Rec. H11307-01, 1991 WL 250340 (Nov. 26, 1991) ............................13, 23

137 Cong. Rec. S18781-02, 1991 WL 252592 (Nov. 27, 1991)....................................22

H.R. Rep. 102-317, 1991 WL 245201 (Nov. 15, 1991)..................................................13

S. Rep. No. 102-178, 1991 WL 211220 (Oct. 8, 1991) ..................................................13

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-v-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

# NOTICE OF MOTION FOR SUMMARY JUDGMENT

Defendant AT&T Digital Life, Inc. ("AT&T") hereby moves the Court for summary judgment on Plaintiff Kirby Spencer's claim for relief under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*

This Second Motion for Summary Judgment is made pursuant to Fed. R. Civ. P. 56 and this Court's September 3, 2015 Minute Order, which denied without prejudice AT&T's original motion for summary judgment and ordered that AT&T may file another motion for summary judgment after the First Amended Complaint and responsive pleading have been filed.  (Doc. No. 50).  This motion is based upon the accompanying Memorandum of Law; the Declarations of Joel D. Smith, Alejandro Olea and Homi Torab, together with the exhibits attached thereto; the supporting Request for Judicial Notice; all the pleadings and other papers in this action; and such other written and oral arguments as may be presented to the Court.

Dated:  November 25, 2015                              _____/s/_____

                                                                              Joel D. Smith

Ryan Lower (SB 9108)
rml@morrislawgroup.com
MORRIS LAW GROUP
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, NV 89101
Telephone: (702) 474-9400
Facsimile: (702) 474-9422

Douglas W. Sullivan (pro hac vice)
dsullivan@crowell.com
Joel D. Smith (pro hac vice)
jsmith@crowell.com
CROWELL & MORING LLP
275 Battery Street, 23rd Floor
San Francisco, CA 94111
Telephone: (415) 986-2800
Facsimile: (415) 986-2827

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.   INTRODUCTION

3      Plaintiff Kirby Spencer has sued Defendant AT&T Digital Life, Inc. ("AT&T") for

4  alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*.

5  The TCPA was enacted in 1991 to curb abusive "telemarketing calls."  *Satterfield v. Simon &*

6  *Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009).  This lawsuit, however, has nothing to do with

7  telemarketing calls.  Instead, Mr. Spencer is seeking to exploit the TCPA to recover a $2.7

8  million jackpot in statutory penalties because he inadvertently received—on a five-dollar,

9  disposable cell phone that he seldom used—emergency text alerts that the previous user of his

10  cell phone number had requested.

11      This lawsuit is one of nearly a dozen TCPA lawsuits filed by Mr. Spencer in this District,

12  many of which demanded substantial amounts of money based on allegations that he received an

13  unusually high number of texts or calls.  Mr. Spencer made this and other lawsuits possible by

14  purchasing up to fifteen disposable "Tracfone" cell phones in 2014, knowing that he could sue for

15  statutory penalties if he received calls that were intended for individuals who previously used one

16  of the cell phone numbers.  Mr. Spencer seldom used his disposable cell phones, if at all, other

17  than for the purpose of enabling a lawsuit.

18      This particular lawsuit arose after Mr. Spencer activated one of his cell phones in May

19  2014, and began receiving text alerts generated by an AT&T Digital Life home security and

20  monitoring system, although he was not a Digital Life customer.  A key feature of the Digital Life

21  system is that customers can program and activate individualized text alerts that provide, in

22  virtually real-time, warnings when home intrusion sensors in their homes detect activity.  Here,

23  Mr. Spencer received text alerts because a Digital Life customer (who is not a party to this case)

24  had previously set up her Digital Life system to send text alerts whenever her front door or

25  kitchen door opened, but later changed the phone number she had provided without updating her

26  contact information and text preferences in the system.  After the customer's phone number was

27  reassigned to one Mr. Spencer's many cell phones, Mr. Spencer received text alerts that were

28

C ROWELL
& M ORING LLP
ATTORNEYS AT LAW

-1-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

1    intended for the AT&T customer.

2          Notwithstanding Mr. Spencer's alleged complaints to AT&T about the texts, he did not

3    attempt to block the texts, did not ask his wireless service company to assign him a different

4    phone number, and did not simply use one of his many other disposable cell phones (assuming

5    that he had such a need).  Instead, he waited for the text alerts to accumulate, and then filed this

6    lawsuit seeking millions of dollars unrelated to any alleged harm that he experienced.

7    Mr. Spencer's claim under the TCPA, however, fails as a matter of law for three separate and

8    independent reasons:

9          First, the TCPA does not prohibit all automated calls or texts.  Instead, it only regulates

10   calls and texts made by a specific type of telephone equipment commonly used by telemarketers,

11   *i.e.,* automated dialers that can randomly or sequentially generate phone numbers to be called.

12   Hence, to show a violation of the TCPA, a plaintiff must prove that the texts he received on his

13   cell phone were sent via an "automatic telephone dialing system" ("ATDS"), a term narrowly

14   defined by the statute as equipment that has the capacity to store or produce telephone numbers to

15   be called, "using a random or sequential number generator, and . . . to dial such numbers."  47

16   U.S.C. § 227(a).

17         Here, AT&T's system is incapable of random or sequential number generation, and

18   sending text alerts to random or sequential cell phone numbers makes no sense in the context of

19   the Digital Life service, which is designed to provide individualized, real-time alerts to customers

20   about events happening in their homes.  Indeed, Mr. Spencer does not contend that AT&T's

21   system has the requisite number generation capacity.  Instead, he argues that the term "ATDS"

22   includes any system that can dial numbers without human intervention, irrespective of its ability

23   to generate numbers.  Even if that interpretation had legal merit (it does not), the Digital Life

24   system does not meet that definition either.  Human intervention is necessary because: (a) Digital

25   Life customers control who receives texts, when texts are sent, and under what circumstances

26   they are sent; and (b) no text is sent unless someone does something in a Digital Life-equipped

27   home that triggers a text alert, such as open a door or window.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-2-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

1   <u>Second</u>, Section 227(b)(1)(A)(iii) of the TCPA imposes liability on the person that

2   "makes" the call.  On July 10, 2015, the FCC issued an order clarifying that where, as here, a

3   company provides an application that allows consumers to control whether and under what

4   circumstances a text is sent, and who receives the text, it is the consumer, not the company, that is

5   deemed to have made the call.  As the FCC explained, such applications differ from the

6   telemarketing "calling campaigns" that the TCPA is intended to curb.  *See In the Matter of Rules*

7   *& Regs. Implementing the TCPA*, 30 F.C.C. Rcd. 7961, 7982, ¶32 (July 10, 2015).

8   <u>Third</u>, the TCPA expressly permits calls and texts that are made for "emergency

9   purposes."  FCC-promulgated regulations define the term "emergency purposes" to mean "any

10  situation affecting the health and safety of consumers" (47 C.F.R. § 64.1200(f)(4)), and the FCC

11  has instructed that the term is to be broadly construed.  Here, the home security services provided

12  by AT&T are called "Life Safety Services," and the undisputed facts establish that the text alerts

13  that Mr. Spencer received were part of those services.  The sole purpose of the text alerts was to

14  warn the Digital Life customer that home security sensors in her home had detected that the front

15  door or kitchen door had been opened.  Indeed, Mr. Spencer's own expert repeatedly

16  acknowledged that the text alerts at issue warned of "security events" and "breaches" of security.

17  By their very nature, home security system warnings concern the safety of consumers, and thus

18  the text alerts were sent for "emergency purposes."  It is undisputed that AT&T had no other

19  purpose in sending the text alerts, and that this case is not about telemarketing.

20  **II.  FACTUAL BACKGROUND**

21      **A.  AT&T Digital Life Provides Home Security And Monitoring Services,**
            **Including Individualized, Real-Time Text Alerts That Warn Customers**
22          **When Home Security Sensors Are Activated.**

23      AT&T Digital Life is an all Internet-Protocol based wireless home security and

24  monitoring service.  (Declaration of Alejandro Olea ("Olea Decl."), ¶¶ 4, 6 [Ex. 1 to Smith

25  Decl.]; *see* First Amended Complaint ("FAC"), ¶¶ 8, 11 [Ex. 10 to Smith Decl.].[1])  The Digital

26

27          [1] All exhibits cited herein are attached to the Declaration of Joel D. Smith in Support of
    AT&T Digital Life Inc.'s Second Motion for Summary Judgment ("Smith Decl.").

28

1  Life system includes many typical professional monitoring and home security features, such as

2  alarms, smoke detectors, motion sensors, and sensors that detect when doors and windows are

3  opened.  (Olea Decl., ¶ 6 [Ex. 1 to Smith Decl.]; Digital Life website screenshots (ATT000078-

4  81) [Ex. 4 to Smith Decl.].)  Collectively, the Digital Life home security and professional

5  monitoring services are called "Life Safety Services."  (Olea Decl., ¶ 6 [Ex. 1 to Smith Decl.];

6  Digital Life User Guide, at p. 1 (ATT000016) [Ex. 3 to Smith Decl.].)  AT&T's website likewise

7  emphasizes the "safety and security features" of the Digital Life system.  (Digital Life website

8  screenshots (ATT000079) [Ex. 4 to Smith Decl.]; Olea Decl., ¶ 7 [Ex. 1 to Smith Decl.].)

9       The Life Safety Services provided by the Digital Life system are supported by several

10  high-tech features.  Using a computer or wireless device, Digital Life customers can remotely

11  manage their home security and monitoring devices by logging on to a password-protected,

12  online account management application ("online tool") provided to Digital Life customers.  (Olea

13  Decl., ¶ 8 [Ex. 1 to Smith Decl.].)  Customers can log on and use the online tool, for example, to

14  remotely view video feeds of their homes, arm or disarm alarms, or to monitor door, window and

15  motion sensors.  (*Id.*)

16       One of the key features of the online tool is that customers can use it to program the

17  system to send "text alerts" that provide instant notifications when a security sensor in the

18  customer's home is activated.  (Olea Decl., ¶ 9 [Ex. 1 to Smith Decl.]; FAC, ¶ 11 [Ex. 10 to

19  Smith Decl.].)  The text alerts describe what event has happened in the home, such as a security

20  sensor detecting a front door or window opening, and indicate the time that the event occurred.

21  (Olea Decl., ¶ 9 [Ex. 1 to Smith Decl.]; *see also* Example Text Alerts [Ex. 5 to Smith Decl.];

22  Smith Decl., ¶ 6.)  The text alerts also instruct customers to go to the online tool to obtain more

23  information about the event described in the text alert.  (Olea Decl., ¶ 9 [Ex. 1 to Smith Decl.];

24  Example Text Alerts [Ex. 5 to Smith Decl.].)

25       AT&T refers to these text alerts as "customer-defined" texts because customers, not

26  AT&T, determine when and under what circumstances text alerts are sent.  (Olea Decl., at ¶¶ 10-

27  11 [Ex. 1 to Smith Decl.].)  Each Digital Life text alert sent by AT&T's system is unique, because

28

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

each text describes a particular event in a particular Digital Life-equipped home, and is sent only to the cell phone number specified by the Digital Life customer.  (*Id.* at ¶ 11; Torab Depo., 77:18-78:6 [Ex. 17 to Smith Decl.].)  Text alerts are not sent *en mass* to consumers and are not used to promote products or services.  (Olea Decl., at ¶ 12 [Ex. 1 to Smith Decl.].)  Their sole purpose is to warn Digital Life customers about events happening in their homes, such as the activation of a home security sensor.  (*Id.*)   The text alert feature is very popular among Digital Life customers, and within its first year, the Digital Life service expanded to seventy-five markets in the United States and won the Best Consumer Mobile Service award at the Mobile World Congress in February 2014.  (*Id.* at ¶ 13.)

### B. AT&T's System Does Not Have The Capacity To Generate Random Or Sequential Numbers To Be Called.

AT&T's system does not have (and has never had) the capacity to produce or store numbers to be called, using a random or sequential number generator, and to call those numbers. (Declaration of Homi Torab ("Torab Decl."), ¶ 16.  [Ex. 2 to Smith Decl.]; *see also id.* at ¶ 4.) The only way that cell phone numbers can be generated and stored is when a sales associate manually enters a Digital Life customer's number into the system at the point of sale, or if a Digital Life customer manually enters a number in the online account management tool, and the system can only call those numbers.  (*Id.*)  AT&T would have to replace its current hardware and software with a new system in order to have the ability to generate or store random or sequential numbers, and to call those numbers.  (*Id.* at ¶ 17.)  Doing so, however, would make no sense, because the purpose of providing individualized, real-time information to Digital Life customers is to alert them about security events happening in their homes.  (*Id.*)

### C. AT&T Digital Life's System Can Generate And Send Text Alerts Only Through Human Intervention—The System Cannot Send Text Alerts Any Other Way.

By default, when AT&T Digital Life equipment is first installed in a customer's home, the system is incapable of sending text alerts to the customer about events happening in his or her home.  (Torab Decl., ¶ 6 [Ex. 2 to Smith Decl.].)  Customers only receive text alerts if they access the online tool described in Section II.A above and activate the text alert feature.  To do so,

Crowell & Moring LLP
Attorneys At Law

customers must use the online tool to create one or more "programs" that control when the system will send a text alert, and who will receive it.  (*Id*; Olea Decl., ¶ 13 [Ex. 1 to Smith Decl.].)  That process requires the customer to manually complete four steps:

- **<u>First</u>**, the customer must access the online tool and enter his or her unique Digital Life user ID and password.  By doing so, the customer obtains access to his or her account information and can set individualized text preferences or discontinue text alerts.  (Torab Decl. ¶ 7 [Ex. 2 to Smith Decl.]; Log-in Screen (ATT000164) [Ex. 7 to Smith Decl.].

- **<u>Second</u>**, using fields available on the online tool, the customer must specify which event will prompt AT&T's system to generate and send a text alert, such as a door or window opening.  The system cannot generate and send text alerts unless and until the customer specifies the event that will prompt a text alert.  (Torab Decl. ¶ 8 [Ex. 2 to Smith Decl.]; *see* also Set Up Notifications/ Select Where to Send Screen (ATT000410) [Ex. 8 to Smith Decl.].

- **<u>Third</u>**, after selecting what event will trigger a text alert, the customer must then go to a screen titled "Select Where to Send."  By default, the customer will see the phone number and email that he or she provided to AT&T when the customer purchased the Digital Life system (the phone number and email information is manually input by a sales associate at the point of sale).  Next to the phone number and email are check boxes, and the system can send alerts by email, text or both depending on which check boxes the customer clicks.  The system will send a text alert only if the customer clicks on the check box next to the phone number in the "Select Where to Send" screen, and will only send a text alert to the phone number shown on that screen.[2]  (Torab Decl. ¶ 9 [Ex. 2 to Smith Decl.]; *see* also Set Up Notifications/ Select Where to Send (ATT000411-13) [Ex. 8 to Smith Decl.].)

---

[2] If the phone number listed on the "Select Where to Send" screen is no longer the correct number, the customer can manually update his or her correct number in the online tool, and the new number will then replace the old number on the "Select Where to Send" screen.  (Torab Decl., at ¶ 10 [Ex. 2 to Smith Decl.].)

- **Fourth**, after completing the above-described steps, the customer must then select a name for the "program" and save it in the system.  As part of that process, the customer also must specify when the program will be active and send alerts.  For instance, the customer can create one program to send text alerts whenever a window is opened (without any time restriction), and another program to send text alerts if the front door is opened during weekday afternoons.  (Torab Decl. ¶ 11 [Ex. 2 to Smith Decl.]; *see also* Name and Save Program Screen (ATT000414-15) [Ex. 9 to Smith Decl.].)

It is undisputed that AT&T's system will generate and send text alerts to a particular phone number only if the customer manually completes the above four steps, and only if an event happens in the home that the customer specified should prompt a text alert.  (Torab Decl., at ¶¶ 12-14 [Ex. 2 to Smith Decl.].)  Mr. Spencer admitted in his opposition to AT&T's first motion for summary judgment that in order to activate text alerts, a Digital Life customer must use the online tool to activate text alerts, choose the cell phone number to which the text messages will be sent and specify the circumstances under which a text will be sent.  (Opp'n to First MSJ, at 7:25-8:1 [Ex. 18 to Smith Decl.]; *see also id.* 11:14-16 ("The type of event that would result in a . . . text messaging notification was determined solely by the customer . . . .").

Thus, in order to send text alerts like those that were allegedly received by Mr. Spencer, the system requires two levels of human intervention.  (*Id.* at ¶ 15.)  First, as described above, a customer must manually log onto the online tool, activate the text alert feature and specify the number to receive the text alert.  (*Id.*)  Second, somebody in the Digital Life-equipped home must do something to activate a sensor, such as open a door or window.  (*Id.*)

### D. In March 2014, An AT&T Digital Life Customer Activated The Text Alert Feature And Set Up The System To Send Text Alerts To 702-496-3387.

In late February 2014, an AT&T Digital Life customer (who is not a party to this case) purchased a Digital Life system.  (Olea Decl., ¶ 14 [Ex. 1 to Smith Decl.]; Customer Service Records (ATT000001) [Ex. 6 to Smith Decl.].)  At the time, the customer had given AT&T the phone number 702-496-3387 as her customer contact number.  (*Id.*)  The Digital Life customer (or someone in her household with access to her account) successfully used the online tool to

activate the text alert feature, and on March 14, 2014, AT&T began sending customer-defined text alerts to the phone number 702-496-3387.  (Olea Decl., ¶ 15 [Ex. 1 to Smith Decl.].)

### E. Mr. Spencer Inadvertently Received Digital Life Text Alerts After The Phone Number Was Reassigned To Him.

Sometime after the Digital Life customer activated the text alert feature, she stopped using phone number 702-496-3387.  (*Id.* at ¶ 16.)  The phone number was later recycled and reassigned to a disposable "Tracfone" prepaid cell phone which Plaintiff Kirby Spencer purchased at a Target store for about five dollars.  (*Id.*; Spencer Dep., 35:4-24; 74:7-76:1; 78:4-7 [Ex. 12 to Smith Decl.]; Example Text Alerts [Ex. 5 to Smith Decl.].)  However, when the Digital Life customer stopped using phone number 702-496-3387, she did not use the online tool to discontinue the text alerts to that number (if she had, then the text alerts would have stopped immediately).  (Olea Decl., ¶ 17 [Ex. 1 to Smith Decl.].)  As a result, the text alert feature remained active and text alerts that were intended for the Digital Life customer inadvertently continued to be sent to 702-496-3387 after the number was reassigned to Mr. Spencer.  (*Id.*)  Each of the text alerts that Mr. Spencer received warned either that the front door or kitchen door of the Digital Life customer's home had been opened.  (Spencer Depo., 134:1-7 [Ex. 12 to Smith Decl.].)  The text alerts were discontinued after AT&T confirmed with the Digital Life customer that she no longer was using phone number 702-496-3387, and was able to help her remove the phone number from her text alert preferences.  (Olea Decl., ¶ 18 [Ex. 1 to Smith Decl.].)

### F. This Lawsuit Is One Of Nearly A Dozen TCPA Lawsuits Filed By Mr. Spencer To Recover Substantial Penalties Unrelated To Any Alleged Harm.

Mr. Spencer has filed nearly a dozen TCPA lawsuits in this District, many of which seek substantial statutory penalties for an unusually high number of calls or texts.[3]  In this lawsuit, he

---

[3] *Spencer v. Nationwide Credit, Inc.*, 2:14-cv-02051-JAD-NJK (filed Dec. 8, 2014); *Spencer v. Security Finance Corp. of Nevada*, 2:14-cv-01914-RFB-PAL (filed Nov. 17, 2014); *Spencer v. Bluestem Brands, Inc.*, 2:14-cv-01880-RFB-VCF (filed Nov. 10, 2014); *Spencer v. Collection Bureau of America, Ltd.*, 2:14-cv-01863-RFB-CWH (filed Nov. 6, 2014); *Spencer v. MRS BPO, LLC*, 2:14-cv-01833-MMD-GWF (filed Nov. 3, 2014); *Spencer v. Kohl's Department Stores*, 2:14-cv-01646-RFB-CWH (filed Oct. 7, 2014); *Spencer v. Wells Fargo Bank, N.A.*, 2:24-cv-01648-LDG-GWF (filed October 7, 2014); *Spencer v. Midland Credit Management, Inc.*, 2:14-cv-01226 (filed July 28, 2014); *Spencer v. Portfolio Recovery Associates*, 2:14-cv-01217-(Continued…)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-8-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

1   is seeking to collect over $2.7 million in statutory penalties.  (Supp. Response to Interrog. No. 1

2   [Ex. 15 to Smith Decl.].)  The purported actual damages caused by the texts, if any, were so

3   inconsequential that Mr. Spencer never bothered to calculate them.  (*Id.*; Spencer Depo., 117:17-

4   118:9 [Ex. 12 to Smith Decl.].)

5        Mr. Spencer's lawsuits were made possible by the fact that he purchased up to fifteen

6   disposable, pre-paid cell phones in 2014, including the phone that received the Digital Life text

7   alerts at issue here.  (Spencer Depo., 64:24-65:11 [Ex. 12 to Smith Decl.].)  Most people use only

8   one cell phone, and Mr. Spencer seldom, if ever, used the disposable phones that he purchased

9   (including the phone that received Digital Life text alerts).  (Spencer Depo., 42:21-43:7; 44:15-

10  45:22; 70:2-71:4; 80:11-15 [Ex. 12 to Smith Decl.]; Snyder Depo., 12:21-13:10 [Ex. 13 to Smith

11  Decl.].)  Mr. Spencer purchased the phones knowing that he might receive calls or texts intended

12  for the previous user of the cell phone number and, if he did, his practice in 2014 was to file a

13  lawsuit under the TCPA.  (*See* Spencer Depo., at 54:21-55:15; 72:25-73:7 [Ex. 12 to Smith

14  Decl.].)  As a result of this practice, during the same period of time that Mr. Spencer received text

15  alerts from Digital Life, he also received hundreds of allegedly unsolicited calls or texts from

16  other companies on other disposable cell phones that he had purchased.  (*Id.* at 46:15-49:6; 51:15-

17  21.)  Mr. Spencer testified that he has never heard of anyone who has received as many allegedly

18  unsolicited calls or texts as he has, or who has filed as many TCPA lawsuits as he has.  (*Id.* at

19  56:9-19; 59:4-15.)

20  **III.  LEGAL STANDARD**

21       Summary judgment is appropriate where "there is no genuine dispute as to any material

22  fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary

23  judgment procedure is properly regarded not as a disfavored procedural shortcut," but rather as a

24  means of securing "the just, speedy and inexpensive determination of every action."  *Celotex*

25  *Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Once a defendant shows that it is entitled to summary

26  ――――――――――――

27  MMD-PAL (filed July 25, 2014); *Spencer v. LTD Financial Servs.*, 2:14-cv-01138-APG-CWH
    (filed July 11, 2014); *Spencer v. AT&T Digital Life, Inc.*, 2:14-cv-01136-RFB-PAL (filed July 10,
    2014).  (Supp. Response To Interrogatory No. 8 [Ex. 15 to Smith Decl.].)

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-9-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

1   judgment, the plaintiff may not refute this showing with conclusory allegations, conjecture, or

2   speculation, but must instead "set forth specific facts showing that there is a genuine issue for

3   trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation omitted);

4   *accord Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 345 (9th Cir. 1995).

5   "[T]he mere existence of some alleged factual dispute between the parties will not defeat an

6   otherwise properly supported motion for summary judgment; the requirement is that there be no

7   genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. "An issue is 'genuine' only if

8   there is a sufficient evidentiary basis on which a reasonable fact finder could find for the

9   nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under

10  the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008). "If the evidence [in

11  opposition to summary judgment] is merely colorable, or is not significantly probative, summary

12  judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

13  **IV.  ARGUMENT**

14        As a matter of law and based on the undisputed facts, Mr. Spencer's claim under the

15  TCPA must be dismissed for three separate and independent reasons.  <u>First</u>, the text messages

16  were not sent with an automatic telephone dialing system, and thus Mr. Spencer cannot establish

17  this necessary element of his claim.  <u>Second</u>, AT&T did not "make" the calls at issue; instead, it

18  provided an application that allowed its customers to make the calls.  <u>Third</u>, the text messages at

19  issue are not actionable because they fall within the TCPA's broad "emergency purposes"

20  exception.

21              **A.  Mr. Spencer's Claim Fails As A Matter Of Law Because The Text Alerts
22                Were Not Sent Using An Automatic Telephone Dialing System.**

23        Section 227(b)(1)(A) does not regulate all automated text messages, but only those that

24  are sent with equipment that meets the statutory definition of an "automatic telephone dialing

25  system" ("ATDS").  *See* 47 U.S.C. § 227(b)(1)(A).  "It is Plaintiff who must show, as an element

26  of his claim, that Defendant used an ATDS," and summary judgment for the defendant is

27  warranted where the plaintiff cannot meet that burden.  *Burslepp v. Improv Miami, Inc.*, 2012 WL

28  4932692 at *2 (S.D. Fla. Oct. 16, 2012).  As set forth more fully below, Mr. Spencer cannot

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-10-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

establish the use of an ATDS here for two reasons.  <u>First</u>, AT&T's equipment does not meet the statutory definition of an ATDS because it does not have the capacity to generate and call randomly or sequentially produced numbers, as required by the plain language of the statute. <u>Second</u>, although Mr. Spencer argues that the term "ATDS" includes any system that dials numbers without human intervention (regardless of its capacity to generate numbers), that interpretation is inconsistent with the plain language of the TCPA and, in any event, the undisputed facts establish that AT&T's equipment does not and cannot dial numbers without human intervention.

      **1.   AT&T's System Does Not Meet The Statutory Definition Of An ATDS Because It Cannot Generate Random Or Sequential Telephone Numbers To Be Called.**

The TCPA defines an ATDS as "equipment which has the capacity (A) to store or produce telephone numbers to be called, <u>using a random or sequential number generator</u>; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1) (emphasis added).  The plain terms of the statute provide that equipment qualifies as an ATDS only if it has the capacity to generate random or sequential numbers to be called.  *Id.*  "Random number generation' means random sequences of 10 digits, and sequential number generation' means (for example) (111) 111-1111, (111) 111-1112, and so on."  *Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189, 1193 (W.D. Wash. 2014) (internal quotation omitted).  Moreover, numerous authorities confirm that the definition of the term "ATDS" turns on whether the equipment has the requisite number generation capacity.

    <u>First</u>, the Ninth Circuit held in *Satterfield* that the statutory definition of the term "ATDS" is clear and unambiguous, and that courts must give effect to every word in the definition. *Satterfield*, 569 F.3d at 951; *see also U.S. v. Caceres-Olla*, 738 F.3d 1051, 1056 (9th Cir. 2013) ("It is our duty to give effect, if possible, to every clause and word of a statute").  Hence, as explained in *Satterfield*, an ATDS is equipment that has the "capacity" to "store, produce, or call randomly or sequentially generated telephone numbers."  *Satterfield*, 569 F.3d at 951.  Although equipment need not necessarily be used in practice for the purpose of generating random or sequential numbers to be called, the statute requires that it have that "capacity" in order to qualify

1   as an ATDS.  *Id.*

2       <u>Second</u>, the FCC likewise emphasizes the number generation capacity requirement.  The

3   definition of an "ATDS" in the FCC's implementing regulations copies nearly verbatim the

4   statutory definition of an ATDS, including the random or sequential number generation capacity

5   requirement.  *See* 47 C.F.R. § 64.1200(f)(2) (effective Oct. 16, 2013) ("The terms [ATDS] and

6   autodialer mean equipment which has the capacity to store or produce telephone numbers to be

7   called using a random or sequential number generator and to dial such numbers").  Similarly, a

8   2014 FCC Consumer Guide explained, "[a]utodialers can produce, store and dial telephone

9   numbers using a random or sequential number generator."  FCC, *Consumer Guide: Unwanted*

10  *Telephone Calls* (Oct. 8, 2014) ("FCC Consumer Guide") [Ex. 11 to Smith Decl. and Ex. A to

11  Request for Judicial Notice ("RJN")].)

12      Equally important, the FCC confirmed the number generation capacity requirement in a

13  2012 Order, and in its most recent July 10, 2015 Order addressing the definition of the term

14  ATDS.  In its 2012 Order, the FCC stated that it "emphasized that this definition [of an ATDS in

15  Section 227(a)(1)] covers any equipment that has the specified <u>capacity</u> to generate numbers and

16  dial them without human intervention," even if that capacity is not used in practice.  *In the Matter*

17  *of Rules & Regs. Implementing the TCPA*, 27 F.C.C. Rcd. 15391, 15392 ¶ 2 n.5 (Nov. 29, 2012)

18  (emphasis in original) ("2012 FCC Order").  Similarly, on June 18, 2015, the FCC issued a press

19  release stating that it would soon issue an order  "affirming the law's definition of an autodialer,"

20  and once again emphasized that an ATDS is "defined in in the [TCPA] as any technology with

21  the capacity to dial random or sequential numbers."  (June 18, 2015 Press Release [Ex. 19 to

22  Smith Decl. and Ex. B to RJN].)  The FCC subsequently issued its order on July 10, 2015,

23  wherein the FCC cited the statutory definition of the term "ATDS" and explained that the

24  definition focuses on the "'capacity' to dial random and sequential numbers, even if it is not

25  presently used for that purpose."  *In the Matter of Rules & Regs. Implementing the TCPA*, 30

26  F.C.C. Rcd. 7961, 7972 ¶10 ("2015 FCC Order").  The FCC further explained that "there must be

27  more than a theoretical potential that the equipment could be modified to satisfy the 'autodialer'

28

[i.e., "ATDS"] definition." *Id.* at ¶ 18; *see also id.* at ¶16 (a "mere theoretical modification . . . is insufficient to sweep [equipment] into our interpretation of 'capacity.'").

**Third,** Congress could have drafted the statute to restrict all automated calls or texts to wireless cell phone numbers but it did not do so. When it defined the term "ATDS," Congress was concerned that by using equipment that generated random or sequential numbers, telemarketers could reach unlisted numbers, hospitals and emergency services, or disrupt businesses who receive sequentially-dialed calls. *See* 137 Cong. Rec. H11307-01, 1991 WL 250340, at *11310 (Nov. 26, 1991) ("automatic dialing machines place calls randomly, meaning they sometimes call unlisted numbers, or numbers of hospitals, police and fire stations, causing public safety problems"); S. Rep. No. 102-178, 1991 WL 211220, at *2 (Oct. 8, 1991) (the TCPA seeks to prevent telemarketers from "dial[ing] numbers in sequence, thereby tying up all the lines of a business and preventing outgoing calls"). At the same time, however, Congress did not want to inhibit "expected or desired communications between businesses and their customers." H.R. Rep. 102-317, 1991 WL 245201, at *17 (Nov. 15, 1991). Congress thus confined potential TCPA claims to calls involving specialized equipment used by telemarketers that is capable of randomly or sequentially generating and dialing telephone numbers, thereby ensuring that not every automated call or text to a cell phone becomes a potential federal case.

**Fourth,** in light of the above authorities, courts have held that dismissal for the defendant is proper where, as here, the defendant's equipment lacks the required number generation capacity. *Gragg*, for example, involved an automated text messaging system used by taxi companies. *Gragg*, 995 F. Supp. 2d at 1194. After a customer called to request a taxi cab, the dispatcher manually entered the customer's phone number into the system, which then transmitted a text message to that customer with customer-specific information about the request, such as the distance from the taxi cab to the customer. *Id.* at 1191. The system automatically sent a text to the customer, however, only if a cab driver pressed a button on a mobile computer in the cab indicating that he or she had accepted the call and was on the way to pick up the customer. *Id.* The *Gragg* court held that, as a matter of law, the system did not meet the

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-13-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

definition of an ATDS because the plaintiff "submitted no evidence that [defendant's system] can autonomously randomly or sequentially generate numbers to be dialed as required to fulfill the statutory definition of an ATDS." *Id.* at 1193.

Similarly, in *Marks,* which also involved automated text messaging, the court followed *Gragg* and granted summary judgment for the defendants because the equipment at issue was incapable of generating random or sequential numbers. *Marks v. Crunch San Diego*, 2014 WL 5422976, *3 (S.D. Cal. Oct. 23, 2014). *Marks* specifically held that the ability to store phone numbers in a database and automatically call those numbers is insufficient as a matter of law to establish that a system qualifies as an ATDS. *Id.* at *3; *see also Ibey v. Taco Bell*, 2012 WL 2401972, *3 (S.D. Cal. June 18, 2012) ("To constitute an ATDS under the statute, the equipment must have the capacity to . . . use a random or sequential number generator to text the numbers.").

Here, the undisputed facts establish that AT&T's system lacks the capacity to call randomly or sequentially generated numbers and cannot reasonably be modified to have the requisite capacity. (Torab Decl., ¶¶ 15-17 [Ex. 2 to Smith Decl.].) The only way that cell phone numbers can be generated is by a person manually entering the number in the system, and text alerts are sent only to phone numbers specified by Digital Life customers. (*Id.* at ¶ 16; *see also id.* at ¶¶ 9-10, 12-15; Olea Decl., ¶ 11 [Ex. 1 to Smith Decl.]). Indeed, Mr. Spencer has never argued that AT&T's system has the requisite number generation capacity, and his expert witness, Randall Snyder, offers no contrary opinion that AT&T's system has such capacity. (Snyder Depo., 100:8-14 [Ex. 13 to Smith Decl.]; *see also id.* at 109:17-110:14; Snyder Decl., ¶ 47 [Ex. 14 to Smith Decl.].) Hence, no ATDS was used here and, thus, the Court should grant summary judgment for AT&T.[4]

### 2.  Mr. Spencer Cannot Evade Summary Judgment By Arguing That AT&T's System Dials Numbers Without Human Intervention.

In a 2003 Order, the FCC interpreted the term "ATDS" to include a specific category of telemarketing equipment not at issue here called "predictive dialers," and noted that the basic

---

[4] The fact that Mr. Spencer may have received a large number of the misdirected texts is irrelevant. He still must establish that they were generated by an ATDS or his action fails.

1   function of predictive dialers is the capacity to dial lists of numbers without "human

2   intervention."[5]   *In the Matter of Rules & Regs. Implementing the TCPA*, 18 F.C.C. Rcd. 14014,

3   14091, ¶ 132 (July 3, 2003) ("2003 FCC Order").   The FCC briefly reiterated that position in a

4   later 2008 Order which also addressed predictive dialers, citing its earlier 2003 Order.   *In re Rules*

5   *and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C. Rcd.

6   559, 566, ¶ 12 (Jan. 4, 2008) ("2008 FCC Order").

7          Some courts have construed the 2003 FCC Order to mean that any equipment that has the

8   capacity to dial numbers without human intervention qualifies as an ATDS, irrespective of

9   whether the equipment can generate random or sequential numbers.  Mr. Spencer cannot rely on

10  that interpretation to establish the use of an ATDS here, however, for three reasons.  First, the

11  FCC did not eliminate the statutory requirement that to qualify as an ATDS, the equipment must

12  have the capacity to generate random or sequential numbers to be called.  Second, even if the

13  term "ATDS" could properly be construed to include any equipment that can dial numbers

14  without human intervention (irrespective of the capacity to generate numbers), AT&T's system is

15  not an ATDS because it requires human intervention.  Third, Mr. Spencer proffers the opinion of

16  Randall Snyder that AT&T's system is an ATDS because it purportedly dials numbers without

17  human intervention.  Mr. Snyder's opinion cannot create a genuine issue of fact, however,

18  because it is inadmissible legal opinion, he is not an expert on the term "human intervention," and

19  he acknowledges that Digital Life customers control when and under what circumstances texts are

20  sent, and who receives them.

21                    **a.   The FCC Never Eliminated The Statutory Number Generation**
22                    **Capacity Requirement.**

23          The proposition that the FCC, in its 2003 Order or 2008 Order, purported to broaden the

24  statutory definition of an ATDS by eliminating the random or sequential number generation

---

25          [5] A predictive dialer is equipment that repeatedly calls a phone number until a human
26  voice comes on the line, at which point the call is transferred to a sales agent who can speak to the
    recipient of the call.  *See* 2003 FCC Order, at 14091, ¶ 131.  This case does not involve the use of
27  a predictive dialer.  (Torab Decl. ¶ 18 [Ex. 2 to Smith Decl.]; Snyder Depo., 98:9-16 [Ex. 13 to
    Smith Decl.].)
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

1    requirement fails for three reasons:

2        First, in the FCC Orders relied on by Mr. Spencer, the FCC did not (and of course, could

3    not) simply ignore the language in Section 227(a)(1) set forth by Congress.  In the FCC's 2003

4    and 2008 Orders, the FCC responded to arguments that potential defendants should not be liable

5    under the TCPA if they use a predictive dialer to dial from lists of numbers, rather than actually

6    utilizing a predictive dialer's ability to generate random or sequential numbers.  *See* 2003 Order,

7    18 F.C.C. Rcd. at 14091-92, ¶ 130; 2008 Order, 23 F.C.C. Rcd. at 566, ¶ 12.  The FCC rejected

8    that argument because, under Section 227(a)(1), the issue of whether equipment qualifies as an

9    ATDS does not turn on how the defendant uses the equipment in practice, but instead on whether

10   the equipment is capable of generating and dialing random or sequential numbers to be called,

11   even if the defendant does not use the equipment for that purpose.  *See* 2003 FCC Order, 18

12   F.C.C. Rcd. at 14091-92, ¶¶ 131-32.  Hence, the FCC reasoned, predictive dialers—which

13   typically have the ability to call randomly or sequentially generated numbers— meet the

14   definition of an ATDS, and therefore it is irrelevant if in practice they dial numbers from lists.[6]

15   *See id.*

16       Second, the notion that the 2003 and 2008 Orders somehow changed the definition of the

17   term "ATDS" makes no sense in light of other regulations and publications by the FCC, and its

18   subsequent Orders in 2012 and 2015.  As shown above, the definition of an "ATDS" in the FCC's

19   implementing regulations copies nearly verbatim the statutory definition of an ATDS.  *Compare*

20   47 C.F.R. § 64.1200(f)(2) *with* 47 U.S.C. § 227(a)(1); *see also Marks*, 2014 WL 5422976 at *2

21   ("The FCC itself adheres to . . . the statutory definition of ATDS in [its] regulations").  Although

22   the FCC has amended other portions of its TCPA-related definitions in recent years, the FCC has

23   never amended its official definition of an ATDS to eliminate the number generation requirement.

24   _____

25       [6] Moreover, it is "well-established," including in the context of the TCPA, that "repeal or
     amendment by implication is disfavored."  *Gottlieb v. Carnival Corp.*, 436 F.3d 335, 340 (2d Cir.
26   2006).  If the FCC had intended to effectuate a significant change in the law by amending the
     definition of the term ATDS, it would have said so in its 2003 or 2008 Orders, but it did not.  Mr.
27   Spencer has never been able to identify any statement by the FCC that it intended to depart from
     the statutory definition of an ATDS.

28

*See*, *e.g.*, *In the Matter of Rules & Regs. Implementing the TCPA*, 27 F.C.C. Rcd. 1830, at Appendix A, *1862-63 (Feb. 15, 2012) (amending various TCPA-related definitions under 47 C.F.R. § 64.1200(f)).  Likewise, if the FCC had eliminated the number generation requirement in its 2003 Order, it would not have told consumers otherwise in its 2014 FCC Consumer Guide. (FCC Consumer Guide [Ex. 11 to Smith Decl.] ("[a]utodialers can produce, store and dial telephone numbers using a random or sequential number generator.")).

Equally important, to the extent that there was any ambiguity in the FCC's 2003 and 2008 Orders before, the ambiguity was eliminated by the FCC's later 2012 and 2015 Orders, where the FCC "emphasized" the importance of the number generation capacity requirement and "affirmed" the statutory definition of an ATDS.  (*See* Section IV(A)(1) above, p. 12).  Moreover, in the recent decision in *Dominguez*, the plaintiff made the same "human intervention" argument that Mr. Spencer makes here, based on the FCC's 2003 Order.  *Dominguez v. Yahoo, Inc.* 2015 WL 6405811 at *1 – Fed. Appx. – (3d. Cir. Oct. 23, 2015).  After analyzing the FCC's 2003 Order and recent 2015 Order, however, the Third Circuit stated, "[W]e reject [plaintiff's] claim that the FCC has interpreted the autodialer definition to read out the 'random or sequential number generator' requirement." The court held that summary judgment turned on whether the defendant's equipment met the statutory definition of an ATDS, including the random or sequential number generator requirement.  *Id.* at *3 n.2.

Third, "it is a cardinal principal of statutory construction" that a statute must be construed so that "no clause, sentence or word shall be superfluous, void or insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *accord Satterfield*, 569 F.3d at 951.  Mr. Spencer's interpretation of the term "ATDS" defies this basic principle of statutory construction because it effectively nullifies the entire first element of Section 227(a)(1)'s definition of an ATDS (*i.e.,* "the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator").  That fact further supports the conclusion that he is misconstruing the FCC's 2003 and 2008 Orders.  *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 401-02 (2008) (declining to adopt interpretation of regulation that conflicted with the underlying statute).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-17-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

**b.   Even If The Term "ATDS" Could Be Construed To Apply To Any Equipment That Dials Numbers Without Human Intervention, AT&T's System Does Not Meet That Definition.**

Even if the term "ATDS" does not require the capacity to generate and call random or sequential numbers, summary judgment is still warranted because two separate levels of human intervention were required to transmit the text alerts at issue.

First, under *McKenna* and *Glauser*, a system is not an ATDS if consumers control whether text messages are sent, when they are sent, or who receives them, because such control qualifies as "human intervention."   *McKenna* involved a software application that, after being downloaded to a customer's smartphone, offered the customer the option of uploading his or her contacts list and having the system automatically compose and send an invitational text message to people on that list.  *McKenna v. WhisperText*, 2015 WL 5264750, *1 (N.D. Cal. Sept. 9, 2015). Similar to Mr. Spencer here, the plaintiff admitted that the defendant's system "sends SMS [texts] only at the user's affirmative direction," and that admission was sufficient to establish that the system did not qualify as an ATDS, notwithstanding the fact that other aspects of the system were automated.  *Id.* at *2-3.  As the court explained, even if the defendant's system used automated processes to upload numbers and send texts, the fact that the system depended on the WhisperText customer "to set the process in motion" qualified as human intervention.  *Id.* at *3.

Similarly, *Glauser* involved a text messaging application that allowed consumers to create a "group," and to send text messages to all members of the group at the same time.  *Glauser v. GroupMe, Inc.*, 2015 WL 475111, *1 (N.D. Cal. Feb. 4, 2015).  At issue were two "Welcome Texts" that were automatically generated and sent to the group from the defendant's system.  The court granted summary judgment for the defendant because the system sent Welcome Texts only to numbers specified by the consumer who created the group.  Hence, "human intervention" was necessary to send the texts despite the fact that consumers who used the application did not draft the automated Welcome Texts or specifically ask GroupMe to send them.  *Id.* at *6.

Here, the undisputed facts establish that the Digital Life text alerts at issue here involve far more user involvement and far less automation than was the case in *McKenna* and *Glauser*, and thus the text alerts here were the result of "human intervention" and are not within the ambit

of the TCPA.  Specifically, it is undisputed that no text alerts can be sent unless a Digital Life customer performs all of the following steps:

- Customers must log onto the online account management tool in order to activate the text alert feature.  (*E.g.*, Opp'n to First MSJ, at 7:25-8:1 [Ex. 18 to Smith Decl.].)

- Customers must specify the circumstances under which a text alert will be sent, such as the opening of a door or window.  (*E.g.*, *id.* at 11:14-16 ("The type of event that would result in a . . . text messaging notification was determined solely by the customer . . . .").)

- Customers must specify which phone number will receive the text alert, and they can change the number at any time.  (*Id.* at 7:25-8:1; Torab Decl. ¶¶ 9-10 [Ex. 2 to Smith Decl.].)

- Customers must specify the time and day that the text alerts will be sent.  (Torab Decl. ¶ 11 [Ex. 2 to Smith Decl.].)

- Customers must name and save a text alert program in the online tool for each type of text alert they want to receive.  (*Id.*)

Second, under *Gragg* (described on page 13 above), human intervention also is present here for the separate and independent reason that each of the text alerts that Mr. Spencer received was caused by somebody opening the front door or kitchen door in the Digital Life customer's home.  (Opp'n, at 4:4-5 [Ex. 18 to Smith Decl.] ("the event that caused the text message notifications to be sent was . . . a door opening"); Spencer Depo., 134:1-7 [Ex. 12 to Smith Decl.]; Olea Decl., ¶ 19 [Ex. 1 to Smith Decl.]; Text Alert Examples [Ex. 5 to Smith Decl.]; Complaint, ¶15 [Ex. 10 to Smith Decl.] (alleging that the text messages Mr. Spencer received stated either "Front Door Opened" or "Kitchen Door Opened").)

In *Gragg*, after ruling that the defendant's system was not an ATDS because it did not generate random or sequential numbers, the court went on to analyze whether the system alternatively qualified as an ATDS under the human intervention standard advanced by Mr. Spencer here.  The court concluded that the fact that the system sent a text only when a taxi driver pressed a button labeled "accept" on a mobile computer established the existence of human intervention, and granted summary judgment.  *See Gragg*, 995 F. Supp. 2d at 1194; *see also Derby v. AOL, Inc.*, 2015 WL 3477658, *4 (N.D. Cal. June 1, 2015) (explaining *Gragg*).  The situation here is very similar:  instead of transmitting a text when someone in a cab presses a

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-19-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

button marked "accept," the system transmits a text alert when someone opens a door.  Thus, even under the broadest possible interpretation of the term "ATDS," no ATDS was used here.

### c.   The Opinions Of Randall A. Snyder Do Not Create A Factual Dispute Concerning The Use Of An ATDS.

In an effort to create a factual question where none exists, Mr. Spencer proffers the opinion of Randall Snyder, who takes the extreme position that humans purportedly were not "in any way involved" with the creation or sending of the text alerts at issue, and thus the texts were sent without "human intervention."  (Snyder Decl., ¶ 47 [Ex. 14 to Smith Decl.]; *see also* Opp'n to First MSJ, at 28:11-14 [Ex. 18 to Smith Decl.].)  Mr. Synder's opinion fails as a matter of law to create a factual issue warranting denial of summary judgment for at least four separate reasons:

<u>First</u>, as shown in Section IV(A)(1) above (pp. 11-14), the fact that AT&T's system is incapable of random or sequential number generation is the dispositive issue here, and Mr. Snyder offers no opinion that AT&T's system has the requisite number generation capacity. (Snyder Depo., 100:8-14; 109:17-110:14  [Ex. 13 to Smith Decl.]; Snyder Decl., ¶ 47 [Ex. 14 to Smith Decl.].)

<u>Second</u>, Mr. Snyder's purported expert opinion on the meaning of the term "human intervention" is inadmissible legal opinion.  *See Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1052 (9th Cir. 2012) ("matters of law are inappropriate subjects for expert testimony").

<u>Third</u>, Mr. Snyder's opinion is inadmissible because he admitted that he is not an expert on the meaning of the term "human intervention."  (Snyder Depo., 101:17-20 [Ex. 13 to Smith Decl.] ("Q: Do you contend that you are an expert on the meaning of the term 'human intervention' as that term was or is used by the FCC?  A:  No, . . . "));  *see also In re Stratosphere Corp. Secs. Litig.*, 66 F. Supp. 2d 1182, 1189 (D. Nev. 1999) (an expert witness "must be qualified to give the proffered testimony").[7]

---

[7] Mr. Snyder testified that he believes the definition of the term "human intervention" is a matter of a "common sense," making his opinion further inadmissible because matters of "common sense" are not proper subjects of expert testimony.  (Snyder Depo., 101:20-24 [Doc. No. 35-6].); *see* Fed. R. Evid. 702(a) (expert testimony inadmissible unless it conveys "scientific, technical or other specialized knowledge"); *Icicle Seafoods, Inc. v. Khalif*, 2006 WL 5159255, *1 (Continued…)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    _Fourth_, both Mr. Snyder and Mr. Spencer acknowledge that Digital Life customers control

2    whether and under what circumstances texts are sent.  (Snyder Depo., 73:13-74:8; 85:24-86:3;

3    86:17-87:8; 89:11-18; 100:2-10 [Ex. 13 to Smith Decl.]; Opp'n to First MSJ, at 7:25-8:1; 11:14-

4    16  [Ex. 18 to Smith Decl.].)  Thus, Mr. Snyder's opinion that humans are not in any way

5    involved with the text alerts cannot support summary judgment because it contradicts the

6    undisputed facts.  _See_, _e.g._, _Brooke Group Ltd. v. Brown & Williamson Tobacco Corp._, 509 U.S.

7    209, 242 (1993) ("when indisputable record facts contradict or otherwise render [expert] opinion

8    unreasonable, it cannot support a jury's verdict").

9  
10    **B. Mr. Spencer's Claim Fails As A Matter Of Law Because AT&T Did Not Make The Calls At Issue.**

11    The TCPA imposes liability on the person that "makes" the call.  47 U.S.C.

12    § 227(b)(1)(A)(iii).  In its July 10, 2015 Order, the FCC clarified that, irrespective of whether a

13    defendant's equipment meets the definition of an ATDS, the TCPA generally does not impose

14    liability on companies that provide automated text messaging applications that allow consumers

15    to control "whether" an automated text is sent, "to whom" the text is sent, and "when" the text is

16    sent, because under those circumstances it is the consumer, not the company, who is deemed to

17    have made the call.  _See_ July 10, 2015 Order, ¶¶ 25, 37; _see also id._ at ¶¶ 26-36.  This holds true

18    even if the company has some control over the content of the text messages, provided that the

19    content is not related to telemarketing.  _Id._ at ¶ 37.  As the FCC explained, text messaging

20    applications that give consumers control over automated text messages differ from the "non-

21    consensual calling campaigns" that the TCPA was designed to regulate.  _Id._ at ¶ 32.

22    In the recent decision of _McKenna_ (described on page 18 above), the court followed the

23    FCC's July 10, 2015 Order and held that the fact that customers controlled whether and to whom

24    texts were sent not only established lack of an ATDS, but also that the defendant was not the

25    person who "made" call under the TCPA.  _McKenna_, 2015 WL 5264750 at *4-5.  _McKenna_ held

26  

27    (W.D. Wash. 2006) (excluding expert testimony because expert conceded that his opinion was based on "common sense").

28  

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-21-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

1   that the fact that the defendant used "automated processes to harvest and upload a user's selected

2   phone numbers and then send [text] messages" was insufficient as a matter of law to establish that

3   the defendant made the call. *Id.* at *5. Hence, the FCC's July 10, 2015 Order and *McKenna*

4   further support dismissal of Mr. Spencer's claim because (as shown on pages 19 above) it is

5   undisputed that Digital Life customers—not AT&T—control when and under what circumstances

6   text alerts are sent, and who receives them.[8] (*See, e.g.*, Opp'n to First MSJ, at 7:25-8:1; 11:14-16

7   [Ex. 18 to Smith Decl.]; Torab Decl., ¶¶ 3, 6-15 [Ex. 2 to Smith Decl.].)

8   **C. Mr. Spencer's Claim Fails As A Matter Of Law Because The Text Alerts He**
    **Received Fall Within The TCPA's Broad "Emergency Purposes" Exception.**

9

10   Section 227(b)(1)(A)(iii) of the TCPA prohibits making "any call (<u>other than a call made</u>

11   <u>for emergency purposes</u> or made with the prior express consent of the called party) using any

12   automatic telephone dialing system or an artificial or prerecorded voice . . . (iii) to any . . .

13   cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). Thus, on its face,

14   the TCPA permits calls and text messages made for "emergency purposes."[9] § 227(b)(1)(A); *see*

15   *also Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed. Appx. 598, 600 n.1 (9th Cir 2011) ("Calls

16   otherwise in violation of the TCPA are not unlawful if made for emergency purposes . . . ."). The

17   undisputed facts establish that the Digital Life text alerts that Mr. Spencer received are not

18   actionable because they are subject to the emergency purposes exception.

19   <u>First</u>, the text alerts fall within the broad regulatory definition of the term "emergency

20   purposes." Congress delegated authority to the FCC to define the term "emergency purposes."

21   137 Cong. Rec. S18781-02, 1991 WL 252592, at *18784 (Nov. 27, 1991) ("The FCC must

22   determine what constitutes an emergency purpose"). Under FCC-promulgated regulations, "the

23

24   [8] In opposing AT&T's first motion for summary judgment, Mr. Spencer argued that
     AT&T necessarily "made" the calls because its system sent the text alerts at issue. That argument
25   fails in light of *McKenna*, where, as explained above, the court held that the defendant did not
     "make" the calls notwithstanding the fact that its system sent the texts at issue. *McKenna*, 2015
26   WL 5264750 at *4-5.

27   [9] Text messages are considered "calls" within the meaning of the TCPA. *Satterfield*, 569
28   F.3d at 952.

term 'emergency purposes' means calls made necessary in any situation affecting the health and safety of consumers."  47 C.F.R. § 64.1200(f)(4).  The FCC has explained that "the legislative history of the TCPA indicates a congressional intent to interpret the term 'emergency' broadly rather than narrowly."  *In the Matter of the Telephone Consumer Protection Act of 1991*, 7 F.C.C. Rcd. 2736, 2738, ¶ 17 (April 17, 1992) ("April 1992 Order").  The exception applies in any situation where "it is in the public interest to convey information to consumers concerning health or safety, whether or not the event was anticipated or could have been anticipated."  *Id.*

Consistent with this broad interpretation, text messages may fall within the "emergency purposes" exception even if they are sent to a single individual rather than the public at large, and regardless of whether there is imminent peril to health or safety.  For example, automated notifications warning of possible power outages due to delinquent electricity bills or scheduled utility maintenance fall under the exception, because the resulting outages can potentially affect an individual's safety.  *Id.* (scheduled utility maintenance notifications fall under the "emergency purposes" exception); 137 Cong. Rec. H. 11307, 11310 (Nov. 26, 1991) (same); *see In the Matter of Rules & Regs. Implementing the TCPA*, 7 F.C.C. Rcd. 8752, 8777-78, ¶¶ 49-51 (Oct. 16, 1992) (service interruption notifications, including those caused by delinquent utility bills, concern potentially hazardous conditions falling within the "emergency purposes" exception).[10]

Here, by its very nature, a home-security system alert is a situation affecting the "safety of consumers."  47 C.F.R. § 64.1200(f)(4).  The safety purpose of the text alerts at issue here is confirmed by each of the following undisputed facts:

- The Digital Life Service is a home intrusion and monitoring service, and all of the text alerts that Mr. Spencer received were sent in connection with that service. (*E.g.*, Opp'n to First MSJ, at 6:25-28 [Ex. 18 to Smith Decl.]; Olea Decl., at ¶¶ 4-11, 14-19 [Ex. 1 to Smith Decl.]; FAC, ¶¶ 8, 11  13, and Exs. 1-2 to FAC [Ex. 10 to Smith Decl.].)

- The Digital Life home intrusion and monitoring services are referred to as "Life Safety

[10] Mr. Spencer previously argued that the emergency purposes exception is "narrow" and only applies where there is an "actual" and "significant" event involving the police or fire departments.  That interpretation, however, is contrary to the FCC's instruction that the exception must be construed broadly and may apply to more mundane matters such as planned utility outages, and Mr. Spencer cited no authority supporting his narrow interpretation.

Services," and AT&T's website emphasizes the "safety and security features" of Digital Life. (Olea Decl., ¶¶ 6-7 [Ex. 1 to Smith Decl.]; Digital Life User Guide, at p. 1 (ATT000016) [Ex. 3 to Smith Decl.]; Digital Life website screenshots (ATT000079) [Ex. 4 to Smith Decl.]; *see also id.* at ATT000078 ("One app integrates home security and automation to help keep you safe . . . .").)

• The only purpose of the text alerts that Mr. Spencer received was to warn a Digital Life customer that the front door or kitchen door of her home had been opened. (*E.g.*, Opp'n to First MSJ, at 10:28-11:1 [Ex. 18 to Smith Decl.] ("the [text] messages at issue did nothing more than notify Defendant's customer that a kitchen door was opened or that the front door was opened."); Spencer Depo., 134:1-7 [Ex. 12 to Smith Decl.]; Example Text Alerts [Ex. 5 to Smith Decl.])

• Mr. Spencer's expert witness repeatedly stated that the text alerts Mr. Spencer received warned of "security" events, and were designed "only communicate the result of something that occurred as a breach of security in the house." (Snyder Depo., at 89:6-7 [Ex. 13 to Smith Decl.]; Snyder Decl., at ¶¶ 27, 29, 43 [Ex. 14 to Smith Decl.].)

Second, the Court may properly look to the purpose of the TCPA when construing the term "emergency purposes." *See Satterfield*, 569 F.3d at 954 (examining the purpose of the TCPA when construing the word "call"); *Ryabyshchuck v. Citibank (S. Dakota) N.A.*, 2012 WL 5379143, *2 (S.D. Cal. Oct. 30, 2012) (courts "consistently and properly look to the purpose and history of the statute" when construing the TCPA). Courts must approach the question of whether a call or text falls within the intended scope of the TCPA "with a measure of common sense." *Chesbro v. Best Buy Stores*, 705 F.3d 913, 918 (9th Cir. 2012). "[C]ontext is indisputably relevant to determining whether a particular call is actionable under the TCPA." *Ryabyschuck*, 2012 WL 5379143, at *3. These principles further support the conclusion that home security alerts like those at issue here were not intended to be regulated by the TCPA, and fall within the broad "emergency purposes" exception.

As explained by the Ninth Circuit and other courts across the country, the TCPA was enacted to prevent abusive telemarketing practices. *See, e.g.*, *Satterfield*, 569 F.3d at 954 ("TCPA was enacted in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls"); *Ashland Hosp. Corp. v. Serv. Employees Int'l Union, Dist. 1199 WV/KY/OH*, 708 F.3d 737, 741 (6th Cir. 2013) ("The TCPA thus seeks to curb abusive telemarketing practices that threaten the privacy of consumers and businesses"). As further

1   explained by the FCC, however, "there are many valuable uses for auto dialer messaging" that are

2   unrelated to telemarketing and that Congress did not intend to prohibit when it enacted the TCPA.

3   April 1992 Order, 7 F.C.C. Rcd. at 2737, ¶ 9.

4         This case has nothing to do with telemarketing, and the text alerts that Mr. Spencer

5   received were not the result of a mass telemarketing campaign promoting products or services to

6   consumers.  (Olea Decl., ¶¶ 12, 19 [Ex. 1 to Smith Decl.]; *see also* Text Alert Examples [Ex. 5 to

7   Smith Decl.].  Indeed, far from "abusive telemarketing" targeted by the TCPA, the value and

8   utility of the Digital Life text alerts are confirmed by the success of the Digital Life service and

9   the popularity of the text alert feature among Digital Life customers.  (Olea Decl., ¶ 13 [Ex. 1 to

10  Smith Decl.].)  Given the broad reach of the "emergency purposes" exception, the texts at issue

11  here do not fall within the prohibitions of the TCPA.[11]

12  **V.      CONCLUSION**

13        For the foregoing reasons, Defendant AT&T respectfully asks that the Court grant its

14  Motion for Summary Judgment and dismiss Mr. Spencer's First Amended Complaint with

15  prejudice.

16  Dated:  November 25, 2015            /s/
                                          _____
17                                        Joel D. Smith

18

19

20        [11] In his opposition to this motion, Mr. Spencer will likely emphasize that he allegedly
    received approximately 2,100 text alerts after complaining about them, but that fact is irrelevant
21  to the "emergency purposes" exception.  It is undisputed that the only purpose of the Digital Life
    text alerts was to provide home security alerts.  That purpose does not change depending on who
22  received the text alerts, and the statute does not make a distinction for emergency calls or texts
    sent to the wrong person.  *See* 47 U.S.C. § 227(b)(1)(A)(iii).  Moreover, given the undisputed
23  purpose of the text alerts, it would have been potentially unsafe for AT&T to discontinue them at
    Mr. Spencer's request without first identifying the potentially-affected Digital Life customer and
24  confirming the legitimacy of the request.  (Olea Depo., 60:12-61:2 [Ex. 16 to Smith Decl.].)
    Indeed, Mr. Spencer agreed that if he had a home security system, he would not want his home
25  security company to shut it down at the request of a stranger without clearing it with him first.
    (Spencer Depo., 107:9-20 [Ex. 12 to Smith Decl.].)  And, as Mr. Spencer's testimony shows, the
26  particular phone he used here was seldom used for any purpose other than to gather misdirected
    calls and texts.  (Spencer Depo., 80:11-15 [Ex. 12 to Smith Decl.].)
27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

1   Ryan Lower (SB 9108)                  Douglas W. Sullivan (pro hac vice)
    rml@morrislawgroup.com                dsullivan@crowell.com
2   MORRIS LAW GROUP                      Joel D. Smith (pro hac vice)
    900 Bank of America Plaza             jsmith@crowell.com
3   300 South Fourth Street               CROWELL & MORING LLP
    Las Vegas, NV 89101                   275 Battery Street, 23rd Floor
4   Telephone: (702) 474-9400             San Francisco, CA 94111
                                          Telephone: (415) 986-2800
5

6   *Attorneys for Defendant AT&T Digital*   *Attorneys for Defendant AT&T Digital*
    *Life, Inc.*                             *Life, Inc.*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-26-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Joel D. Smith, state:

My business address is 275 Battery Street, 23rd Floor, San Francisco, California  94111.  I am over the age of eighteen years and not a party to this action.

On the date set forth below, I served via electronic service the foregoing document(s) described as:

**DEFENDANT AT&T DIGITAL LIFE INC.'S SECOND
MOTION FOR SUMMARY JUDGMENT**

on the following person(s) in this action:

Craig Perry
Craig K. Perry & Associates
8010 W. Sahara Avenue, Suite 260
Las Vegas, NV 89117
phone: (702) 228-4777
Fax: (702) 943-7520
Email: cperry@craigperry.com

*Attorneys for Plaintiff*

Evan Meyers
McGuire Law, P.C.
55 W. Wacker Drive, 9th Floor
Chicago, IL, 60601
Phone:  (312) 893-7002
Fax:  (312) 275-7895
emeyers@mcgpc.com

*Attorney for Plaintiff*

DATED:  November 25, 2015         BY:  _____/s/ Joel D. Smith_____
                                                      Joel D. Smith

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-27-

AT&T'S SECOND MOTION
FOR SUMMARY JUDGMENT;
CASE NO. 2:14-CV-01136-RFB