Craig K. Perry
Nevada Bar # 003786
CRAIG K. PERRY & ASSOCIATES
8010 W. Sahara Avenue, Suite 260
Las Vegas, Nevada 89117
(702) 228-4777
(702) 943-7520 Fax
cperry@craigperry.com

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

KIRBY SPENCER,

        Plaintiff,

v.

AT&T DIGITAL LIFE, INC.,

        Defendant.

Case No. 2:14-CV-01136-RFB-PAL

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT**

Hon. Richard F. Boulware, II

Magistrate Judge Peggy A. Leen

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................... 4

      A.    Plaintiff received more than 2,000 unsolicited text messages from Defendant in just two months despite repeated requests to cease and desist ........................... 4

      B.    Plaintiff only filed this lawsuit after demanding on four separate occasions that Defendant cease sending him the unauthorized text messages ........................ 6

      C.    The text messages received by Plaintiff were purely informational text messages sent by Defendant's AT&T Digital Life home monitoring system ........ 7

      D.    Once a customer consents to receive text message notifications from Defendant's home monitoring system, every text message sent by Defendant is automatically generated and sent without human intervention ........................... 7

III.    PROCEDURAL HISTORY ..................................................................................... 9

IV.     LEGAL STANDARD .............................................................................................. 9

V.      ARGUMENT .......................................................................................................... 10

      A.    The text messages Defendant sent to Plaintiff's cell phone do not fall within the TCPA's "emergency" exception ................................................................... 10

            1.   *The text messages received by Plaintiff were not necessary or related to any emergency situation involving health and safety* ..................................... 10

            2.   *The TCPA's emergency exception was not meant to apply to purely informational notifications such as the ones received by Plaintiff* ................. 12

            3.   *The TCPA was not created solely to prevent automated telemarketing messages* ...................................................................................................... 13

      B.    Defendant "made" the text message calls at issue here ................................... 16

      C.    Defendant's system sent Plaintiff text messages without any human intervention ....................................................................................................... 19

            1.   *Defendant's Digital Life home monitoring system dialed Plaintiff's cellular telephone number without any human intervention* ......................... 20

            2.   *The fact that Defendant's system had to be programmed to send the text messages at issue does not constitute "human intervention"* ......................... 21

3. *The text message notifications received by Plaintiff were sent as a result of an electronic sensor sending a signal to Defendant's system* ....................25

D.   This Court should allow Plaintiff to conduct limited discovery pursuant to Rule 56(d) regarding the potential functionalities of Defendant's system ............26

VI.   **CONCLUSION** .................................................................................................30

1
2

# <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

<u>**United States Supreme Court Cases:**</u>

5

*Anderson v. Liberty Lobby, Inc.*,
6
    477 U.S. 242 (1986).................................................................................................9

7
*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...............................................................................................10
8

9

<u>**United States Circuit Court of Appeals Cases:**</u>

10

*Apple Valley Bldg. & Development Co. v. Bonanza Air Lines, Inc.*,
11
    423 F.2d 661 (9th Cir. 1970) ..................................................................................9

12
*Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*,
    525 F.3d 822 (9th Cir. 2008) ................................................................................29
13

*Margolis v. Ryan*,
14
    140 F.3d 850 (9th Cir. 1998) ..........................................................................26–27

15
*Meyer v. Portfolio Recovery Assocs., LLC*,
    707 F.3d 1036 (9th Cir. 2012) ...............................................................................1
16

17
*Satterfield v. Simon & Schuster, Inc.*,
    569 F.3d 946 (9th Cir. 2009) ............................................................................1, 9

18

19

<u>**United States District Court Cases:**</u>

20

*Agne v. Papa John's Int'l, Inc.*,
    286 F.R.D. 559 (W.D. Wash. 2012) ....................................................................24
21

22
*Bates v. Dollar Loan Center, LLC*,
    No. 13-cv-1731, 2014 WL 60472 (D. Nev. Jan. 7, 2014) ....................................10

23
*Carlson v. Nevada Eye Care Professionals*,
24
    No. 13-cv-00364, 2013 WL 2319143 (D. Nev. May 28, 2013) ........................9, 10

25
*Charkchyan v. EZ Capital, Inc.*,
    No. 14-cv-03564, 2015 WL 3660315 (C.D. Cal. June 11, 2015)..........................24
26

27
*Glauser v. GroupMe, Inc.*,
    No. 11-cv-2584, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015).................23, 24, 26, 28

28

*Gragg v. Orange Cab Co.*,
  995 F.Supp.2d 1189 (W.D. Wash. 2014).............................................23, 26, 27

*Harnish v. Frankly Co.*,
  No. 14-cv-02321, 2015 WL 1064442 (N.D. Cal. Mar. 11, 2015) ...........................28

*Heinrichs v. Wells Fargo Bank, N.A.*,
  No. 13-cv-05434, 2014 WL 985558 (N.D. Cal. Mar. 7, 2014) .................................1

*Johnson v. Yahoo!, Inc.*,
  No. 14-cv-2028, 2014 WL 7005102 (N.D. Ill. Dec. 11, 2014)................................22

*Kramer v. Autobytel*,
  759 F.Supp.2d 1165 (N.D. Cal. 2010) ...............................................................24

*Kristensen v. Credit Payment Servs. Inc.*,
  No. 12-cv-00528, 2015 WL 4477425 (D. Nev. July 20, 2015) ..............................16

*Lamont v. Furniture N., LLC*,
  No. 14-cv-036, 2014 WL 1453750 (D.N.H. Apr. 15, 2014) ..................................15

*McKenna v. WhisperText*,
  No. 14-cv-00424, 2015 WL 5264750 (N.D. Cal. Sept. 9, 2015)...................18, 19, 23

*Pimental v. Google Inc.*,
  No. 11-cv-02585, 2012 WL 691784 (N.D. Cal. Mar. 2, 2012) ..............................24

*Robbins v. Coca-Cola-Co.*,
  No. 13-cv-132, 2013 WL 2252646 (S.D. Cal. May 22, 2013) ..............................24

*Roylance v. ALG Real Estate Servs., Inc.*,
  No. 14-CV-02445, 2015 WL 1522244 (N.D. Cal. Mar. 16, 2015)...........................16

*Sherman v. Yahoo! Inc.*,
  997 F. Supp. 2d 1129 (S.D. Cal. 2014)...............................................................15

*Thomas v. Taco Bell Corp.*,
  879 F.Supp.2d 1079 (C.D. Cal. 2012) ...............................................................16

Vote v. U.S.,
  753 F. Supp. 866 (D. Nev. 1990)......................................................................10

*Webb v. Healthcare Revenue Recovery Grp. LLC*,
  No. 13-cv-00737, 2014 WL 325132 (N.D. Cal. Jan. 29, 2014)................................1

**Statutes and Court Rules:**

Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* .................................*passim*

47 C.F.R. § 64.1200, *et seq.* ...........................................................................10

Fed. R. Civ. P. 56 .................................................................................................................... 3

**<u>Miscellaneous</u>:**

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC Report and Order, CC Dkt. No. 92-90 (Oct. 16, 1992) ................................................................................................................... 12

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, CG Dkt. No. 02-278 (Feb. 15, 2012) .......................................................................................................... 13, 15

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC Declaratory Ruling, CG Dkt. No. 02-278 (July 10, 2015) ................................................................ 2, 3, 17, 18, 19, 27

1    **I.    INTRODUCTION**

2          In an attempt to distract the Court from the undisputed facts of this case, in its Second

3    Motion for Summary Judgment (Dkt. 54) Defendant AT&T Digital Life, Inc. ("Defendant")

4    again raises a number of *ad hominem* personal attacks against the Plaintiff.   However,

5    Defendant's efforts to implicate Plaintiff's character are both unfounded and entirely

6    improper in a motion for summary judgment.   In actuality, Defendant is simply trying to

7    conceal or ignore the undisputed facts actually at issue in this case—such as the fact that

8    Defendant sent over 2,000 text messages to Plaintiff's cellular telephone, that Plaintiff was

9    never one of its customers, and that Plaintiff never authorized Defendant to send such text

10   messages to his cell phone.   In fact, Defendant fails to mention that Plaintiff reached out to

11   Defendant on four separate occasions – both by phone and in writing – in an effort to stop

12   Defendant from sending any more messages *before* filing this suit.   And most fatal to

13   Defendant's efforts to shift the blame onto Plaintiff is the fact that, despite his repeated cease

14   and desist requests, Defendant kept sending Plaintiff text messages for over two months,

15   sometimes sending more than *forty* text messages in a single day.   While Defendant does its

16   best to muddy the waters and smear Plaintiff's character, the factual basis for Plaintiff's

17   claim is irrefutable, and Defendant's liability is clear.

18         Plaintiff brought this suit against Defendant for violating 47 U.S.C. §

19   227(b)(1)(A)(iii) of the Telephone Consumer Protection Act ("TCPA"), which makes it

20   unlawful to (1) call a cellular telephone number; (2) using an automatic telephone dialing

21   system ("ATDS"); (3) without the recipient's prior express consent.   *Meyer v. Portfolio*

22   *Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012) (citing 47 U.S.C. § 227 (b)(1)).[1]

23   There is no dispute in this case that Plaintiff never provided prior express consent to receive

24   the text messages at issue.[2]   Instead, Defendant raises three separate arguments in hopes that

25   ────────────────
     [1] Although lack of consent is not in dispute in this case, the existence of consent is actually an
26   affirmative defense under the TCPA.  *Heinrichs v. Wells Fargo Bank, N.A.*, No. 13-cv-05434, 2014
     WL 985558, at *3 (N.D. Cal. Mar. 7, 2014); *Webb v. Healthcare Revenue Recovery Grp. LLC*, No.
27   13-cv-00737, 2014 WL 325132, at *4 (N.D. Cal. Jan. 29, 2014).
     [2] The Ninth Circuit has ruled that text messages constitute calls under the TCPA.  *Satterfield v. Simon*
28   *& Schuster, Inc.,* 569 F.3d 946, 951 (9th Cir. 2009).

at least one of them will allow it to escape liability: that (1) the calls were made for "emergency purposes," (2) that Defendant did not actually "make" the calls, and (3) that the text messages were not sent using an ATDS.  These arguments are all devoid of merit.

First, Defendant's argument that each of the more than 2,000 messages it sent Plaintiff were necessary to inform the intended recipient of an "emergency" is entirely unsupported by the facts adduced in this case and also defies common sense.  In reality, the text messages Defendant sent Plaintiff were notifications of such common and benign information as "front door opened" or "kitchen door opened."  As further explained below, when these text messages were automatically sent by Defendant's Digital Life home monitoring system, the system did not call the police, did not trigger an alarm to sound, nor do anything else that would indicate that the notifications were actually related to an emergency situation.  Particularly fatal to Defendant's claim that these were "emergency" messages is the fact that Defendant's security system had an entirely *separate* process in place for contacting the local police department and notifying Defendant's monitoring service in case of an *actual* emergency situation.  Sending over forty text messages a day that a kitchen door was opened is far beyond the scope of "necessary" emergency calls related to life threatening situations to which the TCPA's emergency exception was meant to apply.

Second, Defendant's claim that it did not "make" the calls at issue is even more suspect given that the "Director of Digital Life Operations at AT&T" himself admitted that the text messages were "sent by AT&T's system" (Decl. of Alejandro Olea, Dkt. 54-2, Ex. 1, at ¶ 11) and that each text message expressly identified AT&T Digital Life as the sender.[3]  Nor can Defendant attempt to rely on the recent 2015 FCC Ruling,[4] given that it is solely Defendant's system that controls whether a text message is sent, when it is sent, and what the content of the message will be.

---

[3] A screenshot of a May 31, 2014 text message sent by Defendant to Plaintiff's cellular telephone is attached hereto as Exhibit A.  All exhibits referenced herein are attached as exhibits to the Declaration of Evan M. Meyers, filed contemporaneously herewith.

[4] *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, FCC Declaratory Ruling, CG Dkt. No. 02-278* (July 1, 2015) (hereinafter "2015 FCC Ruling," relevant excerpts of which are attached hereto as Exhibit B).

1  Finally, the bulk of Defendant's brief is spent discussing whether its system qualifies

2  as an ATDS under the TCPA.  The 2015 FCC Ruling significantly expanded the definition of

3  ATDS to include equipment that has the "potential functionalities" to dial random or

4  sequentially generated numbers, including the ability to do so with additional software

5  modification.  (Ex. B at ¶ 16.)  As will be explained in detail below and in the attached

6  Declaration in support of Plaintiff's request for Rule 56(d) discovery,[5] because the 2015 FCC

7  Ruling was issued *after* discovery in this case had already closed (*see* Dkt. 21, setting a

8  discovery closure date of April 22, 2015), and *after* Plaintiff already filed his brief in

9  opposition to Defendant's original Motion for Summary Judgment (Dkt. 42, June 29, 2015),

10  Plaintiff has not had any reasonable opportunity to take discovery as to the potential

11  functionalities of Defendant's system.  Accordingly, because one of the central issues in this

12  case is whether Defendant's system can be considered an ATDS, and because responding to

13  Defendant's arguments relating to the ability of its system to randomly or sequentially

14  generate numbers requires an analysis of the potential functionalities of Defendant's system,

15  Plaintiff respectfully requests that briefing on the issue of whether an ATDS was used to

16  send these messages be stayed pending the outcome of Plaintiff's 56(d) request.  However,

17  because Defendant also argues that its system was not an ATDS because the text messages

18  were sent with "human intervention," Plaintiff fully addresses that argument on the merits

19  below.

20  Defendant's primary argument with respect to human intervention – that there was

21  human intervention because an individual has to provide the system with his cell phone

22  number and choose which automated notifications he receives – confuses the issue of human

23  intervention with that of *consent*.  Because *every* phone call made through any ATDS

24  necessarily requires at least some human intervention – at some point, a person must have

25  inputted the phone numbers to be dialed and/or programmed the system to place certain calls

26  – Defendant's interpretation of "human intervention" would effectively eliminate the TCPA.

27
28
[5] The Declaration of Evan M. Meyers in Support of Plaintiff's Request for Discovery Pursuant to Fed. R. Civ. P. 56(d) is attached hereto as Exhibit C.

Furthermore, Defendant's argument is unsupported by the existing case law on the issue, which establishes that a defendant can avoid liability only if there was human intervention in the process of sending *each* particular message. As Defendant's own expert witness testified, once a customer initially opts in to receive text message notifications, the system will automatically generate and send an infinite number of text messages without any human involvement in the process of creating, directing, and sending any of them.

Defendant's alternative argument – that there was human intervention because the sensors that trigger the text message are activated due to human activity – is an even more desperate attempt to confuse the issue. Unlike the cases cited to by Defendant, the event that caused the text message notifications to be sent to Plaintiff was a sensor detecting what it was programmed to recognize as a door opening. An individual pushing a door open, which results in a sensor detecting the event and notifying Defendant's system to send a notification, is in no way comparable to an individual typing up a text message and directly ordering a text message system to send it.

The evidence produced in this case clearly establishes that Defendant made thousands of non-emergency text message calls to Plaintiff's cellular telephone without any human intervention. The only real issue is whether Defendant can claim that its system was not an ATDS. Given the 2015 FCC Ruling revising the definition of ATDS, Defendant's Motion should be denied or deferred pursuant to Rule 56(d) so that Plaintiff may obtain the facts essential to rebut Defendant's arguments on this issue.[6]

## II.    FACTUAL BACKGROUND

A.    <u>Plaintiff received more than 2,000 unsolicited text messages from Defendant in just two months despite repeated requests to cease and desist</u>.

On May 31, 2014, Plaintiff activated a new cell phone that he had recently purchased. (*See* Deposition of Kirby Spencer, relevant excerpts of which are attached as <u>Exhibit D</u>, at

---

[6] Plaintiff does not intend his request for discovery pursuant to Rule 56(d) to constitute a waiver of his right to substantively respond to Defendant's ATDS arguments raised in its renewed motion for summary judgment. Thus, to the extent this Court does not wish to grant Plaintiff's request for Rule 56(d) discovery, Plaintiff requests the opportunity to file a short supplemental opposition brief limited solely to the ATDS issue so that Plaintiff, to the extent possible, can substantively respond to Defendant's arguments based on the discovery already produced by Defendant to date.

1   82:18–20.)   Almost immediately after activating his phone Plaintiff began to receive a

2   constant stream of text messages from a single specific phone number known as a "short

3   code" registered to Defendant.  (Tracfone Log, Ex. E, at 42.)[7]  One of the first text messages

4   Plaintiff received was the following:

AT&T Digital Life
Front door opened on 5/31/14 at 2:26 PM.
Go to https://my-digitallife.att.com for more info.

5
6

7   (Ex. A.)  Plaintiff received eight more text messages from Defendant on that first day alone.

8   (Ex. E at 42.)

9       Plaintiff was never a customer of Defendant and never gave Defendant permission to

10  send any text messages to his cellular telephone.  (Ex. D at 89:4–7, 99:2–14; Pl's June 27,

11  2014 letter to Defendant, Ex. F, at 1.)[8]   Given the annoyance of receiving numerous

12  unwanted text messages that he had never authorized, on June 2, 2015, just two days after

13  receiving the first round of text messages, Plaintiff called Defendant's customer service

14  department in an attempt to get the messages to stop.  (Ex. D at 85:6–23.)  Plaintiff talked to

15  one of Defendant's customer service representatives and requested that Defendant stop

16  sending text messages to his cellular telephone.  (*Id.* at 89:4–7.)  Despite the reassurances of

17  the representative that the text messages would be stopped (*id.* at 89:10–15), Plaintiff

18  received over two hundred additional text messages just by the end of that week alone.  (Ex.

19  E at 39–42.)  On June 10, 2014, Plaintiff sent a letter to AT&T's corporate headquarters in

20  Dallas asking Defendant to "cease and desist sending text messages."[9]  Despite providing his

21  cellular telephone number and his email address, Plaintiff never received a response.

22      Frustrated with receiving countless text messages from Defendant every time some

23  door was opened somewhere, and having received no meaningful response to his phone call

24  or letter, about one week after sending the letter Plaintiff again called Defendant's customer

25  service center.  (Ex. D at 92:14–19.)  Plaintiff informed Defendant's representative that he

26  [7] The TracFone log showing all cellular phone activity for Plaintiff's phone during the relevant time
    period is attached hereto as Exhibit E.

27  [8] Plaintiff's June 27, 2014 letter to Defendant is attached hereto as Exhibit F.

28  [9] Plaintiff's June 10, 2014 cease and desist letter to Defendant is attached hereto as Exhibit G.

had previously called about receiving the unauthorized text messages and that he was still receiving them.  (Ex. D at 93:17–25.)  Despite his third attempt to stop the messages, Plaintiff continued to receive hundreds of text messages a week.  (*See, e.g.*, Ex. E at 16–23.) In early July 2014, Plaintiff tried yet again – for the *fourth* time – to stop Defendant from sending the text messages by calling Defendant's customer service center, only to be told by the representative that there was nothing she could do to stop them.  (Ex. D at 97:24–98:6, 99:2–14, 99:22–24.)

On July 10, 2014, after receiving well over 1,450 text messages from Defendant, Plaintiff filed this lawsuit for violations of the TCPA.  (Ex. E at 12–42; Dkt. 1.)  Even though Defendant was served with the Complaint on July 18, 2014, Defendant continued to send text messages to Plaintiff until July 30, 2014.  (Ex. E at 1.)  By July 30, 2014 – over two months after Plaintiff first contacted Defendant to stop sending the messages – Plaintiff received a total of over 2,000 text messages before Defendant finally stopped sending messages to him. (Ex. E at 1–42; Def. Opp. to Pl.'s Mot. for Leave to Amend, Dkt. 27, at 5:17.)

B.    Plaintiff only filed this lawsuit after demanding on four separate occasions that Defendant cease sending him the unauthorized text messages.

While Defendant seems to suggest that Plaintiff's lawsuit is manufactured and resorts to personal attacks against Plaintiff's character, Plaintiff operated a real estate investing business in which he earned a sizeable income in 2014, and he testified that he purchased the phone for use in his business of buying, renovating, and marketing real-estate properties. (Ex. D at 65:12–66:25, 154:5–9, 154:25–155:22.)  In addition, Plaintiff actually had to pay out-of-pocket expenses as a result of the unauthorized text messages received from Defendant.  (*Id.* at 117:12–16.)  Finally, and flying in the face of Defendant's argument that Plaintiff somehow "manufactured" this lawsuit, Plaintiff reached out to Defendant to request that the messages stop on multiple occasions *before* he asked for any monetary compensation and before he filed suit—including placing a phone call just two days after receiving the first unauthorized text message.  (Ex. D at 85:6–23, 92:14–19, 97:24–98:6; Ex. G.)

1

      C.     <u>The text messages received by Plaintiff were purely informational text messages sent by Defendant's AT&T Digital Life home monitoring system</u>.

2

3

      All of the unauthorized text messages received by Plaintiff were sent by an AT&T Digital Life home monitoring system installed and operated by Defendant in one of its customer's homes.  (Deposition of Homi Torab, Defendant's designated rebuttal expert, relevant excerpts of which are attached hereto as <u>Exhibit H</u>, at 24:7–19, 51:13–17, 69:2–14.) The text messages that Defendant sent to Plaintiff simply stated that either a "front door opened" or that a "kitchen door opened."  (Def. Ex. 5, Dkt. 54-3, at 7–12; Ex. D at 133:22–134:7.)  The text message notifications sent by Defendant's system are sent regardless of whether the home monitoring system was "armed" or "unarmed" and regardless of whether the homeowner is even inside the house at the time the sensor is triggered.  (Ex. H at 67:6–19.)  In fact, the Digital Life system can send notifications upon any number of events occurring regardless of whether they even potentially relate to safety—*e.g.* if the temperature in the house changes or the lights are turned on.  (*Id.* at 65:3–13; 66:7–22, 67:20–25.)

4

5

6

7

8

9

10

11

12

13

      Most importantly, the text message notifications at issue here were sent by a system *separate* from the system that handles alarm monitoring and notifying the police or other emergency services.  (*Id.* at 94:19–95:21.)  Thus, "emergencies" and "alarm monitoring emergencies" are handled *separately* from any of the text message notifications received by Plaintiff.  (*Id.* at 95:17–21.)  When there is a "life emergency-type" situation such as a "fire" or "robbery," Defendant's home monitoring service will reach out to the police or fire department and will also attempt to call or reach the homeowner *independently* of any text message notifications the customer had signed up to receive.  (*Id.* at 94:22–95:4; 95:15–21.)

14

15

16

17

18

19

20

21

      D.     <u>Once a customer consents to receive text message notifications from Defendant's home monitoring system, every text message sent by Defendant is automatically generated and sent without human intervention</u>.

22

23

      Defendant's customers with a Digital Life home monitoring system installed can "opt in" to receive certain text message notifications from the monitoring system.  (Ex. H at 62:15–21.)  A customer opts in to receive certain text messages by (1) logging into his/her Digital Life account through an internet website, (2) selecting a specific "triggering" event that will determine when a text message notification will be sent, and (3) choosing the cell

24

25

26

27

28

phone numbers to which the text messages will be sent.  (Def. Exs. 7, 8, 9, Dkt. 54-4, at 1–10; Ex. H at 83:11–84:2.)   Once a customer opts in to receive a certain type of message, every successive message is automatically sent every time a sensor installed as part of the home monitoring system reports that the triggering event occurred.  (Ex. H at 63:6–10, 65:3–7, 73:19–23; *see* Deposition of Plaintiff's expert witness, Randall Snyder, relevant excerpts of which are attached hereto as <u>Exhibit I</u>, at 93:7–94:3.)   The text messages are generated solely as a result of the sensor itself being triggered regardless of how or why the sensor was triggered—that is, regardless of what causes the sensor to register the triggering event, including the homeowner himself coming back inside, a cat leaving the room, the weather, etc.  (Ex. H at 64:22–65:7, 66:7–22.)   Once a sensor is triggered, the text message is automatically sent by Defendant's system, which dials without any human involvement the cell phone number already stored on a list in Defendant's database.  (Ex. H at 69:2–14; 69:22–70:1; Ex. I at 93:14–94:3.)   No person analyzes the sensor being triggered to decide what to do, whether to send a text message, or what the text message should say; no person drafts a message; and no person actually sends a message to the number already on file.  (Ex. H at 64:22–65:7, 69:2–70:1, 72:2–73:4.)   The content of the text message itself is not created by a human, but rather is based on a template that is automatically populated with information from the system.  (*Id.* at 69:15–70:1.)

The process of a customer opting in to receive certain text message notifications from Defendant is identical to the process of an individual opting in to receive other automated text messages, such as coupons from a retailer.  (Ex. I at 21:15–24, 94:25–95:7.)   The fact that a text message was automatically sent as a result of an independent event that may have had a human as a "but for" cause is completely unrelated to the automatic process by which the message itself is sent without human intervention.  (*Id.* at 87:16–88:1; 88:7–9.)   Indeed, a human is a "but for" cause of nearly every call and every text message regardless of the circumstance, and Defendant's theory in this case ultimately seeks to nullify the TCPA.  Such a theory is untenable and should be rejected.

1

**III.    PROCEDURAL HISTORY**

2

On July 10, 2014, Plaintiff filed his original Complaint as an individual action

3

alleging violations of the TCPA.  (Dkt. 1.)  Defendant filed its Answer on September 12,

4

2014.  (Dkt. 6.)  On November 18, 2014, the Court entered a discovery schedule setting a

5

deadline to amend pleadings of January 22, 2015, a discovery closure date of April 22, 2015,

6

and a May 22, 2015 deadline to file dispositive motions.  (Dkt. 21.)  On January 22, 2015,

7

Plaintiff filed his Motion for Leave to File an Amended Complaint seeking to add class

8

allegations.  (Dkt. 26.)  Defendant opposed Plaintiff's Motion (Dkt. 27), and on May 22,

9

2015 also filed its first Motion for Summary Judgment.  (Dkt. 35.)  On September 1, 2015,

10

after Defendant's Motion for Summary Judgment was fully briefed, the Court granted

11

Plaintiff's Motion for Leave to File an Amended Complaint.  (Dkt. 48.)  On September 3,

12

2015, the Court denied Defendant's first Motion for Summary Judgment without prejudice in

13

light of its Order granting Plaintiff's Motion for Leave.  (Dkt. 50.)  Plaintiff filed his First

14

Amended Class Action Complaint on September 15, 2015 (Dkt. 51), to which Defendant

15

filed its Answer on September 29, 2015.  (Dkt. 52.)  On November 24, 2015, Plaintiff filed a

16

Motion for Entry of an Amended Scheduling Order so that he may proceed with class

17

discovery given that discovery was closed on April 22, 2015.  (Dkt. 53.)  That motion has

18

been fully briefed and is awaiting ruling by the Court.  On November 25, 2015, Defendant

19

filed its Second Motion for Summary Judgment that is at issue here.  (Dkt. 54.)

20

**IV.    LEGAL STANDARD**

21

"Summary judgment is an extraordinary remedy" that should only be granted when

22

"no genuine and disputed issues of material fact remain, and . . . the movant is clearly

23

entitled to prevail as a matter of law."  *Apple Valley Bldg. & Development Co. v. Bonanza*

24

*Air Lines, Inc.*, 423 F.2d 661, 662 (9th Cir. 1970); *Satterfield v. Simon & Schuster, Inc.*, 569

25

F.3d 946, 950 (9th Cir. 2009).  At the summary judgment stage the "evidence of the

26

nonmovant is 'to be believed, and all justifiable inferences are to be drawn in his favor.'"

27

*Carlson v. Nevada Eye Care Professionals*, No. 13-cv-00364, 2013 WL 2319143, at *3 (D.

28

Nev. May 28, 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

The movant initially bears the heavy burden of establishing the "absence of a genuine issue of material fact." *Bates v. Dollar Loan Center, LLC*, No. 13-cv-1731, 2014 WL 60472, at *1 (D. Nev. Jan. 7, 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The nonmoving party then has to set forth facts demonstrating that there is a genuine issue of fact for trial. *Bates*, 2014 WL 60472, at *1. It is sufficient for the nonmoving party to simply show that "the claimed factual dispute requires a jury or judge to resolve the parties' differing versions of the truth at trial." *Carlson*, 2013 WL 2319143, at *3.

In general, "[t]rial courts should act with caution in granting summary judgment and may deny summary judgment where there is reason to believe that the better course would be to proceed to trial." *Vote v. U.S.*, 753 F. Supp. 866, 870 (D. Nev. 1990).

## V.  ARGUMENT

### A.  The text messages Defendant sent to Plaintiff's cell phone do not fall within the TCPA's "emergency" exception.

The TCPA exempts from its regulations calls "made for emergency purposes." 47 U.S.C. § 227 (b)(1)(A). The FCC has defined the term "emergency purposes" to mean "calls made necessary in any situation affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4). However, the text messages Defendant sent to Plaintiff's cell phone were nothing more than informational notification messages that a door was opened and could in no way be considered "necessary" to the "health and safety" of the intended recipient. In addition, the FCC's rulings have clearly established that the emergency purposes exception was not meant to apply to such purely informational text messages.

#### 1.  *The text messages received by Plaintiff were not necessary or related to any emergency situation involving health and safety.*

Despite Defendant's efforts to label the text messages received by Plaintiff as "alerts," "warn[ings]," and "home-security system alert[s]," (Def. Mot. at 22:17, 22:19, 24:4, 24:22), the reality is that the messages at issue were intended to do nothing more than notify Defendant's customer that a kitchen door was opened or that the front door was opened. (Def. Ex. 5, Dkt. 54-3, at 7–12; Ex. D at 133:22–134:7.) The content of the message itself –

simply that a door was open – certainly did not indicate that the message was sent as a result of an emergency situation relating to the "health" or "safety" of the recipient.  Nor were the messages in any way linked to an emergency situation such as an alarm being triggered because someone had broken into the house.  (Ex. H at 94:13–95:21.)  In fact, the text message notifications at issue would have been sent regardless of whether the system was armed or unarmed, and regardless of whether the homeowner himself was still inside the house.  (*Id.* at 67:6–19.)  Indeed, the fact that there were over 2,000 of these "door open" notifications sent to the same number in just a two-month period – sometimes over 40 messages in a single day – demonstrates that the notifications were not truly "emergencies" in any reasonable sense of the word.  These notifications were simply not "necessary" for the recipient's health or safety, as required by the specific wording of the statute to be exempt.

Moreover, Defendant's home monitoring system was designed to send out automatic text message notifications whenever sensors installed in the house detected any number of events.  The type of event that would result in a sensor triggering a text message notification was determined by the customer and did not have to have any relationship with his/her "health" or "safety" being threatened, including choosing to receive notifications about a change in temperature inside the house or someone turning on the lights.  (*Id.* at 65:3–13; 66:7–22, 67:20–25.)  The fact that it was entirely discretionary whether a customer would receive these notifications, that a customer could choose to receive notifications about completely harmless events, and that hundreds or thousands of these alerts could be triggered in a short period of time, support the conclusion that these text message notifications sent by Defendant's system were for discretionary informational purposes, rather than part of the emergency monitoring service that Defendant also provided.

Particularly fatal to Defendant's argument that these text messages were "necessary" in a situation involving the "health" or "safety" of its customer is the fact that Defendant's home monitoring system had a completely *separate* system in place for contacting the police or fire department, as well as the homeowner themselves, in the event that it detected an *actual* emergency.  (*Id.* at 95:7–21.)  Thus, when the system detects an emergency situation

and contacts the proper authorities it will not even necessarily send out a text message notification such as the ones received by Plaintiff.   (Ex. H at 94:8–18, 94:22–95:4.) Defendant's system was created in such a way that any emergency alerts actually relating to the health and safety of the customer were routed to the proper authorities, while customers could choose to utilize the same sensors to receive automated notifications *independent* of an emergency event occurring.   There is a fundamental difference between an emergency alert feature that utilizes sensors to monitor for emergency situations and to call the authorities when appropriate, and a voluntary convenience feature that utilizes the same sensors to keep the customer informed about what is happening in his/her house.   The former may be an "emergency," but the latter, while perhaps helpful or informative, is most surely not."[10]

>    2.    *The TCPA's emergency exception was not meant to apply to purely informational notifications such as the ones received by Plaintiff.*

The text message notifications at issue here involve situations quite distinct from those that the FCC has found could "pose significant risks to public health and safety."[11] Unlike notifications involving "service outages" and "interruptions in the supply of water, gas or electricity" that could lead, for example, to individuals being unable to heat their homes or to the disruption of critical life-sustaining medical equipment, a front door or kitchen door being opened – thousands of times over a two-month period – can hardly be considered a situation that poses the same type of "risk to public health and safety," and is certainly not a situation where a notification is "necessary."   (Ex. J at ¶ 51.)   This is especially the case here because, as discussed above, the door being opened is not in any way related to whether there is an actual emergency situation that results in Defendant's system

---

[10] At the very least, there is a factual dispute as to whether these "door open" notifications should be considered "emergency" alerts, evidenced by the fact that Defendant's own expert witness testified that the text message notifications were sent independently of any emergency alert being triggered, regardless of whether the alarm system was armed or disarmed, and even if there was no emergency situation.  (Ex. H at 94:8–95:21, 67:6–19.)  Thus, to the extent the Court does not reject Defendant's emergency exception argument as a matter of law, summary judgment should nonetheless be denied so that the finder of fact can assess whether these "door open" notifications were truly "necessary" for the intended recipient's "health and safety."

[11] *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, *FCC Report and Order*, *CC Dkt. No. 92-90*, at ¶ 51 (Oct. 16, 1992) (hereinafter "FCC 1992 Order" and attached hereto as Exhibit J.)

Pl's Response in Opposition to                                    Case No. 14-CV-01136-RFB-PAL
Def's 2nd Mot. for Summary Judgment

contacting emergency services.

In addition, in its more recent February 15, 2012 Report and Order, the FCC gave an example of "calls initiated for emergency purposes" and pointed to "emergency messages permitted by the WARN Act and/or the Commercial Mobile Alert System (CMAS)."[12]  The types of messages sent by the CMAS pursuant to the WARN Act "cover only critical emergency situations" involving "three types of alerts: 1. Alerts issued by the President[,] 2. Alerts involving imminent threats to safety or life[, and] 3. Amber Alerts."  *See* https://www.fcc.gov/guides/wireless-emergency-alerts-wea.    Furthermore,  all  of  the messages sent pursuant to the WARN Act are sent free of charge to the recipients.  (*Id.*)  Unlike messages sent under the WARN Act that the FCC has specifically found to be exempt under the emergency exception, the text messages sent by Defendant were (1) not free of charge to Plaintiff (Ex. D at 117:12–16), and (2) did not involve imminent threats to safety or life, or anything resembling an Amber Alert or an alert issued by the President.

Finally, in the same FCC 2012 Order, the FCC also determined that automated calls involving notifications about school closings were not "calls initiated for emergency purposes."  (Ex. K at ¶ 3.)  The FCC stated that "purely informational messages," even ones as important as "school closings," were still subject to TCPA regulation and the FCC did not exempt such calls from regulation under the emergency purposes exception.  (*Id.*)  Given that a school closing can directly affect the health and safety of children, the FCC's refusal to exempt such calls from TCPA regulation is a clear sign that informational text messages involving a kitchen door being opened fail to meet the emergency exception requirements.

###### 3.    *The TCPA was not created solely to prevent automated telemarketing messages*.

Defendant argues that because the "TCPA was enacted to prevent abusive telemarketing practices," and because "the text alerts that Mr. Spencer received were not the result of a mass telemarketing campaign," the text messages at issue here "were not intended

---

[12] *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, FCC Report and Order*, CG Dkt. No. 02-278, at ¶ 17 (Feb. 15, 2012) (hereinafter "FCC 2012 Order" and attached hereto as Exhibit K).

1    to be regulated by the TCPA[.]"  (Def. Mot. at 24:20–25.)  However, contrary to Defendant's

2    characterization of the TCPA as strictly a "telemarketing" statute, the language of the TCPA,

3    as well as the FCC's rulings, make clear that even "popular[]" automated messages that are

4    purely informational are <u>not</u> exempt from regulation under the TCPA.  (*Id.* at 25:4–10.)

5         The TCPA prohibits certain automated phone calls placed to residential phone lines

6    and another, broader set of automated calls placed to cellular telephone lines.  *See* 47 U.S.C.

7    § 227(b)(1)(A)(iii) and 47 U.S.C. § 227(b)(1)(B).  Under the regulations for automated calls

8    to residential lines the TCPA prohibits calls "using an artificial or prerecorded voice."  47

9    U.S.C. § 227(b)(1)(B).  The TCPA exempts such calls to residential numbers from regulation

10   if they are made for emergency purposes <u>or</u> are otherwise exempt by the FCC under Section

11   227(b)(2)(B).  *See id.*  Section 227(b)(2)(B)(i) allows the FCC to exempt calls "not made for

12   a  commercial  purpose"—*i.e.*  informational  phone  calls.   By  contrast,  Section

13   227(b)(1)(A)(iii), under which Plaintiff brought suit, prohibits *any* telephone call made using

14   an  ATDS.    Unlike  the  TCPA  prohibition  on  calls  to  residential  lines,  Section

15   227(b)(1)(A)(iii) does not have a clause allowing the FCC to create any exemption from

16   regulation.   All calls, regardless of whether they are for commercial or informational

17   purposes, are prohibited under 227(b)(1)(A)(iii) if they are made using an ATDS and without

18   the recipient's consent.

19        By allowing the FCC to exempt informational calls made to residential lines, and not

20   inserting a similar clause within the prohibition on calls made to cellular telephones,

21   Congress implicitly established that informational calls placed to cellular telephones are

22   subject to TCPA regulation.  If Congress had intended – as Defendant seems to suggest – to

23   limit liability for automated calls placed to cell phones solely to telemarketing calls, then it

24   would have inserted a similar exemption for calls not made for commercial purposes.

25   However, Congress chose to prohibit *all* automated telephone calls, whether informational or

26   commercial, from being sent to cellular telephones—perhaps because cellular telephone calls

27   can result in the recipient incurring a charge per call regardless of the content or purpose of

28   the call.  *See* 47 U.S.C. § 227 (b)(1)(A)(iii) (prohibiting phone calls made "to any number

assigned to a . . . cellular telephone service").

Congress's intent to prohibit both commercial and purely informational calls to cellular telephones has recently been reaffirmed by the FCC, which has stated that even "valu[able]" and "popular[]" informational calls (Def. Mot. at 25:4–10), such as school closures, are still subject to TCPA regulations and can only be placed if the school has obtained prior express consent:

> None of our actions change requirements for prerecorded messages that are non-telemarketing, informational calls, such as calls by or on behalf of tax-exempt non-profit organizations . . . and calls for other *noncommercial* purposes, including those that deliver *purely informational messages* such as school closing.  Such calls continue to require some form of prior express consent under the TCPA and the Commission's rules, if placed to wireless numbers[.]

(Ex. K at ¶ 3) (emphasis added); (*see also* Ex. K at ¶ 28.)  If Congress and the FCC had only intended for the TCPA prohibition on automated cell phone calls to apply strictly to telemarketing messages, then surely automated informational messages placed by schools would be exempt from TCPA regulation.   On the contrary, the TCPA regulates both telemarketing and purely informational calls to cellular telephones, regardless of the purpose of such calls, including the ones placed by Defendant here.  *See Sherman v. Yahoo! Inc.*, 997 F. Supp. 2d 1129, 1134–35 (S.D. Cal. 2014) (holding that a single text message informing the recipient that a "friend" had sent them a message was actionable under the TCPA and rejecting the defendant's argument that a "notification message is not the type of invasion of privacy Congress intended to prevent in passing the TCPA"); *Lamont v. Furniture N., LLC*, No. 14-cv-036, 2014 WL 1453750, at \*2, \*3 (D.N.H. Apr. 15, 2014) (finding that purely informational automated calls to a cell phone regarding when a piece of furniture would be delivered were actionable under the TCPA and required "prior express consent").

As discussed above, Defendant can hardly claim that the text messages that Plaintiff received here were "necessary" in a situation involving the "health" or "safety" of its customer when it sent over 2,000 messages over the course of just two months.  (Ex. E at 1–2.)   Nor can Defendant lean on the supposed "broadness" of the emergency purposes exception given the fact that the FCC has refused to even exempt school closing notifications

1   from TCPA regulation and has only narrowly acknowledged that free automated alerts from

2   the President or free alerts involving child abductions or *imminent* threats to life or safety are

3   considered emergency notifications.  Because the text messages at issue here related solely to

4   whether a kitchen or front door was opened – nothing more, and nothing less – they are

5   subject to the TCPA and are not exempt under the emergency purposes exception.

6        B.    <u>Defendant "made" the text message calls at issue here.</u>

7        Given the undisputable cell phone call records showing thousands of text messages

8   made by Defendant to Plaintiff's cell phone (Ex. E), as well as the fact that the messages

9   specifically identified "AT&T Digital Life" as the sender (Ex. A), it is remarkable that

10  Defendant now attempts to dispute its liability by claiming that it did not "make" the calls at

11  issue.  Not only is Defendant's argument contradicted by these undisputed facts, it is also

12  contrary to well-established case law that the entity that is the actual "sender of the text" can

13  be held directly liable under the TCPA.  *Thomas v. Taco Bell Corp.*, 879 F.Supp.2d 1079,

14  1084 (C.D. Cal. 2012) *aff'd*, 582 F.App'x 678 (9th Cir. 2014) (finding that direct liability can

15  be imposed on the "actual sender of the text"); *Kristensen v. Credit Payment Servs. Inc.*, No.

16  12-cv-00528, 2015 WL 4477425, at *2 (D. Nev. July 20, 2015) (ruling "[d]efendants can be

17  liable under the TCPA . . . when they actually send a text"); *Roylance v. ALG Real Estate*

18  *Servs., Inc.*, No. 14-CV-02445, 2015 WL 1522244, at *5 (N.D. Cal. Mar. 16, 2015) *report*

19  *and recommendation adopted as modified*, No. 14-CV-02445, 2015 WL 1544229 (N.D. Cal.

20  Apr. 3, 2015) (finding that allegations that a defendant "called [plaintiff] twice" are sufficient

21  to establish direct liability for those calls).

22       Plaintiff's cell phone calling records, as well as the actual content of the messages,

23  establish that "AT&T repeatedly and regularly *sent* non-emergency, automated calls . . . to

24  the Plaintiff's cellular telephone[.]"  (Amend. Compl. at ¶ 39) (emphasis added).  In fact, a

25  Declaration by the "Director of Digital Life Operations at AT&T" filed in support of

26  Defendant's Motion for Summary Judgment actually states that "[e]ach Digital Life text alert

27  *sent* by AT&T's system . . ." and that "AT&T began *sending* Digital Life text alerts to

28  [Plaintiff's phone number] . . . ."  (Dkt. 54-2, Ex. 1, at ¶¶ 2, 11, 15) (emphasis added).

Defendant's own Motion for Summary Judgment even states that "on March 14, 2014, AT&T began *sending* customer-defined text alerts to the phone number . . ." (Def. Mot. at 8:1–2) (emphasis added).  Thus, Defendant can, and should, be held directly liable as the entity that actually dialed Plaintiff's cell phone and sent the messages.

Furthermore, the 2015 FCC Ruling, citing to the DISH Network Declaratory Ruling, reiterated that "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call" and that "'initiate' suggests some 'direct connection between a person or entity and the making of a call.'"  (Ex. B at ¶¶ 27, 29) (citing DISH Network Declaratory Ruling, 28 FCC Rcd. at 6583, ¶ 26).  As explained further in Section V(C), below, Defendant's customers only "consent" or "sign up" to receive the automated text messages; it is Defendant's system that actually carries out automatically all the steps necessary to "physically place" each of the text message calls at issue.  (*See supra* at 20:1–21:11, 21:26–22:4, 25:17–20.)  In fact, as Defendant admitted in its original Motion for Summary Judgment:

> If an event occurs in the home that matches the customer's criteria for sending a text [message], the controller device in the home transmits information to the server in AT&T's Data Center . . . along with a command to generate and send a text [message]. . . . Based on the information sent . . . proprietary software developed by AT&T, called the 'Digital Life Core Platform,' *instantly* generates the text [message].

(Dkt. 35 at 7:5–11) (emphasis added); (*see also* Dkt. 54-2, Ex. 2, at ¶ 13).[13]  Given that each text message was generated and sent by Defendant's system using Defendant's own shortcode, the evidence produced in discovery and Defendant's own admissions establish that the only "direct" connection was between Defendant's system and Plaintiff's cell phone.

Finally, Defendant's citation to the 2015 FCC Ruling's discussion of "automated text messaging applications" is inapplicable to the situation here.  The 2015 FCC ruling discussed two different types of text messaging applications in the context of when an entity might not be considered the "maker of the call."  The first application discussed by the FCC simply

---

[13] While Defendant omits this paragraph entirely in its renewed Motion for Summary Judgment opening brief, the Declaration of Homi Torab that Defendant filed in support of its renewed motion still contains the same exact language that Defendant cited to in its original brief.  (*Compare* Dkt. 35-2, Ex. 2, at ¶ 11 and Dkt. 54-2, Ex. 2, at ¶ 13.)

sent a text message in response to any voicemail left on the application user's telephone. (Ex. B at ¶¶ 31–32.)   The FCC found that because the application did not control "the recipients, timing, or content" of the messages, nor had "pre-setting options in the app, that physically cause auto-replies to be sent" the application was not "the maker of the call."  (*Id.* at ¶¶ 32–33.)  Defendant's system, however, *does* control the timing as well as the content of the automated text message alerts.  As previously discussed, the content of the text message alerts sent by Defendant's system are created solely by Defendant's system based on pre-configured templates, and the user of the system has no control whatsoever over the content of the messages sent.  (Ex. H at 69:2–70:1, 72:2–73:4.)  As Plaintiff's expert Randall Snyder testified, "a human did not create the message, draft it, type it, send it, or [was] in any way. . . involved with the creation, generation, or sending of the text message[.]"  (Ex. I at 98:23– 99:4.)  Further, the timing of the text messages is entirely dependent on the system's pre-configured settings of when it determines, based on information received from automated sensors, that a certain "threshold" has been passed.  (Ex. H at 64:1–21.)  Finally, when it comes to the types of notifications that Plaintiff received – that a door has opened – the user of Defendant's system has no control over that "threshold" or when a message will be sent after that threshold is passed.  As stated by Defendant's expert witness, Mr. Torab, "[i]f it is a small crack" "the sensor may not pick that up," "[i]t has to pass a threshold to send it out." (*Id.* at 64:14–21.)  It is ultimately Defendant's system that determines that threshold.[14]

The second set of applications discussed by the 2015 FCC Ruling – and the application at issue in *McKenna v. WhisperText*, No. 14-cv-00424, 2015 WL 5264750 (N.D. Cal. Sept. 9, 2015) – all involved invitational text messages that were automatically sent to contacts stored on the application user's cellular telephone.  Ex. B at ¶¶ 34, 36; *McKenna*, 2015 WL 5264750, at *1.  Any discussion related to these applications is even further removed from the text messages at issue here because, unlike Defendant's system, the text message invitations sent by those applications were found to have been a result of the user

---

[14] While Defendant's system does allow users to set a threshold for when a certain temperature will cause a temperature sensor to trigger (Ex. H at 65:8–13), the text messages at issue here involved a purely on/off event where Defendant's system independently determined whether a door was "open."

choosing each contact to whom the text message invitation would be sent and the application then sending a single invitational text message in direct response to that input.  (Ex. B at ¶¶ 36–37); *McKenna*, 2015 WL 5264750, at *2 ("the Whisper App [could] send SMS invitations only at the user's affirmative direction to recipients selected by the user.") Defendant's system, on the other hand, does not send *any* text messages as a direct result of a user consenting to receive certain text message notifications.  (Ex. H at 65:22–66:6.)  Rather, Defendant's system automatically sends a potentially infinite number of text messages whenever the *system* determines that a text message should be sent, rather than just a single "invitational message" that is directly triggered and controlled by the user.  (*Id.* at 66:7–12, 67:22–68:6.)  The key component to the FCC's ruling regarding the TextMe application and the *McKenna* court's ruling regarding the WhisperText application – that the messages were actually sent due to the user "affirmative[ly]" "*choos*[*ing*] to *send* the . . . text message" – is missing here.  (Ex. B at ¶ 36) (emphasis added); *McKenna¸* 2015 WL 5264750, at *5.

      **C.**    <u>Defendant's system sent Plaintiff text messages without any human intervention</u>.

As explained more fully in Section V(D), below, and in the Declaration in support of Plaintiff's request for discovery pursuant to Fed. R. Civ. P. 56(d) (Ex. C), because the 2015 FCC Ruling fundamentally redefined the definition of ATDS under the TCPA, and introduced new criteria for determining whether a dialing system is an ATDS that were not at issue when discovery closed on April 22, 2015 (Dkt. 21), Plaintiff – without further discovery – cannot present facts necessary to fully address Defendant's specific arguments that its system was not an ATDS due to the lack of random or sequential number generation capabilities.  (Def. Mot. at 11:1–3.)  However, to the extent Defendant argues that "AT&T's system is not an ATDS because it requires human intervention," the evidence adduced in this case thus far directly rebuts such a claim.  (*Id.* at 15:14–15.)  Not only is there no solid factual or legal basis for Defendant's argument that the text messages received by Plaintiff did in fact require human intervention, but Defendant's interpretation of "human intervention" would also effectively nullify the TCPA.

Pl's Response in Opposition to
Def's 2nd Mot. for Summary Judgment
    19    
Case No. 14-CV-01136-RFB-PAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.   *Defendant's Digital Life home monitoring system dialed Plaintiff's cellular telephone number without any human intervention.*

Re-hashing its "maker of the call" argument, Defendant attempts to point to every single step where a human interacts with its Digital Life home monitoring system *prior* to a message being sent as evidence of human intervention. (Def. Mot. at 18:12–17, 19:3–20.) However, Defendant cannot dispute the facts produced in this case that establish how its system ultimately *dialed* plaintiff's cell phone number and *sent* the text messages at issue automatically and without any human intervention. As Defendant's own expert witness admitted, once a customer consents to receive certain text message notifications when a chosen event occurs, the customer will automatically receive a text message notification every time that event occurs. (Ex. H at 63:6–10, 65:3–7, 73:19–23.) Every single text message notification sent by Defendant's system is automatically created using a pre-configured message template that does not involve any human individual actually reviewing or drafting the message. (*Id.* at 69:15–70:1.) Once the message is automatically created, Defendant's system automatically dials the telephone number from the list of numbers stored in the database and sends the text message—all without human intervention. (*Id.* at 69:2–14; 69:22–70:1.) As explained in the Declaration of its "Director of Technology" that Defendant attaches to its Motion, these text messages were not sent as a result of any human actions, but rather because "the controller device in the home transmit[ed] information to the server in AT&T's Data Center . . . along with a command to generate and send a text [message]" and software called "the 'Digital Life Core Platform,' *instantly* generate[d] the text [message]." (Dkt. 54-2, Ex. 2, at ¶ 13) (emphasis added). Thus, as made clear by Defendant's own admissions, the Digital Life system responsible for sending the text messages received by Plaintiff automatically generates and dials telephone numbers without human intervention.

Based on the above facts, as well as other evidence produced by Defendant detailing how its Digital Life system functions, Plaintiff's expert witness, Randall Snyder, who has over 30 years of experience working in the telecommunications industry, also opined that Defendant's system sent text message notifications without human intervention. (*See*

Declaration of Randall Snyder, attached hereto as <u>Exhibit L</u>, at ¶¶ 44–51; Ex. I at 98:23–99:4.)  According to Mr. Snyder:

> [W]hen a certain event occurs the system detects that event . . . then decides what the event is, based on the sensor, chooses automatically . . . which messaging event to send . . . door open, window open, etc., automatically takes from within the system the current date and time, pulls . . . the cellular telephone number . . . creates the text message . . . automatically puts those fields together . . . and then automatically sends that message out[.]

(Ex. I at 93:7–94:3.)  Thus, when Defendant's system sends a text message notification, "a human did not create the message, draft it, type it, send it, or in any way be involved with the creation, generation, or sending of the text message[.]"  *(Id.* at 98:23–99:4.)  A system that automatically dials and sends limitless text messages based on a series of automated processes is the very definition of operating "without human intervention."

> ## 2.  *The fact that Defendant's system had to be programmed to send the text messages at issue does not constitute "human intervention."*

Ignoring the automated processes in its system that are actually responsible for creating and sending the text messages, Defendant's main argument is that the text messages were sent with human intervention because a user has to initially sign up to receive them. (Def. Mot. at 19:3–12.)  However, not only does Defendant's argument conflate the issue of consent with that of human intervention in actually dialing the number, it also effectively nullifies the TCPA and runs contrary to the cases that Defendant cites to for support.

As Plaintiff's expert witness testified, the process of Defendant's customers signing up to receive the text message notifications is equivalent to that of an individual consenting to receive automatically generated advertisements.  (Ex. I at 21:15–24, 94:25–95:7.)  The initial step of *signing up* to receive a certain type of automated message, a particular advertisement, or telemarketing calls, is fundamentally distinct and separate from the subsequent calls that are themselves automatically dialed without human intervention.  (*Id.* at 98:23–99:13.)  As Defendant's own expert witness confirmed, when one of Defendant's customers signs up to receive the automated notifications, the act of signing up does not in and of itself generate a text message notification.  (Ex. H at 65:22–66:6.)  Rather, when an

1  event entirely independent of the process of signing up for the text message occurs, a text

2  message notification is automatically generated, and the customer's cell phone is dialed

3  without any human intervention—weeks, months or potentially even years after such consent

4  was originally provided.  (Ex. H at 66:7–12.)

5         Furthermore, *every* ATDS requires the same kind of initial setup as Defendant's

6  system here.  *See, e.g., Johnson v. Yahoo!, Inc.*, No. 14-cv-2028, 2014 WL 7005102, at *5

7  (N.D. Ill. Dec. 11, 2014) ("[e]very ATDS requires some initial act of human agency – be it

8  turning on the machine or pressing 'Go.'  It does not follow that every subsequent call the

9  machine dials – or message it sends – is a product of that human intervention.")  In fact, even

10 entirely automated systems, that Defendant holds up as the "gold standard" for an ATDS

11 because they dial randomly or sequentially generated numbers, require a human to program

12 the system and set certain preferences for how many phone calls to make, at what interval to

13 dial numbers, and when to connect or disconnect a call.  (*See* Def. Mot. at 11:13–17)

14 (describing how random number generators are programmed to create "random sequences of

15 10 digits" or sequential 10 digit telephone numbers).  If the act of programming a dialing

16 system to automatically place certain calls upon a certain event occurring is considered

17 "human intervention," then the TCPA would effectively be rendered meaningless because

18 *every* ATDS requires a similar act of initially programming the system as Defendant's

19 system here.  Similarly, if the act of an individual signing up, or consenting, to receive

20 subsequent text messages was itself sufficient "human intervention" to find that an ATDS

21 was not used, then the issue of "consent" and the issue of whether an ATDS was used would

22 cease to be separate considerations under the TCPA—a result that would run afoul of the

23 plain language of statute, the FCC's interpretations, and court rulings regarding the TCPA.

24        Defendant's argument also fails to draw the distinction between an individual being

25 directly involved and responsible for the sending of each specific text message (a situation

26 which would avoid TCPA liability) and, as in this case, an individual being involved in

27 setting up a system that then subsequently sends an infinite number of text messages

28 automatically and without any further human involvement.  (Ex. H at 64:22–65:7, 73:19–23.)

Human intervention is "essentially having a human involved in the actual direct sending . . . creation and sending of the message to a specific recipient." (Ex. I at 101:2–10.)  The failure to draw this distinction becomes particularly clear when reviewing the three cases cited to in support by Defendant: *Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189 (W.D. Wash. 2014), *McKenna v. WhisperText*, and *Glauser v. GroupMe, Inc.*, No. 11-cv-2584, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015).  In all three cases the court found that there was no ATDS used because each *individual* text message was sent as a *direct* result of human intervention.

For example, in *Gragg*, the court focused on the fact that *each* message sent out to the defendant's customers required multiple layers of direct human involvement from different individuals: (1) a customer providing information to a dispatcher, (2) the dispatcher pressing "enter" in order to transmit the information to the TaxiMagic program, and (3) a driver pressing "accept" on his or her data terminal.  995 F. Supp. 2d at 1193.  By contrast, Defendant's system *automatically* created the text messages sent to Plaintiff's cellular telephone, and sent thousands of those messages without requiring any individual to press "enter" or "accept" in order for each transmission to occur.  After Defendant's customer provided the initial consent there was no human involvement of any kind at any time.

In *McKenna*, the court focused on the causal relationship between the "user's affirmative direction" and the sending of each text message, stating that "where an application sends SMS invitations only at the user's affirmative direction, the action taken is with human intervention."  2015 WL 5264750 at *4.  Unlike in *McKenna*, Defendant's system in this case does not send any text message notifications as a result of the actual act of signing up and programming the notifications.  Rather, Defendant's system automatically sends multiple text messages in the future independently of the initial act of programming and without any "affirmative direction" by the user.  (Ex. H at 66:7–12.)  In short, the only "affirmative direction" from Defendant's customers is their consent to receive text message notifications; it is solely Defendant's system that "affirmatively directs" when to send a text message, to which number it should be sent, and what the message should say.

Finally, *Glauser*, like *McKenna*, involved automated "welcome" text messages sent

by a group messaging application. *Glauser*, 2015 WL 475111, at *1. The text messages at issue in *Glauser* were sent when a human user created a "group" which resulted in the messaging application sending initial welcome text messages to the plaintiff and other "group" members. *Id.* In finding that the messages were sent with human intervention, the court focused on the fact that "the Welcome Texts were sent to plaintiff as a *direct response* to the intervention of Mike L., the 'Poker' group creator." *Id.* at *6 (emphasis added). In this case, the act of Defendant's customer opting in to the text notifications did not, and could not, *directly* "trigger" the text message notifications that Plaintiff received. Rather than the notifications being sent as a "direct response" to the *human* intervention of Defendant's customer opting in to receive the message, the pre-programmed notifications were sent as a "direct response" to the *non*-human intervention of an electrical sensor being triggered at some future time after the customer provided any initial consent. (Ex. H at 66:3–12.)

In contrast to the three cases cited to by Defendant are a long line of TCPA cases involving multiple automated text messages sent to an individual's cell phone where courts have denied motions to dismiss and even approved class certification. *See, e.g.*, *Charkchyan v. EZ Capital, Inc.*, No. 14-cv-03564, 2015 WL 3660315, at *1 (C.D. Cal. June 11, 2015); *Robbins v. Coca-Cola-Co.*, No. 13-cv-132, 2013 WL 2252646, at *1 (S.D. Cal. May 22, 2013); *Pimental v. Google Inc.*, No. 11-cv-02585, 2012 WL 691784, at *1 (N.D. Cal. Mar. 2, 2012); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 562 (W.D. Wash. 2012); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1167 (N.D. Cal. 2010). If, as Defendant argues, programming a system to send out multiple text messages to the same cell phone number is considered "human intervention," then the types of spam text messaging campaigns that were at issue in the above cases would not be subject to TCPA liability and companies would be free to send out as many text message advertisements as they wished, so long as they simply had a human set up the campaign and transfer the phone numbers into the system. Defendant is effectively looking to nullify the TCPA, something that this Court, like other courts, should reject.

1

2

3        3.      *The text message notifications received by Plaintiff were sent as a*
                *result of an electronic sensor sending a signal to Defendant's system.*

4        In a final attempt to escape liability, Defendant claims that there was human

5   intervention because "each of the text alerts that Mr. Spencer received was caused by

6   someone opening the front door or kitchen door in the Digital Life customer's home." (Def.

7   Mot. at 19:13–16.)  Defendant, however, is mischaracterizing the process by which its own

8   system operates.   As Defendant's expert witness affirmed, "what actually results in the

9   notification is when a sensor senses the event happening, a garage door opening, window

10  breaking, or the temperature over a certain amount[.]"   (Ex. H at 66:7–12.)   Further

11  evidencing the fact that it is ultimately the sensor, and not a human action, that "causes" the

12  text messages to be sent is the fact that Defendant's system will send notifications regardless

13  of what caused the sensor to trigger.   (*Id.* at 64:5–8, 66:13–22.)   As long as a certain

14  "threshold" is passed, the sensor will trigger and cause a text message notification to be sent.

15  (*Id.* at 64:14–65:5.)  Thus, the fact that a sensor will cause a text message notification to be

16  sent regardless of whether it was triggered by an "intentional breakage," a "tornado," or an

17  "accident[]," means that it is ultimately the sensor sensing the event that determines whether

18  a text message is sent, rather than the event itself occurring.  (*Id.* at 64:5–65:5, 66:13–22.)

19        A person opening the door – and as a result (i) triggering a sensor, (ii) which in turn

20  sends a signal to the Digital Life system, (iii) that then communicates with a "Back-End

21  Application," (iv) which automatically creates the text message using a pre-determined

22  template, (v) then sends it to Defendant's messaging system, (vi) which then actually *dials*

23  the telephone number and sends the text message (*Id.* at 69:2–14) – is many times removed

24  from having any human involvement in the actual sending of the text message.  Carrying out

25  Defendant's reasoning to its logical but absurd conclusion, there is nothing in the causal

26  chain of human involvement in a text message being sent that would ultimately not be

27  considered "human intervention."   By way of example, sports-related text message

28  notifications are increasingly popular.  A person can sign up for automatic text notifications

    with the updated score for his/her favorite baseball or football team.  If an individual signed

    up to receive a text message every time his/her team scored a run or a touchdown, it would

be incredulous to argue that such messages were sent with "human intervention" even though, as in the instant case, the individual had to sign up for the messages and a player had to score a run or catch a pass for a touchdown.  The TCPA, if it is to have any application at all, should not, and cannot, be interpreted in the manner advocated by Defendant.

Ultimately, it is the sensor's recording of a particular event that causes the text message to be sent out.  Whatever led to the event occurring is, by itself, incapable of triggering a text message notification.  As Plaintiff's expert, Mr. Snyder testified:

> [T]he event is the door opening.  The event is not what a human does.  So the opening of the door is where the sensor is, and the sensor at the opening of the door sends an automated electrical signal that then causes the automatic text messaging system to send a text message with the right content based on what that sensor detected.

(Ex. I at 87:20–88:1.)  This is why this case is fundamentally distinct from the cases relied on by Defendant, where human intervention was *directly* responsible for the text message being sent.  *See, e.g., Gragg*, 995 F. Supp. 2d at 1193; *Glauser*, 2015 WL 475111, at *6.  Here, any human intervention was not directly responsible for the sensor detecting that a triggering event had occurred or Defendant's system registering the sensor's input and choosing to create a text message and automatically sending it to a cellular telephone.

There is no dispute that Defendant's Digital Life system sent thousands of unauthorized text messages to Plaintiff's cellular telephone.  Nor is there any dispute that neither Plaintiff nor Defendant's customer was in any way involved in the creation, drafting, or actual sending of any, much less each, such text message.  As much as Defendant reiterates how someone had to program the system and opt-in to receive these messages, none of that changes the fact that every ATDS requires someone to initially program it, and that the actual act of "opting in" or "consenting" to receive these messages does not by itself create a text message notification.  To rule otherwise would effectively abolish the TCPA.

D.      This Court should allow Plaintiff to conduct limited discovery pursuant to Rule 56(d) regarding the potential functionalities of Defendant's system.

Under Fed. R. Civ. P. 56(d) "if a party opposing summary judgment demonstrates a need for further discovery in order to obtain facts essential to justify the party's opposition, the trial court may deny the motion for summary judgment or continue the hearing to allow

1  for such discovery." *Margolis v. Ryan*, 140 F.3d 850, 853 (9th Cir. 1998).   In this case,

2  Defendant's key argument as to why summary judgment should be granted is because its

3  system "does not meet the statutory definition of an ATDS because it does not have the

4  capacity to generate and call randomly or sequentially produced numbers[.]"  (Def. Mot. at

5  11:1–3.)  Plaintiff "cannot present facts essential to justify [his] opposition" to Defendant's

6  argument as to why its system is not an ATDS because the 2015 FCC Ruling fundamentally

7  changed the definition of ATDS after discovery in this case had closed.[15]

8         Specifically, the 2015 FCC Ruling clarified that "the capacity of an autodialer is not

9  limited to its current configuration but also includes its *potential functionalities*" and that

10 dialing equipment can be considered an "autodialer" even when it "lack[s] the necessary

11 software" to "store or produce numbers and dial those numbers at random, in sequential

12 order, or from a database of numbers."  (Ex. B at ¶ 16) (emphasis added).  The importance of

13 this ruling is made clear by the very cases that Defendant itself cites to that were decided

14 prior to the 2015 FCC Ruling.  For example, in *Gragg*, the court specifically stated that,

15 "[t]he Court declines to expand the definition of an ATDS to cover equipment that merely

16 has the *potential* to store or produce telephone numbers using a random or sequential number

17 generator[.]"  *Gragg*, 995 F.Supp.2d at 1196 (emphasis added).  Even more directly on point,

18 the *Glauser* court explicitly stated that if it "had adopted plaintiff's 'potential capacity' view"

19 – the same exact view that the FCC *has* now adopted – then "there would be no dispute that

20 defendant's equipment was indeed an 'autodialer,' and defendant's motion [for summary

21 judgment] would need to be denied."  2015 WL 475111, at *5.  Accordingly, while the

22 caselaw *prior* to the 2015 FCC Ruling was clear that dialing equipment that had the present

23 capacity to dial randomly or sequentially generated numbers was an ATDS, the 2015 FCC

24 Ruling shifted the focus to the equipment's *potential* capacity.  In fact, even Defendant

25 acknowledges this shift when it argues for the first time in its renewed motion that its

[15] As explained above in Section III, discovery in this case closed on April 22, 2015 (Dkt. 21), and Defendant filed its original Motion for Summary Judgment on May 22, 2015.  (Dkt. 35.)  The 2015 FCC Ruling was not released until July 10, 2015, well after discovery had closed and after Plaintiff had filed his Opposition brief on June 29, 2015.  (Dkt. 42.)

Pl's Response in Opposition to
Def's 2nd Mot. for Summary Judgment
27
Case No. 14-CV-01136-RFB-PAL

equipment "cannot reasonably be modified to have the requisite capacity" (Def. Mot. at 14:12–14), while in its original motion it actually cited to *Gragg* and rejected as "'absurd' the argument that mere 'potential' capacity to store or produce numbers using a random number generator is sufficient to establish an ATDS." (Dkt. 35 at 15 n.8.)

As explained in detail in the Declaration in support of Plaintiff's request for Rule 56(d) discovery (Ex. C), Plaintiff is seeking discovery regarding the "potential functionalities" of Defendant's system that, as the court in *Glauser* stated, could (and would) lead to denial of Defendant's motion for summary judgment on the issue of whether its equipment qualifies as an ATDS under the 2015 FCC Ruling. While Defendant will surely argue in its reply brief that Plaintiff should have obtained such evidence before discovery closed on April 22, 2014, Plaintiff had no reason to take any such discovery given the clear state of the law on the issue that defined an ATDS solely according to its *present* capacity. Nor is Plaintiff attempting to use this request for 56(d) discovery as a delay tactic since Plaintiff has already once fully briefed summary judgment and addressed on the merits Defendant's previous arguments that its system is not an ATDS. (*See* Dkt. 42 at 17–28.)

The fact of the matter is that Plaintiff did not pursue any discovery regarding the potential capacity of Defendant's system to dial randomly or sequentially generated numbers because, as Defendant points out, it was clear that it did not *presently operate* in such a manner. (Def. Mot. at 5:10–17; 14:14–21.) Instead, Plaintiff pursued discovery, and opposed Defendant's original motion for summary judgment, based solely on the FCC's rulings and supporting caselaw that an ATDS is defined by its ability to dial "numbers without human intervention." *See* Dkt. 42 at 17–28; *Harnish v. Frankly Co.*, No. 14-cv-02321, 2015 WL 1064442, at *2 (N.D. Cal. Mar. 11, 2015); *Glauser*, 2015 WL 475111, at *6. That is why the declaration of Plaintiff's expert witness "offers no contrary opinion that AT&T's system has such capacity" to dial randomly or sequentially generated numbers. (Def. Mot. at 14:18–20.) However, because Defendant now *does* introduce the argument that its system "cannot reasonably be modified to have the requisite capacity," – an argument made necessary by the new standard set forth in the 2015 FCC Ruling – Plaintiff has not

1   obtained the discovery needed to properly refute this assertion, nor has Defendant produced

2   any discovery in support of its new argument beyond a single paragraph in a declaration by

3   one of its witnesses.  (*See* Def. Mot. at 14:12–14; Dkt. 54-2, Ex. 2, at ¶ 17.)

4        In sum, while Plaintiff was previously limited to rebutting Defendant's motion for

5   summary judgment regarding the ATDS issue based solely on evidence that it operated

6   without human intervention, the 2015 FCC Ruling now allows Plaintiff to also directly rebut

7   Defendant's contentions that its system does not meet the statutory definition of an ATDS

8   based on its *potential* capacity to dial randomly or sequentially generated numbers—a

9   rebuttal now necessary based on Defendant's specific argument on this point.  However, the

10  only way to know what latent features exist within Defendant's system, and how it could

11  *potentially* function, is by obtaining discovery regarding the software and hardware

12  components operating within the system.  In short, while Plaintiff believes that the operation

13  of Defendant's system without human intervention is still sufficient to find that it is an ATDS

14  (*see* Dkt. 42 at 17–28), Plaintiff nonetheless requires discovery to rebut the functionality

15  arguments specifically raised by Defendant in its renewed motion for summary judgment.

16       The Ninth Circuit has explained that courts should grant requests for discovery under

17  Rule 56(d) where the requesting party "has [a] set forth in an affidavit the specific facts it

18  hopes to elicit from further discovery; b) that the facts sought exist; and c) that the sought-

19  after facts are essential to oppose summary judgment."  *Family Home & Fin. Ctr., Inc. v.*

20  *Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008).  The Declaration attached

21  as Exhibit C clearly defines the limited discovery regarding the functionalities of Defendant's

22  system that Plaintiff seeks.  In addition, there is no doubt that such facts exist, as Defendant's

23  expert witness has already attested about the "feasibility" of modifying its system to dial

24  randomly or sequentially generated numbers.  (Dkt. 54-2, Ex. 2, at ¶ 17.)  Finally, such facts

25  are "essential" for Plaintiff to oppose the specific ATDS arguments raised in Defendant's

26  renewed motion for summary judgment.  As the court in *Glauser* recognized, under the new

27  2015 FCC Ruling, such evidence could be dispositive as to whether Defendant's system is an

28  ATDS.  Accordingly, Plaintiff should be entitled to pursue limited discovery to obtain such

1  evidence in support of his opposition brief.[16]

2  **VI.      CONCLUSION**

3        For the reasons set forth above, Plaintiff respectfully requests that the Court defer

4  ruling on Defendant's Second Motion for Summary Judgment pending discovery pursuant to

5  Rule 56(d) and following supplemental briefing, or that the Court deny the Defendant's

6  Motion in its entirety.

7

8  Dated: January 7, 2016                         Respectfully submitted,

9                                                 MCGUIRE LAW, P.C.

10                                                 By: /s/ Evan M. Meyers
                                                       One of Plaintiff's Attorneys

11

12  Craig K. Perry, Esq.
    Nevada Bar # 003786
13  8010 W. Sahara Avenue, Suite 260
    Las Vegas, Nevada 89117
14  Tel: (702) 228-4777
    Fax: (702) 943-7520
15  cperry@craigperry.com

16  Evan M. Meyers (*pro hac vice*)
    McGUIRE LAW, P.C.
17  55 W. Wacker Drive, 9th Fl.
    Chicago, IL 60601
18  Tel: (312) 893-7002
    emeyers@mcgpc.com

19
    *Attorneys for Plaintiff Kirby Spencer*
20

21

22

23

24

25

26

27  _____
    [16] As explained in footnote 6, above, to the extent the Court denies Plaintiff's request for additional
    Rule 56(d) discovery, Plaintiff seeks the opportunity to file a short supplemental opposition brief
28  related solely to the ATDS issue and based only on discovery obtained to date.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2016, I electronically filed the forgoing *Plaintiff's Response in Opposition to Defendant's Second Motion for Summary Judgment* with the Clerk of the Court using the CM/ECF system.  Notice of this filing is sent to all counsel of record by operation of the Court' electronic filing system.  Parties may access this filing through the Court's system.


/s/ Evan M. Meyers